HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **ULTRATEC, INC. and CAPTEL, INC.,** | § § § | |
| Plaintiffs, | § § | Civil Action No.: 3:13-cv-00346-bbc |
| v. | § § | |
| **SORENSON COMMUNICATIONS, INC. and CAPTIONCALL, LLC,** | § § § | |
| Defendants. | § § § | |

**DEFENDANTS SORENSON COMMUNICATIONS, INC. AND CAPTIONCALL, LLC'S RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' BREACH OF CONTRACT COUNTERCLAIM AND EIGHTH, NINTH, AND TENTH AFFIRMATIVE DEFENSES**

**[FILED UNDER SEAL]**

# Redacted - Public Version

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................1

II.  SUMMARY JUDGMENT STANDARD ..............................................................4

III. DENIAL OF PARTIAL SUMMARY JUDGMENT ..............................................5

   A.   Summary Judgment Is Not Appropriate For Defendants' Defense of
Unclean Hands...........................................................................................................5

      1.   Plaintiffs Collaborated with Dr. Vanderheiden in Misleading the FCC
About Alternatives to Ultratec's Patents..........................................................6

      2.   Plaintiffs Made Representations to the FCC That Were Knowingly
False or Misleading............................................................................................8

      3.   The FCC Was Misled Despite Plaintiffs' Alleged "Correction" that It
Did Not Intend to License "All Providers."........................................................14

      4.   Defendants Suffered Prejudice as a Result of Plaintiffs' Wrongful
Conduct. ..........................................................................................................16

   B.   Plaintiffs Are Not Entitled to Summary Judgment on Defendants'
Defense of Estoppel. ...............................................................................................18

      1.   Plaintiffs' Actions Give Rise to Equitable Estoppel Under Federal
Common Law...................................................................................................18

      2.   Plaintiffs' Actions Give Rise to Equitable Estoppel Under Wisconsin
Law. ................................................................................................................23

      3.   Plaintiffs' Actions Give Rise to Judicial Estoppel.........................................24

      4.   Plaintiffs' Actions Give Rise to Promissory Estoppel. ..................................28

   C.   Plaintiffs' Actions Give Rise to Breach of a Contract With the FCC that
Defendants Are Entitled to Enforce. ........................................................................30

      1.   Ordinary Principles of Contract Construction Govern the Court's
Analysis of Whether a Contract Exists Between Ultratec and the FCC. .............32

      2.   As in the RAND Context, Here the "Realities of the Transaction"
Reflect the Existence of a Contract Between Ultratec and the FCC...................36

      3.   Because the FCC Intended the Order to Apply to TRS Providers
Other than Ultratec, It Secured a Promise from Ultratec that It Would
Openly License its Patents. ..............................................................................40

      4.   The Contract Between Ultratec and the FCC Is Also Similar to the
"Federal Procurement Contracts" that States Enter into with TRS
Providers for the Provision of Intrastate TRS....................................................41

i

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

5.    The Terms of that Contract Obligate Plaintiffs to Offer a License on "Reasonable Terms and Conditions" to "Legitimate TRS Providers." ................................43

6.    Defendants Are "Legitimate TRS Providers" and Are Clearly Intended Third-Party Beneficiaries to that Contract. .............................................................45

7.    Ultratec's Contract with the FCC Requires Ultratec First to Offer a Reasonable Patent License to Defendants Before Suing for Exclusionary Relief. ...........................................................................................................................48

D.    Summary Judgment Is Not Appropriate for Defendants' Defense of Patent Misuse. .........................................................................................................................51

IV. CONCLUSION ...................................................................................................................55

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992)
  (en banc)......................................................................................................18, 19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................................4, 5

*Apple, Inc. v. Motorola Mobility, Inc.*,
  2011 WL 7324582 (W.D. Wis. June 7, 2011) ..................................................28, 29

*Apple, Inc. v. Motorola Mobility, Inc.*,
  886 F. Supp. 2d 1061 (W.D. Wis. 2012) (Crabb, J.) ..................................36, 39, 46

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*,
  605 F. 3d 1305 (Fed. Cir. 2010)................................................................................18

*AT&T Corp. v. Beehive Tel. Co., Inc.*,
  2010 WL 376668 (D. Utah Jan. 26, 2010)..........................................................25, 27, 28

*Beer Capitol Distributing, Inc. v. Guinness Bass Import Co.*,
  290 F.3d 877 (7th Cir. 2002) .....................................................................................28

*Biltmore Forest Broadcasting FM, Inc. v. U.S.*,
  555 F.3d 1375 (Fed. Cir. 2009)..........................................................................32, 33

*Chaveriat v. Williams Pipe Line Co.*,
  11 F.3d 1420 (7th Cir. 1993) .....................................................................................25

*Core Commc'ns, Inc. v. Verizon Maryland LLC*,
  2014 WL 868618 (4th Cir. Mar. 6, 2014)...............................................................25

*Cosgrove v. Bartolotta*,
  150 F.3d 729 (7th Cir. 1998) .....................................................................................28

*Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*,
  554 F.3d 1133 (7th Cir. 2009) ....................................................................................5

*GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l
  Ass'n*,
  617 F.3d 1027 (9th Cir. 2012) ...................................................................................45

*Hoffman v. Red Owl Stores, Inc.*,
  133 N.W.2d 267 (Wis. 1965)......................................................................................28

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    921 F. Supp. 2d 903 (N.D. Ill. 2013) ....................................................................47

*Insolia v. Philip Morris Inc.*,
    53 F. Supp. 2d 1032 .............................................................................................24, 25

*Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc.*,
    486 F. Supp. 2d 855 (W.D. Wis. May 23, 2007) ....................................................28

*Lampi Corp. v. Am. Power Products, Inc.*,
    228 F.3d 1365 (Fed. Cir. 2000)..............................................................................25

*Microsoft Corp. v. Motorola, Inc.*,
    2012 WL 4827743 (W.D. Wash. Oct. 10, 2012) ....................................................29

*Microsoft Corp. v. Motorola, Inc.*,
    854 F. Supp. 2d 993 (W.D. Wash. 2012)...................................................... *passim*

*Milas v. Labor Ass'n of Wisconsin, Inc.*,
    571 N.W. 2d 656 (Wis. 1997)................................................................................23

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)..........................................................................................24, 25

*Pertzsch Design, Inc. v. Gundersen Lutheran Health Sys., Inc.*,
    647 F. Supp. 2d 1064 (W.D. Wis. August 21, 2009)..............................................28

*Rissetto v. Plumbers & Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ...................................................................................25

*State v. Petty*,
    548 N.W. 2d 817 (Wis. 1996)................................................................................24

*Trustees in Bankr. of N. Am. Rubber Thread Co., Inc. v. United States*,
    593 F.3d 1346 (Fed. Cir. 2010)........................................................................24, 25

**STATUTES**

47 U.S.C. § 225(d) ........................................................................................................38

**OTHER AUTHORITIES**

47 C.F.R. §§ 64.601 ......................................................................................................38

Fed. R. Civ. P. 56(c) ......................................................................................................4

Mark A. Lemley, *Intellectual Property Rights and Standard–Setting Organizations*, 90
    Cal. L. Rev. 1889, 1925 (2002) .............................................................................50

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

Restatement (Second) of Contracts § 202(1) (1981) ....................................................................33

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## I.      INTRODUCTION

In 2006, when the FCC considered approval of internet protocol (IP) captioned telephone

service (CTS) for reimbursement, "the FCC asked Ultratec for a statement concerning Ultratec's

intent to license its technology to providers."  Pls.' Contract Br. at 6, Dkt. 90.[1]  The FCC's

request was prompted ██████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██ ██ █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

To memorialize its commitment, Ultratec filed an *ex parte* letter with the FCC on

November 27, 2006 stating that "Ultratec Inc. . . . has licensed its technologies at reasonable

rates since captioned telephone service first became available over five years ago and will

continue to license its technologies, including technologies relating to IP captioned telephone,

going forward."  *See* DFOF at ¶¶ 77–81, Dkt. 81.  When the FCC approved reimbursement for IP

CTS, it reiterated its concern over Ultratec's single-source model and expressly conditioned its

approval on Ultratec's representation: "*[W]e expect that this will not be a service under the*

*control of one vendor or provider.  In this regard*, we condition our approval on Ultratec's

---

[1]          When the phrase "Pls.' Contract Br." is used going forward, Defendants are referring to the brief Plaintiffs
filed in support of their partial motion for summary judgment. *See* Dkt. 90.

[2]          When the term "DFOF" is used going forward, Defendants are referring to Defendants' Proposed Findings
of Fact filed in support of their motion for summary judgment. *See* Dkt. 81.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

representation that it will continue to license its captioned telephone technologies, including technologies relating to IP CTS, at reasonable rates."   DFOF at ¶¶ 86-89, Dkt. 81 (emphasis added).

At the same time the FCC was inquiring into Ultratec's licensing practices, Tom Chandler of the FCC also asked a professor from the University of Wisconsin, Dr. Gregg Vanderheiden, for a formal opinion on whether there was an alternative ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████   Ostensibly, Dr.

Vanderheiden was to provide the statement as an independent expert,[3] but unbeknownst to the

FCC, Ultratec worked with Dr. Vanderheiden to ████████ his response so that he did not have to

████████████████████████████   █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████

---

[3]       Plaintiffs continually insisted—even days before Dr. Vanderheiden's documents were produced—that Dr. Vanderheiden did not make his statement on Ultratec's behalf, and that his statement had "no relevance" to the issues in this case.  DSFOF at ¶ 487-488.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

While the FCC considered whether to approve IP CTS for reimbursement, Sorenson monitored the FCC's proceedings in real-time, as it was considering whether to develop an IP CTS offering of its own.  DFOF at ¶ 101, Dkt. 81.  Sorenson was building its product from the ground up and reasonably believed its potential IP CTS product and service, CaptionCall, was the type of alternative that the FCC was looking for and thus would not infringe Ultratec's patents.  DFOF at ¶ 108, Dkt. 81; DSFOF at ¶¶ 492-493.  Nevertheless, Sorenson relied on Ultratec's promise to the FCC and the public that it would license its CTS patents at reasonable rates to other TRS providers, like Defendants, should such providers require a patent license to provide IP CTS products and services.  DFOF at ¶ 109, Dkt. 81; DSFOF at ¶ 494.

For nearly three years, Plaintiffs remained silent as Sorenson entered the marketplace with CaptionCall and expanded the market to include new, previously underserved hard-of-hearing users.  On May 17, 2013, without  notifying Defendants of their alleged infringement and without offering them a patent license of any kind, Plaintiffs sued to enjoin Defendants from practicing the Ultratec Patents.  DFOF at ¶ 198, Dkt. 81.  As of the date of this writing, Plaintiffs have still not offered a license to Defendants on any terms, ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

Despite Ultratec's representations to the FCC, Plaintiffs claim that "Ultratec retained the right to license whomever it wanted, or not license whomever it wanted, as well as to set the terms of any such licenses."  Pls.' Contract Br. at 19, Dkt. 90; *see also* DSFOF at ¶¶ 500-501.  But Plaintiffs' own correspondence contradicts this made-for-litigation position.  ██████████████

████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

In addition to contradicting their promise to the FCC and the public, Plaintiffs' stated intent behind this lawsuit—"███████████████████████████████████ —undermines the entire purpose behind the FCC's request for Ultratec's assurance that it would license its technology. ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ Plaintiffs should be held to their word, and the Court should deny Plaintiffs' Motion for Partial Summary Judgment on Defendants' affirmative defenses of estoppel, unclean hands, and patent misuse, and their counterclaim for breach of contract, as well as grant Defendants' Partial Motion for Summary Judgment (Dkt. 79) to the effect that Plaintiffs are not entitled to exclude Defendants from the IP CTS market.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).  A dispute about a material

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Although the court views the underlying facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, conclusory allegations are insufficient to defeat a summary judgment motion. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1139 (7th Cir. 2009). "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Id*. at 1137.

## III.   DENIAL OF PARTIAL SUMMARY JUDGMENT

### A.   Summary Judgment Is Not Appropriate For Defendants' Defense of Unclean Hands.

Courts in equity have a "wide range . . . of discretion in refusing to aid the unclean litigant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945). Plaintiffs have asked this Court for equitable relief in the form of an injunction. Their request should be denied in light of their misleading and deceptive conduct before the FCC.

As revealed in Plaintiffs' own correspondence from that time, Plaintiffs' conduct was particularly egregious. However, contrary to Plaintiffs' argument, the defense of unclean hands does not require "particularly egregious conduct." *See, e.g.*, *id.* (barring plaintiffs' claims of patent infringement due to unclean hands without mentioning "particularly egregious conduct"); *Keystone Driller Co. v. General Excavator Co*., 290 U.S. 240, 241 (1933) (same). The case Plaintiffs cite for that proposition dealt with the specific situation where a party seeks to "preclude application of the laches defense" using unclean hands. *See Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1361 (Fed. Cir. 2008); Pls.' Contract Br. at 28, Dkt. 90. Plaintiffs rely on language from *Serdarevic*, which in turn quoted *A.C. Aukerman Co. v. R.L.*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

*Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992).  The full quotation from *Aukerman* reads, "A patentee may also ***defeat a laches defense*** if the infringer 'has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor.'" *Aukerman*, 960 F.2d at 1033 (emphasis added).  In any case, "[s]ummary judgment is rarely proper in cases raising the defense of 'unclean hands' because summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles."  *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 577 (D. Del. Dec. 30 1993) (internal quotations omitted).

### 1.  Plaintiffs Collaborated with Dr. Vanderheiden in Misleading the FCC About Alternatives to Ultratec's Patents.

Much of Plaintiffs' wrongful conduct was detailed in Defendants' Brief in Support of their Motion for Partial Summary Judgment.  *See* Dkt. 80; *see infra* sections III(A)(2)-(3).  But additional wrongful conduct regarding Plaintiffs' coordination with Dr. Gregg Vanderheiden and their respective representations to the FCC has been revealed in recent document productions, one on the last business day before the deadline for filing summary judgment motions, and another two days after the deadline.[5]

When the FCC considered approving IP CTS in 2006,                                                      The FCC

---

5      Ultratec's behind-the-scenes participation in Dr. Vanderheiden's ex parte letter to the FCC was not revealed until Dr. Vanderheiden's documents were produced on April 11, 2014 (the last business day before the deadline for motions for summary judgment) and April 16, 2014 (two days after the deadline).

6

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

████████████████████████████████████████████████████████████████

███████████████████████   ███████████████████████████   "[F]or the record," Dr.

Vanderheiden stated that Ultratec's "equipment" was not needed.  DSFOF at ¶¶ 484-485.  The

FCC specifically cited and relied on Dr. Vanderheiden's statement for the following proposition

in its declaratory ruling approving IP CTS: "We emphasize that such [IP CTS] service may be

initiated, set up, and provided in numerous ways, including using specific telephone equipment

or IP-enabled devices, and various combinations of the PSTN and IP-enabled networks."

DSFOF at ¶ 486.

Allegedly, Dr. Vanderheiden was providing an independent opinion.  Plaintiffs insisted—

even days before Dr. Vanderheiden's documents were produced—that Dr. Vanderheiden did not

make his statement on Ultratec's behalf, and that his statement had "no relevance" to the issues

in this case.  DSFOF at ¶¶ 487-488.  But behind the scenes, Dr. Vanderheiden coordinated his

response with Plaintiffs by exchanging drafts with Plaintiffs' Founder, President, and CEO, Mr.

Engelke, and Plaintiffs' legal counsel and lobbyist, Karen Peltz Strauss.  DSFOF at ¶¶ 479-483.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████   ███████████████   █████████████

████████████████████████████████████████████████████████████████

 

 

 

 

   2.   **Plaintiffs Made Representations to the FCC That Were Knowingly False or Misleading.**

The FCC had long been concerned about Ultratec's sole-source model.

 

 

 

 

 

 

In response to the FCC's concerns, Ultratec filed an *ex parte* letter with the FCC on November 27, 2006 with representations about its past licensing practices—that it had "licensed its technologies at reasonable rates since captioned telephone service first became available over five years ago"—and its future licensing intent—that it "will continue to license its technologies,

---

[7]   Dr. Vanderheiden kept the portion of his earlier proposed answer that "[s]ome captioned telephone providers may wish to use Ultratec technologies in order to capitalize on all Ultratec's experience and developments." DSFOF at ¶¶ 485

[8]

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

including technologies relating to IP captioned telephone, going forward." *See* DFOF at ¶¶ 77–81, Dkt. 81.  It is now clear that Ultratec's representations about its past licensing practices and future licensing commitment were intentionally misleading.

**Past Licensing Practices.**  It is undisputed that Plaintiffs



Mr. Engelke is the Founder, President, and CEO of both companies.  Plaintiffs cannot dispute that as a result of its "exclusive license," CapTel was the sole source of CTS at the time of the FCC's approval.

Plaintiffs use deliberately ambiguous language throughout their brief in an effort to avoid confronting these simple facts.

---

9

Plaintiffs refer to CapTel as Ultratec's "sister company" in their filings with the Court.  DFOF ¶¶ 119-20, Dkt. 81 ("Ultratec's sister company, CapTel, is the exclusive licensee of the '482, '314, '346, '835,'082,'740, '104 and '578 Patents[.]").

10

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY



**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Ultratec's true practices, concealed from the

FCC, were *precisely* the single-sourced model the FCC had sought to avoid, and Ultratec,

CapTel, and their agents knew it.  They took advantage of the FCC's lack of visibility into

Ultratec's contractual relationships with its reseller-partners and the FCC's lack of engineering

expertise, knowing that the FCC would accept the representation at face value.  DSOF at

¶¶ 495-496. ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

**Future Licensing Intent.**  When the FCC requested a public statement from Ultratec

about its licensing intentions, █████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ultratec

11

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

answered the FCC's request with a statement that it had licensed its CTS technologies at "reasonable rates" and "will continue to license its technologies, including technologies relating to IP captioned telephone, going forward." *See* DFOF at ¶¶ 77–81, Dkt. 81.

12

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ .

Plaintiffs now claim that, despite Ultratec's representations to the FCC, "Ultratec retained the right to license whomever it wanted, or not license whomever it wanted, as well as to set the terms of any such licenses."  Pls.' Contract Br. at 19, Dkt. 90.  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

But despite these promises to the FCC and ████████████████████████

████████████████████████████████████████████████ , ████████████

████████████████████████████████████████████████████

███████████████████████████████████ ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████ ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY



Plaintiffs knew the FCC's intent, understood that Ultratec's promise to the FCC and the public required them to openly license legitimate TRS providers on reasonable terms and conditions, and yet privately schemed to exploit Ultratec's CTS patents to exclude all potential competition from the IP CTS market.

### 3. The FCC Was Misled Despite Plaintiffs' Alleged "Correction" that It Did Not Intend to License "All Providers."

Plaintiffs now argue that Ultratec did not mislead the FCC about its *future* licensing intentions because Plaintiffs contacted the FCC after it published a press release announcing its approval of IP CTS conditioned on Ultratec's promise to license its patents at reasonable rates to "all providers." Pls.' Contract Br. at 7, 18, Dkt. 90.  Plaintiffs contend that they "clarified to the FCC that Ultratec had never agreed to license 'all providers'" and "[a]s a result, the language in the final, as issued, January 11, 2007 Order was changed" to remove the "all providers language." *Id.*[13] But Plaintiffs provide *no* evidence supporting their allegation.

---

[12]



---

[13]     Regardless of whether the FCC was misled about future licensing intentions, Plaintiffs' alleged clarification to the FCC did not attempt to also clarify that Ultratec had not, in fact, licensed anyone other than its sister company

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

The words "all providers" were not, as Plaintiffs suggest, "removed from the statement in the press release." *See id.* To this day, anyone can access the FCC's December 20, 2006 press release announcing approval of IP CTS on the FCC's website. DSFOF at ¶ 499. And to this day, that press release states that the FCC's approval of IP CTS was "condition[ed]" on Ultratec's promise to license at reasonable rates to "all providers." DFOF ¶ 84, Dkt. 81; *see also* DSFOF at ¶ 499. To be clear, the December 20, 2006 press release was a statement provided by the FCC immediately following the public hearing at which the FCC commissioners approved IP CTS, and there is no evidence that any FCC "Order" existed on that date or that the FCC "changed" any such "Order" to reflect a "clarified" understanding of Ultratec's commitment.

Far from reflecting Plaintiffs' understanding that "Ultratec retained the right to license whomever it wanted, or not license whomever it wanted, as well as to set the terms of any such licenses" (Pls.' Contract Br. at 19, Dkt. 90), the FCC's Declaratory Ruling expressly conditioned its approval on Ultratec's representation that it would continue license its patents because it did not want IP CTS service to be under the control of one vendor or provider. DFOF at ¶¶ 86, 88, Dkt. 81 ("[W]e expect that this will not be a service under the control of one vendor or provider. In this regard, we condition our approval on Ultratec's representation that it will continue to license its captioned telephone technologies, including technologies relating to IP CTS, at reasonable rates.").

---

CapTel to its CTS technologies or to state that Ultratec would not license to competitors as long as its patents were in force. *Those* statements would have been truly clarifying—and they would certainly have resulted in the withdrawal of the FCC ruling permitting reimbursement altogether.

On a separate note, it is ironic that while they blast Defendants for trying to introduce extrinsic evidence in violation of the parol evidence rule (which does not apply here), Plaintiffs repeatedly ask the Court to give credence to their alleged behind-closed-doors conversation with the FCC between December 20, 2006 and January 11, 2007 to "clarify" the meaning of a publicly-filed letter, publicly-issued FCC press release, and publicly-issued FCC Order. *Compare* Pls.' Contract Br. at 7, 18, Dkt. 90 (asking the Court to credit Plaintiffs' purported off-the-record conversation with the FCC about the "all providers" language) *with id.* at 17 (invoking the "parol evidence rule" to bar the Court's consideration of anything other than what the FCC's Order and Ultratec's licensing letter state).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

While Plaintiffs now argue that the FCC was not misled into believing that Ultratec would license its CTS technologies to "all providers," FCC's then-Chairman Kevin J. Martin appended the following statement to the FCC's January 11, 2007 Order: "Because we expect, however, that IP captioned telephone service will not be under the control of just one vendor or provider, the Commission's action is conditioned on the licensing of captioned telephone technologies to **all providers**."  DFOF ¶ 90, Dkt. 81 (emphasis added).  Moreover, Plaintiffs' post-IP CTS approval correspondence to their reseller-partners, Sprint and Hamilton Relay, reflects that Plaintiffs had the same understanding as Chairman Martin— ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████  In sum, while Plaintiffs now claim to have notified the FCC to "clarify" their public licensing promise, ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

### 4.    Defendants Suffered Prejudice as a Result of Plaintiffs' Wrongful Conduct.

Defendants monitored the FCC's declaratory ruling proceedings in 2005–2007 and circulated Ultratec's *ex parte* letter, with discussion of its commitment to license Ultratec's CTS patents, the day after the letter was sent. DFOF ¶¶ 102-103, Dkt. 81.  Defendants also internally circulated Dr. Vanderheiden's statement about "generic" methods of doing "IP captioned telephony" that did not require using Plaintiffs' proprietary equipment. DSFOF at ¶ 491.  The Vanderheiden letter led Sorenson to believe the FCC was "actively looking for alternatives to Ultratec-based solutions."  *Id.*  The day the FCC issued its declaratory ruling, Defendants

16

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

circulated a copy of the Order and summarized its salient points—specifically pointing out that the FCC "condition[ed]" its approval on Ultratec's promise to license.  DFOF ¶¶ 104-106, Dkt. 81.

Based on public representations to the FCC and conversations with the filer of the petition to the FCC to approve IP CTS, Brenda Battat of the Hearing Loss Association of America ("HLAA"), Sorenson knew the FCC was "balking at a subsidized monopoly for one [Ultratec]" and seeking "alternatives" to Ultratec's proprietary equipment and relay technologies. DSFOF at ¶¶ 489-491.  Indeed, Ms. Battat asked Sorenson in late 2006 if it would be willing to "present evidence [to the FCC] from [other] companies that it is possible to enter the captioned telephone market without relying on Ultratec's technology."  *Id.*   At the time, Sorenson reasonably believed the IP CTS product and service that it was developing was precisely the type of "alternative" the FCC and consumer representatives, like Ms. Battat, were looking for. DSFOF at ¶¶ 492-493; *see also* DFOF ¶¶ 108-109, Dkt. 81.

Relying on its reasonable belief that it did not infringe anyone else's patents, as well as Ultratec's public assurance that it would license its patents at reasonable rates should Defendants require such a license, Sorenson launched its own IP CTS product and service, CaptionCall, in 2010.   DFOF at ¶¶ 109–110, 178–180, Dkt. 81; DSFOF at ¶ 494.   Defendants invested significant resources designing, manufacturing, and deploying IP CTS equipment and services. DFOF at ¶¶ 109–110, Dkt. 81; DSFOF at ¶ 494.   Given their reliance on Ultratec's representation that it would continue to license its CTS patents at reasonable rates, Defendants would be materially prejudiced if Ultratec were permitted to obtain an injunction preventing Defendants from licensing or using those patents.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

B.    **Plaintiffs Are Not Entitled to Summary Judgment on Defendants' Defense of Estoppel.**

As explained in Defendants' briefing in support of their Motion for Partial Summary Judgment (Dkt.  80), based on the undisputed material facts in this case, Plaintiffs should be estopped—under the doctrines of equitable, promissory, and judicial estoppel—from seeking exclusionary relief.  Because the undisputed facts warrant summary judgment for Defendants on the defense of estoppel, Plaintiffs' Motion for Partial Summary Judgment on those defenses should be denied, and Defendants are entitled to partial summary judgment (*see* Dkt. 79-80) that their estoppel defenses bar Plaintiffs from obtaining exclusionary relief.[14]

1.    **Plaintiffs' Actions Give Rise to Equitable Estoppel Under Federal Common Law.**

Equitable estoppel has three elements: "(1) the patentee, through misleading conduct, led the alleged infringer to reasonably believe that the patentee did not intend to enforce its patent against the infringer; (2) the alleged infringer relied on that conduct; and (3) due to its reliance, the alleged infringer would be materially prejudiced if the patentee were permitted to proceed with its charge of infringement."  *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc)).  "Misleading conduct may include specific statements, action,

---

[14]        As an initial matter, Plaintiffs mischaracterize Defendants' equitable defense of estoppel as being "base[d] . . . on a tortured theory that Ultratec somehow entered into a contract with the Federal Government requiring Ultratec not only to license all of its competitors[.]" Pls.' Contract Br. at 1, Dkt. 90.  While Defendants' equitable defenses and breach of contract claims arise out of the same nucleus of facts, Defendants' estoppel defenses are not based on their breach of contract theory.  Indeed, in similar circumstances in *Apple v. Motorola Mobility*, 886 F. Supp. 2d 1061 (W.D. Wis. 2012), this Court treated estoppel as an equitable "alternative claim to [Apple's RAND] breach of contract claims." *Id.* at 1078 (treating "equitable estoppel" as an alternative to breach of contract claims); *see also, e.g., In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 924 (noting that "promissory estoppel" and RAND "breach of contract" are "alternative grounds of relief"); *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 6000017, at *5 (W.D. Wash. Nov. 12, 2013) (noting, in the RAND context, that "[p]romissory estoppel is an alternative theory of recovery" to breach of contract claims).  Breach of contract and estoppel have different elements that must be established, and to the extent Plaintiffs suggest that the two must rise and fall together, they are wrong.

18

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

inaction, or silence when there was an obligation to speak." *Id.* (internal quotations and citations omitted).

**Ultratec's misleading conduct.**  Ultratec filed its *ex parte* letter in response to the FCC's concerns that it would attempt to use its patents to exclude competition or implement a "single-source" model where Ultratec would only license itself or a single provider. *Supra* section III.A.2.  Yet, Ultratec had no intention of licensing its IP CTS technologies to any competitor or potential competitor and privately viewed its patents as a means to *exclude* competitors from the market.  *Supra* section III.A.2.  Notwithstanding this subjective intent, Ultratec assured the FCC in 2005 that it would ███████████████████████████████████████ ████████████████████████████ and later confirmed that understanding in its *ex parte* letter by promising the FCC that it would "continue to license its technologies, including technologies relating to IP captioned telephone, going forward."   DFOF at ¶¶ 77–80, Dkt. 81.   Ultratec's misleading representations led both the FCC and Sorenson (who was monitoring the proceedings contemporaneously) to reasonably believe that Ultratec would not use its CTS patents to exclude potential competitors by seeking injunctions. *Supra* section III.A.3.[15]

Ultratec's *ex parte* letter also contained representations about Ultratec's past licensing practices that were untrue at the time they were made.  In response to the FCC's concerns that Ultratec would use whatever technology it had to maintain its status as a single-source provider (DSFOF at ¶¶ 469-476), Ultratec told the FCC that it had "licensed its technologies at reasonable rates since captioned telephone service first became available over five years ago."  DFOF ¶¶ 77-80, Dkt. 81.███████████████████████████████ ███████████████ ████████████████████████████████████████████

---

[15]   For reasons discussed *supra* section III.A.3, Ultratec's purported attempt to "clarify" what it meant when it told the FCC it would license at reasonable rates does not establish that the FCC was not misled by Ultratec.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

To support their motion, Plaintiffs attempt to use carefully-crafted language conflating the provision of their trademarked "CapTel®" service with a license to Ultratec's CTS technologies.

20

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

Plaintiffs allege that the FCC was not misled, but admit that their representation to the FCC—that Ultratec had licensed its CTS technologies—was not based on an actual license to use Ultratec's CTS technologies, but instead on agreements allowing Sprint and Hamilton to resell trademarked "CapTel®" service provided by CapTel itself.

Neither Sprint nor

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

Hamilton competed with Ultratec or CTI, either then or now.[16]  They were the sole suppliers of equipment and services provided by Ultratec and its affiliates alone.  *Supra* n.15.

      **Reliance.**  Defendants relied on Ultratec's promise to license its CTS technologies to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ when Defendants decided to invest significant resources into developing an IP CTS product and service.  *See supra*, section IIIA.4; DFOF ¶¶ 109-110, Dkt. 81; DSFOF at ¶ 494.  Defendants' reliance was reasonable because the FCC's stated and published purpose for securing a promise from Ultratec was to encourage other TRS providers to enter the marketplace for IP CTS services, and the FCC explicitly conditioned its approval of IP CTS for reimbursement on Ultratec's promise.  DFOF ¶¶ 86-87, 90, Dkt. 81.

      In addition to reasonable reliance, Plaintiffs assert that Defendants needed to be "legally entitled to rely on any statement Ultratec made to the FCC."  Pls.' Contract Brief at 27, Dkt. 90.  This is not a requirement for equitable estoppel; plaintiffs rely on case law discussing a "right to rely" in the context of the parol evidence rule and fraud but not equitable estoppel.  *See id.*; *Durkee v. Goodyear Tire & Rubber Co*., 676 F. Supp. 189, 192–93 (W.D. Wis. May 22, 1987) ("[P]arol evidence may be admissible in support of a claim of fraudulent inducement to enter into a contract, as in such a case there is no attempt made to vary the terms of the contract itself.  Such inducements must, however, constitute promises made with a present intention not to perform, and must also be promises 'upon which the purchaser has a right to rely.'"); *Amplicon, Inc. v. Marshfield Clinic*, 786 F. Supp. 1469, 1470 (W.D. Wis. Feb. 3, 1992) ("To state a claim

---

[16]     TRS providers unaffiliated with Plaintiffs and state relay programs articulated this lack of competition quite well when the FCC was considering whether to approve IP CTS.  *See* DFOF ¶ 69, Dkt. 81 ("Ultratec is not a direct party to the competition between TRS providers.  Although all TRS providers must compete for the opportunity to provide Captioned Telephone, as the sole provider of Captioned Telephone, Ultratec has no such competition.  Thus, if the Commission were to mandate such service, there is no guarantee Ultratec would make the service available to all TRS providers at commercially reasonable terms and conditions.") ; DFOF ¶ 164, Dkt. 81 (likening Plaintiffs to "robber barons"—except considering them worse because "there is no 'market' for the provision of the CTS technology" because "it is a technology provided on a monopoly basis [by Plaintiffs], with neither competition nor regulation constraining prices"); *see also* DFOF ¶ 165, Dkt. 81.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

of fraudulent misrepresentation, Marshfield must establish that its reliance on the alleged misrepresentations was reasonable or justifiable. . . . 'a party cannot reasonably rely upon allegedly fraudulent promises which are directly contradicted by the terms of . . . a subsequently executed contract.'") (Crabb, J.) (citations omitted).  In any event, Defendants had a right to rely on Plaintiffs' promise to the FCC and the public because the FCC secured that promise for the purpose of encouraging new entrants into the IP CTS market to foster competition.  *See* DFOF ¶¶ 86-90, Dkt. 81; DSFOF at ¶¶ 469-473.

**Material Prejudice.**  As discussed above, Defendants relied on Ultratec's promise before investing additional resources in designing, manufacturing, and deploying their CTS equipment and services, as well as launching an entirely new Sorenson subsidiary, CaptionCall.  *See supra*, section III.A(4); DSFOF at ¶ 494.  Thus, Defendants would be materially prejudiced if Plaintiffs were permitted to enjoin Defendants from licensing or using Ultratec's CTS patents.

## 2. Plaintiffs' Actions Give Rise to Equitable Estoppel Under Wisconsin Law.

Under Wisconsin law, the elements of equitable estoppel are: "(1) action or non-action, (2) on the part of one against whom estoppel is asserted, (3) which induces reasonable reliance thereon by the other, either in action or non-action, and (4) which is to his or her detriment." *Milas v. Labor Ass'n of Wis., Inc.*, 571 N.W. 2d 656, 660 (Wis. 1997).  As for the first and second elements, Ultratec exhibited both when it sent a public letter to the FCC stating that it had licensed and would license its CTS patents at reasonable rates.  DFOF at ¶¶ 77-80, Dkt. 81.  Ultratec's letter induced reasonable reliance by the FCC, which conditioned approval of IP CTS on Ultratec's promise (DFOF at ¶ 89, Dkt. 81), and it induced reasonable reliance by Defendants when they decided to continue to significantly invest time and money in the development and delivery of an IP CTS product and service based on Defendants' understanding that Ultratec

23

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

would license any CTS patents if necessary (DFOF at ¶ 109, Dkt. 81).   After the FCC and Defendants relied on Ultratec's promise to license its CTS patents, Ultratec now seeks to do the opposite.   By seeking an injunction against Defendants, Plaintiffs seek to avoid their licensing obligations and to use Ultratec's patents to exclude competition from the market.   Thus, the FCC and Defendants relied to their detriment.   Therefore, as shown above with the Federal Circuit's formulation under *Aukerman*, the uncontroverted facts actually warrant a partial summary judgment in favor of the Defendants—as they have so moved (Dkt. 79)—that Plaintiffs are equitably estopped from seeking injunctive relief under Wisconsin law as well.   In any event, Plaintiffs' motion for partial summary judgment should be denied.

### 3.      Plaintiffs' Actions Give Rise to Judicial Estoppel.

The doctrine of judicial estoppel prevents a party from taking positions that are inconsistent with positions taken in prior proceedings.   *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."); *Trustees in Bankr. of N. Am. Rubber Thread Co., Inc. v. United States*, 593 F.3d 1346, 1353-54 (Fed. Cir. 2010) (citing *New Hampshire*); *State v. Petty*, 548 N.W. 2d 817, 820 (Wis. 1996) ("The doctrine precludes a party from asserting a position in a legal proceeding and then subsequently asserting an inconsistent position.") (internal citations and quotation marks omitted).   In other words, "courts are under no compulsion to heed the shifting theories of chameleonic litigants," and thus "will accept a party's prevailing position in previous litigation (or, as here, quasi-judicial proceedings) as dispositive." *DeGuiseppe*, 68 F.3d at 191.   The judicial estoppel doctrine is "intended to prevent a litigant from playing fast and loose with the courts."   *Insolia v. Philip Morris Inc*., 53 F. Supp. 2d 1032, 1043 (W.D. Wis.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

1999) (Crabb, J.) *aff'd in part, rev'd in part*, 216 F.3d 596 (7th Cir. 2000). This Court and others have noted that judicial estoppel applies to positions "adopted by a court or administrative agency[.]" *Insolia*, 53 F. Supp. 2d at 1043.[17] And at least one court has applied judicial estoppel to a party's statements to the FCC in rulemaking proceedings like those involving the approval of IP CTS. *See AT&T Corp. v. Beehive Tel. Co., Inc.*, 2010 WL 376668 (D. Utah Jan. 26, 2010).

Three non-exclusive factors typically inform the determination as to whether judicial estoppel applies in a particular case: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51; *Trustees*, 593 F.3d at 1354 (citing *New Hampshire*).

**Clearly Inconsistent.** Plaintiffs now claim that, when Ultratec sent its *ex parte* letter to the FCC, "Ultratec retained the right to license whomever it wanted, or not license whomever it wanted, as well as to set the terms of any such licenses." Pls.' Contract Br. at 19, Dkt. 90. This position clearly contradicts Plaintiffs' earlier position before the FCC, ███████████████

█████████████████████████████████████████████████████████

---

[17]   *Trustees*, 593 F.3d at 1353-54 ("Judicial estoppel applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts."); *Core Commc'ns, Inc. v. Verizon Maryland LLC*, 2014 WL 868618, at *9 (4th Cir. Mar. 6, 2014) (applying judicial estoppel based on prior statements made to the Maryland Public Service Commission); *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993) ("Though called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding."); *Lampi Corp. v. Am. Power Products, Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000) (applying Seventh Circuit law) ("The [judicial estoppel] doctrine also applies to administrative proceedings in which a party obtains a favorable order by making an argument that it seeks to repudiate in a subsequent judicial proceeding."); *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996) ("[M]any cases have applied the doctrine where the prior statement was made in an administrative proceeding, and we are not aware of any case refusing to apply the doctrine because the prior proceeding was administrative rather than judicial.").

25

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

Defendant Sorenson was—and continues to be—a ███████████████████ The fact that Defendants are now (in Plaintiffs' words) a "direct competitor" to Plaintiffs (Pls.' Contract Br. at 1, Dkt. 90) only strengthens the force of Ultratec's obligation to license its patents. The entire purpose behind Ultratec's *ex parte* letter was to address █████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████

**Perception that the FCC was misled.** If Ultratec were granted an injunction, thereby preventing its only significant competitor, CaptionCall, from offering an alternative to the CapTel product and service, it would create a perception that the FCC was misled by Ultratec's prior assurances. ████████████████████████████████████████████

███████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

██████████████████████████████████████████████████████████████

████████████████████████████████████████ Thus, Ultratec has admitted that its

current course of action—seeking exclusionary relief instead of offering a license—would lead

to the inescapable conclusion that the FCC was, indeed, misled by Ultratec's prior assurances.

**Unfair advantage.**  Ultratec would stand to profit from its deception—thus gaining an

unfair advantage—by promising an open license to assuage the FCC's concerns that Ultratec

would ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████ Allowing Ultratec to engage in this behavior

would impose an unfair detriment on Defendants, who reasonably relied on Ultratec's past

position and now stand to lose significant investments if Ultratec is permitted to pursue a clearly

inconsistent approach by seeking injunctive relief instead of a reasonable license.  *See* DFOF ¶¶

109-110, Dkt. 81.

Judicial estoppel was applied in a closely analogous case where a party took one position

before the FCC in order to secure approval and then, with FCC approval in its rearview mirror,

took a contrary position in its dealings with other parties and the federal court.  In *AT&T Corp. v.

Beehive Telephone Co., Inc.*, a provider of interstate access services (Beehive) persuaded the

FCC to raise the allowable tariff for each charge by representing that only one charge would be

authorized per minute.  *See* 2010 WL 376668, at *14 (D. Utah Jan. 26, 2010).  Subsequently,

Beehive used the increased tariff rate but argued that it was authorized to apply multiple charges

per minute at that increased rate.  *See id.* at *13–14.  On these facts, the court granted summary

judgment based on judicial estoppel to bar Beehive from "tak[ing] a position contrary to its

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

statements to the FCC," and held that Beehive's "change in position is precisely the type of 'fast and loose' litigation tactic that the judicial estoppel doctrine was established to rein in."  *Id.* (internal quotations omitted).

### 4.    Plaintiffs' Actions Give Rise to Promissory Estoppel.

Promissory estoppel has three elements: (1) the promisor makes a promise that it should reasonably expect would induce action or forbearance of a definite and substantial nature on the part of the promisee; (2) the promisor must induce such action and forbearance; and (3) injustice can be avoided only by enforcement of the promise.  *Hoffman v. Red Owl Stores, Inc.*, 133 N.W. 2d 267, 275 (Wis. 1965); *Pertzsch Design, Inc. v. Gundersen Lutheran Health Sys., Inc.*, 647 F. Supp. 2d 1064, 1069 (W.D. Wis. August 21, 2009).[18]  Promissory estoppel does not require Defendants to show that Plaintiffs *intended* to mislead to the FCC; the focus is on the promise, the induced action, and the injustice from failing to enforce the promise.[19]  Moreover, of direct relevance here, this Court has held that a patent holder's promise to an SSO that it would license its patents on fair, RAND terms can be the basis for a promissory estoppel claim.  *See Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582 at *15 (W.D. Wis. June 7, 2011).  Each element of promissory estoppel is satisfied here.

*First*, Ultratec made a promise when it sent a public letter to the FCC stating that it "has licensed its technologies at reasonable rates since captioned telephone service first became

---

[18]    This Court has previously held that a similar formulation cited by the Seventh Circuit did not have any important differences.  *See Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc.*, 486 F. Supp. 2d 855, 861 (W.D. Wis. May 23, 2007) ("Other courts, including the Court of Appeals for the Seventh Circuit, break the test down into four factors, including '1) a promise; 2) on which the promisor should reasonably expect to induce action or forbearance; 3) which did induce such action or forbearance; and 4) that injustice can be avoided only by enforcement of that promise.' *Beer Capitol Distributing, Inc. v. Guinness Bass Import Co.,* 290 F.3d 877, 880 (7th Cir. 2002); *see also Cosgrove v. Bartolotta*, 150 F.3d 729, 733 (7th Cir. 1998) (describing type of promise required for pleading promissory estoppel in Wisconsin). The difference is unimportant.  In either analysis, the reviewing court must determine whether there was a promise and whether it was one the promisor should expect would induce reliance.") (Crabb, J.).

[19]    Plaintiffs argue that because "Defendants have not demonstrated any misrepresentation," their "allegations supporting these affirmative defenses must fail." Pls.' Contract Br. at 26, Dkt. 90.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

available over five years ago and will continue to license its technologies, including technologies relating to IP captioned telephone, going forward."  DFOF at ¶¶ 77–81, Dkt. 81.  This letter constituted a promise to the FCC and third-party beneficiaries such as Sorenson and CaptionCall.[20]

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

Ultratec knew or reasonably should have expected that its promise would induce action of a definite and substantial nature by the FCC and other potential IP CTS providers.  Ultratec was also aware of the FCC's concern that, if IP CTS were approved, the CTS market would lack competition, (DFOF at ¶¶ 43-45, 48, Dkt. 81), and Ultratec made its promise to the FCC specifically to alleviate those concerns and induce a result: the FCC's approval of IP CTS for reimbursement.  DFOF at ¶¶ 48, 131-34, 138, 142, Dkt. 81.  Approval of IP CTS was both definite and substantial because it created a CTS market that did not otherwise exist.  Further, Ultratec reasonably should have expected that its promise to the FCC would induce other vendors to enter the CTS market—after all, the creation of a competitive market was the driving factor behind the FCC's concerns.  Ultratec should have reasonably expected those vendors to enter the market under the belief that Ultratec would "continue to license its technologies" at "reasonable rates" should Ultratec believe that its patents were necessary for the provision of IP CTS by an entering vendor.

---

[20]  *See Apple*, 2011 WL 7324582, at *9–11 ("Motorola contends that Apple's promissory estoppel claim should be dismissed as inadequately pleaded because Apple has not alleged that Motorola made any promise to Apple. I disagree."); *see also Microsoft Corp. v. Motorola, Inc.*, 2012 WL 4827743 at *7 (W.D. Wash. Oct. 10, 2012).

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

*Second*, Ultratec's promise in fact induced its intended action by the FCC and other IP CTS providers. In response to Ultratec's promise, the FCC approved TRS reimbursement for IP CTS and expressly conditioned its approval on Ultratec's promise to license its CTS patents to other TRS providers at reasonable rates. DFOF at ¶¶ 86–89, Dkt. 81. Moreover, the undisputed evidence shows that Ultratec's promise induced Defendants to invest substantial resources in developing, marketing, and providing services for the newly created IP CTS market—in offering the precise sort of competition that the FCC had hoped would emerge. *See supra*, section IIIBA.4; DFOF at ¶¶ 109-110, Dkt. 81; DSFOF at ¶ 494.

*Third*, injustice can only be avoided by denying injunctive relief and enforcing Ultratec's promise to license the Asserted Patents on reasonable terms. Now that the FCC has relied on Ultratec's promise and approved IP CTS for reimbursement, and now that other IP CTS providers, such as CaptionCall, have developed and deployed IP CTS for hard-of-hearing Americans, Ultratec attempts to enlist the Court's help in breaking its promise by granting a permanent injunction that stifles competition from the CTS market. In sum, Defendants reasonably relied on Ultratec's promise, and they have been damaged as a result, because their services now stand accused of infringement, facing the threat of injunction. DFOF at ¶¶ 109–110, 197, Dkt. 81; DSFOF at ¶ 494. Injustice to the Defendants, the FCC, and hard-of-hearing Americans can be avoided only by enforcement of Ultratec's promise. Plaintiffs' motion for partial summary judgment should be denied.

### C. Plaintiffs' Actions Give Rise to Breach of a Contract With the FCC that Defendants Are Entitled to Enforce.

The remedies in this case, if any, were defined by a promise—a promise Plaintiffs long ago made to the FCC when poised to reap the benefits of the FCC's approval of IP CTS. That promise was simple: if you (the FCC) approve IP CTS for reimbursement, we (Ultratec) will

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

address your concerns about sanctioning a telecommunications monopoly by offering a reasonable patent license to any TRS provider that requires one.  DFOF at ¶¶ 131-135, 138, 139, Dkt. 81; *see also* DFOF at ¶¶ 78-80, 83, 89-90, Dkt. 81.  That promise was similar to those frequently seen in a RAND commitment because, like a standards-setting organization, the FCC had the power to enhance the value of Ultratec's patents by granting Plaintiffs access to an expanded market, in this case a relatively-untapped market of approximately 6 million hard-of-hearing Americans.  After months of meetings with Plaintiffs, consumer groups, and TRS providers in the course of the IP CTS rulemaking process (DFOF at ¶¶ 71, 75, Dkt. 81), the FCC accepted that commitment as true and "condition[ed]" its approval of IP CTS on the belief that Ultratec would follow through on its word.  DFOF at ¶ 89, Dkt. 81.

Now, having gained the significant benefit of the FCC's approval of IP ███████████ ███████████████████████████████████████████████—Ultratec would have its assurance to the FCC be nothing more than an illusory promise: "Ultratec retained the right to license whomever it wanted, or not license whomever it wanted, as well as to set the terms of any such licenses." Pls.' Contract Br. at 19, Dkt. 90.  But Plaintiffs' current position is contradicted



Plaintiffs even admitted their understanding that FCC expected them to license their patents.  *Supra* section III.A.3.

Plaintiffs fully understood that the FCC would *not* approve IP CTS unless it received assurance that there would be open competition in IP CTS —assurance that IP CTS would *not* be controlled by Ultratec as a single vendor as it was at the time the FCC was considering whether

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

to approve IP CTS for reimbursement.  DSFOF at ¶¶ 469-473.  To overcome these concerns, Plaintiffs promised the FCC, consumer groups, and the public on multiple occasions that Ultratec would openly license its CTS patents at reasonable rates to ███████████████████████ ████████████████████████████████████████████████████████  Plaintiffs understood that promise to be a *quid pro quo* for the FCC's approval of IP CTS.  DFOF at ¶¶ 131, 132, 138, 144, Dkt. 81.  Plaintiffs understood that the FCC conditioned its approval of IP CTS on that promise.  DFOF at ¶¶ 133, 135, 137, 138, Dkt. 81.  And Plaintiffs understood that failure to comply with this obligation would lead to ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████

**1.      Ordinary Principles of Contract Construction Govern the Court's Analysis of Whether a Contract Exists Between Ultratec and the FCC.**

It is well-established that administrative regulatory actions can be the basis of a contract. *Biltmore Forest Broadcasting FM, Inc. v. U.S.*, 555 F.3d 1375, 1380 (Fed. Cir. 2009) ("[B]oth the Supreme Court and we [the Federal Circuit] have held that contract and takings claims . . . can be founded on regulatory actions by Congress or federal agencies."); *see also U.S. v. Winstar Corp.*, 518 U.S. 839, 862-63 (1996) (contract existed in situation involving Bank Board's regulatory approval of business merger).  As Plaintiffs state, in determining the existence of such contracts, federal courts "frequently" turn to the Restatement of Contracts for guidance.  Pls.' Contract Br. at 13-14, Dkt. 90.  In fact, that is precisely what the Supreme Court did in *Winstar* when it concluded that the Bank Board's "regulatory approval" of a business merger was the foundation of a binding contract between the Government and the regulated entity.  *See Winstar*,

518 U.S. at 862-63.  In making that determination, the Court considered whether the "realities of the transaction favored reading [the operative] documents as contractual commitments, not mere statements of policy."  *Id.*  Put differently, "[w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."  *Id.* (quoting Restatement (Second) of Contracts § 202(1) (1981)).   After considering those realities, the Court rejected the Government's argument that agency statements in a memorandum were mere "statements of then-current federal regulatory policy rather than contractual undertakings."  *Id.*

The precedent Plaintiffs cite in their brief does not alter *Winstar's* rubric for determining if a regulatory contract exists.  To the extent Plaintiffs suggest that the mere nature of regulatory actions precludes the formation of a contract between agencies and private actors, Plaintiffs are wrong.  *Biltmore Forest Broadcasting FM, Inc*, 555 F.3d at 1380; *Winstar*, 518 U.S. 839, 862-63 (1996).[21]  Further, to the extent Plaintiffs suggest that the nature of the contract between the FCC and Ultratec requires a heightened showing of unmistakable intent by the FCC not required in

---

[21]        The primary case Plaintiffs cite in support of the proposition that the FCC's January 11, 2007 Order is a purely regulatory, as opposed to contractual, undertaking is *U.S. v. American National Can Company*, 216 F. Supp. 2d 521 (N.D. Ill. 2000).  That case is inapposite for several reasons.  First, the conduct the government was seeking to have the EPA proscribe as part of a contractual undertaking was *not* within the EPA's power to enforce or regulate in the first place.  *Id.* at 531-32.  In other words, "the EPA had no legal authority to regulate the underlying activity"—which is why the Government was trying to argue that a contract existed that gave the EPA power it did not otherwise possess.  *See id* ("The government attempts to infuse the administrative order with legal force by arguing that the order is a contract which binds ANC to comply with its terms even if the EPA had no legal authority to regulate the underlying activity.").   That is not the case here.  The FCC has specifically delegated, broad prescriptive and enforcement authority under Title IV of the ADA.  *See* 47 U.S.C. § 225(d)-(e).  It has the power to issue rules—like the January 2007 IP CTS rule—and enforce those rules.  *Id.*  Second, the *American Can* case does not mention the Supreme Court's seminal *Winstar* decision on regulatory contracts, much less try to explain its applicability or lack thereof.  Plaintiffs' other  citations are likewise inapposite.  *See F.D.I.C. v. Frates*, 44 F. Supp. 2d 1176, 1200-01 (N.D. Okla. 1999) (no consideration of *Winstar* despite the fact that both *Frates* and *Winstar* dealt with whether regulatory actions in the context of FIRREA were contractual undertakings); *New Era Constr. v. U.S.*, 890 F.2d 1152, 1155-56 (Fed. Cir. 1989) (addressing the unrelated question of whether agency supervision of a contract between private parties created a contract between the government and contractor; also predated *Winstar*).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

the common construction of contracts,[22] Plaintiffs are likewise wrong.  *See, e.g., Winstar Corp.*, 518 U.S. at 858-60 (rejecting the argument "that the Government could not be held to a promise to refrain from exercising its regulatory authority in the future unless that promise was unmistakably clear in the contract").  The Supreme Court in *Winstar* held that this heightened intent requirement—known as the "unmistakability defense"—does not apply to the construction of a regulatory contract where "enforcement of the contractual obligation alleged would not block the Government's exercise of a sovereign power."  *Id.* at 840, 879.  In *Winstar*, "[n]othing in the documentation or the circumstances of these [regulatory] transactions purported to bar the Government from changing the way in which it regulated the thrift industry"—not even where finding the existence of a contract meant that the Government would be contractually liable for the implementation of a new regulatory requirements.  *Id.* at 868-70.  The same is true here. Enforcement of Ultratec's promise to license and the FCC's concomitant obligation to reimburse Plaintiffs for the provision of IP CTS that complies with the FCC's regulations does not "block" the FCC's exercise of its sovereign power.[23]  The existence of a contract between Ultratec and the FCC is consistent with the exercise of that regulatory power and no less contractual than a

---

[22]     Pls.' Contract Br. at 14-15, Dkt. 90 ("A government agency's action may not be construed to be a contract with the government unless the intent of the government to enter into a contract is express, and clear from the agreement" (citing *Greenbrier (Lake Cnty. Trust Co. No. 1391) v. U.S.*, 40 Fed. Cl. 689, 691-92 (1998)).

[23]     Plaintiffs argue that because the "FCC remained free to change its [IP CTS] reimbursement decision or add more requirements for reimbursability in the future," the transaction between the FCC and Ultratec was not a contract.  Pls.' Contract Br. at 16, Dkt. 90.  While the FCC, of course, retains the ultimate power to alter reimbursability of IP CTS, the FCC would still be obligated to reimburse Plaintiffs for any services rendered that complied with the original terms of the FCC's approval of IP CTS during the time in which those terms were in effect.  The "consideration" that Plaintiffs received for their promise to license was eligibility of IP CTS to receive reimbursement *and* actual reimbursement for the provision of IP CTS that satisfied the FCC's minimum standards for the provision of the service.  As in *Winstar*, nothing in the transaction between the FCC and Ultratec "purported to bar" the FCC's ability to continue to regulate TRS in whatever manner it chose.  *See* 518 U.S. at 868-70.  Indeed, because the FCC is procuring and paying for a service offered by private entities to disabled Americans, these facts are quite similar to Government "contracts, say, to buy food for the army" where "no sovereign power is limited by the Government's promise to purchase and a claim for damages implies no such limitation."  *Id.* at 880 ("So long as such a contract is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that [Government] power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it.").

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

consent decree resulting from an enforcement action to compel Ultratec to comply with its promise to license its patents.  Indeed, Plaintiffs plainly anticipated some adverse reaction along these very lines from the FCC ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

In short, the unmistakability doctrine does not apply.  As in *Winstar*, "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties" govern the Court's analysis.  *Id.* at 870-71 (rejecting the Government's argument that ordinary contract principles should not apply).  Those principles require the Court to examine the objective "realities of the transaction" between Ultratec and the FCC to determine its "principal purpose."  *Id.* at 863 (citing Restatement (Second) of Contracts § 202(1) (1981) ("Words and other conduct are interpreted in light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.")); *Laserage Tech. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) ("Secret hopes and wishes count for nothing because the status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." (Citation and marks omitted)).[24]

---

[24]     Plaintiffs state that "Defendants [cannot] demonstrate that *Ultratec* intended that the January 11, 2007 Order" be a contractual undertaking.  Pls.' Contract Br. at 16, Dkt. 90.  However, it is "black letter law contract law . . . that mutual assent does not mean that parties must subjectively agree to the same interpretation at the time of contracting."  *Deputy v. Lehman Bros.*, 345 F.3d 494, 512 (7th Cir. 2003); *Nat'l Prod. Workers Union Ins. Trust v. CIGNA Corp.*, 665 F.3d 897, 901 (7th Cir. 2011) ("In assessing whether contracting parties have mutually assented to a contract, Illinois courts have long cautioned that the parties' subjective intentions are irrelevant.  Rather, courts must evaluate mutual assent based on the objective conduct of the parties.").

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

    **2.    As in the RAND Context, Here the "Realities of the Transaction" Reflect the Existence of a Contract Between Ultratec and the FCC.**

The objective conduct of Ultratec and the FCC reflects that the "principal purpose" of the transaction between the FCC and Ultratec was clear—to create mutually binding obligations on the part of Ultratec to openly license[25] its CTS patents to other legitimate TRS providers on reasonable terms, and on the part of the FCC to reimburse Plaintiffs for the provision of IP CTS. *See* DFOF ¶¶ 77-80, 83-90, Dkt. 81. Whatever Ultratec's subjective intent with respect to its public communications with the FCC may have been, the objective reality is that Ultratec was the *only* vendor of CTS at the time of the FCC's approval (DFOF ¶¶ 51, 63-67, 122, Dkt. 81; DSFOF at ¶ 470]; Ultratec knew the FCC expected it to offer an "open license" to its patents (DFOF ¶ 131, Dkt. 81; DSFOF at ¶ 474); Ultratec responded to that concern by promising to openly license its patents and by publicly filing correspondence with the FCC confirming that promise to license (DSFOF at ¶¶ 475-476; DFOF ¶¶ 48-50, 77-80, 132, Dkt. 81); the FCC conditioned its approval of IP CTS on Ultratec's promise to license (DFOF ¶¶ 83-90, Dkt. 81); Ultratec recognized that its promise was *quid pro quo* for the FCC's approval of IP CTS (DFOF ¶¶ 131-132, 138, 144, Dkt. 81); and Ultratec recognized that its promise ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Those facts are compelling, objective evidence that a contract between Ultratec and the FCC exists, and they strikingly resemble the facts underlying RAND obligations between patent-holders and standards-setting organizations ("SSOs") that this Court and others have said are contractually binding. *See Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1083-

---

[25] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

84 (W.D. Wis. 2012) (Crabb, J.) (combination of SSO policies and bylaws, and patentee's participation in the SSO accompanying promise to license its patents on RAND terms "constitute[d] contractual agreements"); *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. 2012) ("agree[ing] with Microsoft that through Motorola's [RAND] letters to [SSOs], Motorola has entered into binding contractual commitments to license its essential patents on RAND terms"); *Realtek Semiconductor*, 946 F. Supp. 2d at 1006-07 ("Similar to the situation in *Motorola*, the defendants are contractually obligated under their Letters of Assurance to the IEEE to license the [asserted patents] on RAND terms[.]"); *see also* Defs.' Br. at III.D, Dkt. 80.

As in the RAND context, here the FCC extended a straightforward offer to Ultratec: ***If*** you agree to openly license your CTS patents at reasonable rates to any TRS provider who needs one, we will reimburse you for the provision of IP CTS.  DFOF at ¶¶ 48-50, 77-80, 84-90, Dkt. 81; DSFOF at ¶¶ 474-476.  Ultratec accepted that offer when it represented to the FCC that it had, in fact, licensed its CTS technologies at "reasonable rates" for the past five years and assured the FCC that it would continue to do so in the future.  DFOF at ¶¶ 77–80, Dkt. 81.  This exchange of offer and acceptance is reflected in the FCC's January 11, 2007 Declaratory Ruling approving IP CTS for reimbursement.  DFOF at ¶¶ 86–89, Dkt. 81.  In that ruling, the FCC states: "[W]e expect that this ***will not be a service under the control of one vendor or provider***. ***In this regard***, we condition our approval on Ultratec's representation that it will continue to license its captioned telephone technologies . . . at reasonable rates."  DFOF at ¶ 86, Dkt. 81 (emphasis added).

To eliminate all doubt regarding the terms of offer and acceptance, then-FCC Chairman Kevin J. Martin contemporaneously appended his comments to the FCC's ruling, confirming

37

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

these terms: "[T]he Commission's action is conditioned on the licensing of captioned telephone technologies to all providers. . . . It is only by doing so that we can continue to ensure that individuals with disabilities have the same access to communication technologies as all other Americans." DFOF at ¶ 90, Dkt. 81.[26]

**Offer.** In *Motorola Mobility*, this Court held that the intellectual property policies of an SSO were "offers" to Motorola to participate in the SSO. *Id.* at 1083-84. These offers "set out the essential terms of the contract, namely, that members must abide by the intellectual property rights policies" of the SSO. *Id.* The policy at issue was the policy that SSO "members must submit letters of assurance including a commitment to license essential patents under reasonable and nondiscriminatory terms." *Id.* Here, the evidence of an "offer" is similarly compelling. Like the IEEE policies in *Motorola Mobility*, the FCC has prescribed extensive rules governing the provision of all forms of TRS, including IP CTS. *See* 47 U.S.C. § 225(d) (authorizing FCC to "prescribe" rules and regulations governing the provision of TRS for the hearing-impaired); 47 C.F.R. §§ 64.601–64.613 ("relay service rules" governing provision of TRS).

Further, just as SSOs require RAND assurances—such as the "Letter of Assurance" required by the IEEE—the FCC specifically required Ultratec to promise that it would license its CTS patents on reasonable terms to other TRS providers. DFOF at ¶¶ 131-135, 138, 139, Dkt. 81. The FCC did so for obvious reasons—because Ultratec was, and had long been, the only provider of CTS and claimed to hold key patents governing the provision of the service. DFOF at ¶¶ 66, 154-156, Dkt. 81; *see also* DFOF at ¶ 48, Dkt. 81. Like a "Letter of Assurance" to an

---

[26]    Plaintiffs state that "Ultratec is *not* under obligation to license any of its patents on a FRAND or RAND basis" because "Ultratec retained the right to license whomever it wanted, or not license whomever it wanted, as well as to set the terms of any such licenses." Pls.' Contract Br. at 19, Dkt. 90. That begs the question of whether Ultratec, in fact, "retained" that virtually unfettered right to do whatever it wanted with its patents. The answer is, no, Ultratec did not retain that broad right. Ultratec agreed to a "compromise" whereby it would offer its patents at reasonable rates to legitimate TRS providers in return for the FCC's approval. Because Ultratec did so, these facts make their promise to the FCC very similar to the promise that standard-essential patent holders make to SSOs.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

SSO, Ultratec's assurance to license was made public in its *ex parte* letter to the FCC on November 27, 2006 (DFOF at ¶¶ 77-80, Dkt. 81), and this assurance was codified as a "condition" of the FCC's approval of IP CTS on January 11, 2007 (DFOF at ¶¶ 86–89, Dkt. 81).

**Acceptance.** In *Motorola Mobility*, this Court held that Motorola "accepted" the SSO offers when it joined the SSOs and "confirmed that it was bound by the [SSO] policies when it submitted declarations and letters of assurance stating that it would license its patents on fair, reasonable, and nondiscriminatory terms." *See* 886 F. Supp. 2d at 1084. In like manner, and in response to the FCC's conditional offer to approve IP CTS, Ultratec filed a public letter with the FCC promising to license its CTS patents at "reasonable rates." DFOF at ¶ 144, Dkt. 81. Shortly thereafter, the FCC approved IP CTS and Plaintiffs began providing IP CTS to consumers (via Sprint and Hamilton) and receiving compensation from the Interstate TRS Fund for doing so. DFOF at ¶ 91, Dkt. 81. As in *Motorola Mobility, Microsoft, Innovatio*, and *Realtek Semiconductor*, Ultratec's actions constituted "acceptance" of the FCC's conditional offer. ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██

**Consideration.** In *Motorola Mobility*, this Court held that "[b]oth Motorola and the organizations benefited from th[eir] arrangement and thus, the element of consideration [was] satisfied." *Id.* at 1084. Here, both Ultratec and the FCC similarly received clearly-defined benefits from their agreement with respect to the FCC's approval of IP CTS. Ultratec benefited from eligibility to receive reimbursement from the federal government for providing IP CTS. DFOF at ¶¶ 85, 91-92, Dkt. 81. The FCC's approval of IP CTS increased market penetration for

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Plaintiffs' CTS product and service.  DFOF at ¶ 92, Dkt. 81.  The creation of an entirely new form of compensable TRS—and one that was not subject to the vagaries of state regulation like PSTN CTS—made IP CTS a fertile ground for TRS providers (like Sorenson and CaptionCall) looking to expand the scope of their product and service offerings.  DFOF at ¶ 93, Dkt. 81.  In short, Plaintiffs have reaped, and continue to reap, substantial benefits from the FCC's approval of IP CTS.  The FCC benefited because its approval of IP CTS directly furthered its goal of "functional equivalence" for the hard-of-hearing, fostered competition (at least in theory), and substantially increased the number of hard-of-hearing Americans reached by CTS.  DFOF at ¶ 183, Dkt. 81.  As in *Motorola Mobility*, the element of mutual consideration is present here.

In *Motorola Mobility*, this Court concluded that "the combination of the policies and bylaws of the [SSOs], Motorola's membership in those [SSOs] and Motorola's assurances that it would license its essential patents on [FRAND] terms constitute contractual agreements." 886 F. Supp. 2d at 1083-84.  Likewise, here the "realities of the transaction" show that the combination of the FCC's rules and regulations and Ultratec's promise to license its patents at reasonable rates in return for approval of IP CTS similarly constitute an enforceable contract between the FCC and Ultratec.  At a minimum, these facts create a genuine dispute as to whether a RAND-type contract exists.

> **3.**     **Because the FCC Intended the Order to Apply to TRS Providers Other than Ultratec, It Secured a Promise from Ultratec that It Would Openly License its Patents.**

Plaintiffs' statement that the FCC's IP CTS ruling is not a contract, in part, because it "is a general order applicable to all providers rather than [an] agency's agreement between just two parties, such as a consent order resolving an enforcement action or a federal procurement contract" (Pls.' Contract Br. at 15, Dkt. 90) is illogical.   It is also ironic, because the FCC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

secured Ultratec's promise to license so that there would be in the future other IP CTS providers

not sourced by one vendor.  DSFOF at ¶¶ 469-473; DFOF ¶¶ 48-50, 86, 132, Dkt. 81.

At the time of the FCC's approval, Ultratec was the *only* vendor providing CTS.  (DFOF

¶¶ 51, 63-67, 122, Dkt. 81; DSFOF at ¶ 470].  The FCC asked Ultratec for assurances on its

licensing policy so that Ultratec would not remain the only vendor of CTS.  DFOF ¶¶ 86, 90,

Dkt. 81 ("[W]e expect that this will not be a service **under the control of one vendor or**

**provider**.  **In that regard**, we condition our approval on Ultratec's representation that it will

continue to license its captioned telephone technologies, including technologies relating to IP

CTS, at reasonable rates." (Emphasis added)); *see also* DSFOF at ¶¶ 470-473.   Ultratec

responded by promising that it would license its patents at reasonable rates.  DFOF ¶¶ 78-80,

Dkt. 81.  The FCC's Order approving IP CTS was thus predicated on Ultratec's promise to forgo

its almost unlimited right to control when, to whom, and for how much Ultratec would license its

patents in lieu of offering a reasonable patent license to any provider that needed one.  Ultratec

considered that a ████████████████████████████████████ Ultratec's convenient,

newfound explanation that its assurance to the FCC meant nothing more than that it would

continue to license its "sister company" to its patents is nonsensical because that type of illusory

promise would not have even remotely addressed the FCC's concerns about subsidizing a CTS

monopoly.

> **4.      The Contract Between Ultratec and the FCC Is Also Similar to the
> "Federal Procurement Contracts" that States Enter into with TRS
> Providers for the Provision of Intrastate TRS.**

In addition to factual and conceptual similarities to RAND contracts, as well as the

FCC's intention that Ultratec forgo its normal patent rights in return for IP CTS approval, there

is yet another reason these facts support the existence of a contract: the FCC **pays** Plaintiffs for a

service they provide to United States citizens.  Under the ADA, the FCC is charged with making

41

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

TRS available to disabled Americans, setting standards for provision of TRS, and paying telecommunications providers for offering compliant TRS to disabled Americans. *See generally* 47 U.S.C. § 225.  In other words, this is not your typical regulatory scenario in which an agency is regulating private entities with no nexus to the agency other than the fact that it regulates them. This situation is analogous to a "federal procurement contract" because the FCC must make TRS "available" to disabled Americans; to do that, the FCC pays TRS providers like Plaintiffs for the service they provide to disabled Americans on the Government's behalf.

There is ample precedent supporting the treatment of this type of procurement transaction as a contract: *every* state government contracts with a TRS provider (i.e., Sprint, Hamilton, or AT&T) to procure intrastate TRS for that state's citizens.  DFOF ¶ 163, Dkt. 81.  These contracts mirror the relationship of Plaintiffs and the FCC.  Each state articulates rules governing the provision of TRS by the providers, which often incorporate by reference the FCC's rules and regulations governing TRS.  ███████████████████████████████████████████████
████████████████████████████████████████.[27]  And each state pays TRS providers a reimbursement rate from the state relay funds for the provision of TRS to the state's citizens. *See* DFOF ¶¶ 20-22, Dkt. 81.  Aside from the fact that the FCC pays[28] Plaintiffs for the provision of *inter*state TRS, there is no functional difference between these contractual relationship of states and TRS providers and the relationship of the FCC and Ultratec.  Here, the express "condition" that Ultratec license its CTS patents at reasonable rates is simply one term of that

---

[27]     Plaintiffs have not produced the actual contracts that their TRS partners enter into with each state, but Plaintiffs have produced certain request for service documentation, as well as the approved bid terms and contract service orders between CapTel and the TRS providers for particular states.  *See* DSFOF at ¶ 502.

[28]     The FCC actually authorizes a third party, Rolka Loube Saltzer Associates, to track reimbursable TRS minutes and administer payment from the federal government's Interstate TRS Fund for the provision of TRS. DSFOF at ¶ 504; DFOF ¶¶ 20-24, Dkt. 81.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

contract—a term that could just as easily be imposed by any state contracting with a TRS provider that held intellectual property that might be essential to the provision of TRS.

In sum, "words and conduct interpreted in light of all the circumstances," *Winstar* 518 U.S. at 863, objectively reflect that Ultratec contracted with the FCC on terms requiring Ultratec to offer a patent license on "reasonable terms and conditions" to "legitimate TRS providers" like CaptionCall and Sorenson. DFOF ¶¶ 48-50, 131-153, Dkt. 81; DFOF ¶¶ 77-80, 83-90, Dkt. 81; DSFOF at ¶¶ 469-476; *see also Laserage Tech.*, 972 F.2d at 802. The fact that Ultratec *knew* of the FCC's intentions—███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████ The objective realities of the transaction govern. And those objective realities reflect that Ultratec is contractually obligated to offer a patent license on reasonable, non-discriminatory terms to other legitimate TRS providers like Defendants.

As articulated here and at length in Defendants' briefing in support of their Motion for Partial Summary Judgment briefing (*see* Dkt. 80), the undisputed facts reflect that Defendants are entitled to partial summary judgment that a contract exists between Ultratec and the FCC. In any event, the Court should deny Plaintiffs' Partial Motion for Summary Judgment on the existence of a contract.

### 5. The Terms of that Contract Obligate Plaintiffs to Offer a License on "Reasonable Terms and Conditions" to "Legitimate TRS Providers."

Plaintiffs' interpretation of the "terms" of their contract with the FCC is irrational. In their estimation, they are not required to license "anyone else other than those who were licensed at the time of the statement" to the FCC. *See* Pls.' Contract Br. at 17, 19, Dkt. 90 ("Ultratec retained the right to license whomever it wanted, or not license whomever it wanted, as well as

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

to set the terms of any such licenses.").  That position is absurd given that the *only* entity actually licensed to Ultratec's patents at that time of the FCC's approval was CapTel, Ultratec's "sister company."  DFOF at ¶¶ 114–130, Dkt. 81; *see also* DSFOF at ¶ 498.

As discussed above, both the FCC and Ultratec understood Ultratec's promise required it

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████  Given these undisputed facts, Plaintiffs' argument that the FCC required nothing more than the status quo is simply incredible and asks the Court to ignore the context of that statement and the FCC's conditional approval (except for the context that *Plaintiffs* want the Court to consider—*i.e.*, that Plaintiffs succeeded in getting the FCC to "change" an FCC Order that did not exist (*see* Pls.' Contract Br. at 7, 18, Dkt. 90)).[29]

Defendants are not asking the Court to "rewrite" the contract.  Pls.' Contract Br. at 17-18, Dkt. 90.  Rather, Defendants direct the Court to the context of Ultratec's licensing representation and the FCC's conditional approval that clarifies what the FCC and Ultratec *objectively* intended.  *Cf.* Pls.' Contract Br. at 17, Dkt. 90 (acknowledging that "intent in contract law is objective rather than subjective").  Regardless of what Ultratec *subjectively* intended to convey by its statement to the FCC, the objective conduct of both the FCC and Ultratec reflects that the terms of the contract require Ultratec to offer a reasonable license to its CTS patents to ██████████████

---

[29]     Plaintiffs invoke the parol evidence rule in arguing that the Court should not look at anything other than the contract itself to determine the existence of a contract and its terms.  Pls.' Contract Br. at 17, Dkt. 90.  But there is no written contract with an integration clause in this case.  *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (noting that when a contract is fully  integrated, "the parol evidence rule prohibits the use of extrinsic evidence to add to or to modify its terms.").  As with the regulatory contract the Supreme Court found in *Winstar*, the contract is not based on a single, fully integrated agreement, but rather a course of conduct that requires examining all the facts and circumstances to assess the "realities of the transaction."  *See Winstar*, 518 U.S. 839, 862-63.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

██████ like Sorenson and CaptionCall.  These are the terms of the contract, and they are no less definite than the terms of the contract this Court found to exist in the *Motorola Mobility* case.  *See* 886 F. Supp. 2d at 1083-84 ("In this case, the combination of the policies and bylaws of the [SSOs], Motorola's membership in those [SSOs] and Motorola's assurances that it would license its essential patents on [FRAND] terms constitute contractual agreements."); *see also Realtek*, 946 F. Supp. 2d at 1005 ("no dispute" that licensing assurances to SSO formed contract); *Microsoft Corp. v. Motorola*, 864 F. Supp. 2d 1023, 1030-33 (W.D. Wash. 2012) (holding that contract was formed by commitment to SSO to license patents on RAND terms).  In any event, if there is a question of fact as to the terms of the contract between Ultratec and the FCC, summary judgment that no contract exists is improper.  In either event, the Court should deny Plaintiffs' Motion for Summary Judgment.

### 6.  Defendants Are "Legitimate TRS Providers" and Are Clearly Intended Third-Party Beneficiaries to that Contract.

As an initial matter, Defendants are not trying to enforce an administrative order *qua* administrative order.  That authority resides with the FCC.  But Defendants are nonetheless clear, intended third-party beneficiaries of the *contract* between the FCC and Ultratec that requires Ultratec to license its patents at reasonable rates to other TRS providers.

Under federal common law, "[t]o prove intended beneficiary status, the third party must show that the contract reflects an express or implied intention of the parties to the contract to benefit the third party."  *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 617 F.3d 1027, 1033 (9th Cir. 2012).  "The contract need not name a beneficiary specifically or individually in the contract; instead, it can specify a class clearly intended by the parties to benefit from the contract."  *Id.*  In the context of government contracts,

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

there must be "clear intent" to benefit the third party.  *Smith v. Cent. Ariz. Water Conserv. Dist.*, 418 F.3d 1028, 1035 (9th Cir. 2005).

That the FCC and Ultratec intended to benefit the "class" of third-party TRS providers is clear on the face of the FCC's declaratory ruling: "[W]e expect that this will not be a service under the control of one vendor or provider.  In this regard, we condition our approval on Ultratec's representation that it will continue to license its captioned telephone technologies, including technologies relating to IP CTS, at reasonable rates."   DFOF at ¶¶ 86, 88, Dkt. 81. Plaintiffs argue that Defendants could not have been third-party beneficiaries because "they were not even in the IP CTS business at the time" of IP CTS approval.  Pls.' Contract Br. at 1, Dkt. 90. That statement illustrates precisely why the FCC conditioned its approval of IP CTS on Ultratec's assurance that it would openly license its patents to TRS providers: to **prevent** Ultratec from engaging in patent holdup and to encourage **new** IP CTS providers, like Defendants, to begin offering the service.   Ultratec had no competitors; the FCC was determined that there would be competitors in the future, and that those competitors would receive the benefit of Ultratec's promise.

Plaintiffs' own internal correspondence substantiates this clear intent to benefit TRS providers who were not yet offering IP CTS when the FCC approved it in 2007. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██

In the closely analogous RAND context, this Court held that Apple, as "a potential user of the standards at issue and a prospective licensee of essential patents," was a third-party

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

beneficiary of the agreements between Motorola and various standards bodies.[30]   Other courts

examining the issue have reached the same conclusion.  *See, e.g.*, *In re Innovatio*, 921 F. Supp.

2d at 923. ("Here, the promises of [the patent holder's] predecessors to offer a RAND license to

all users of the applicable IEEE standards plainly contemplate benefitting those users.");

*Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. Feb. 27, 2012)

("Additionally, the court finds that Microsoft, as a member of both the IEEE and the ITU, is a

third-party beneficiary of Motorola's commitments to the IEEE and ITU.").

　　　　Plaintiffs state that it would be "absurd to conclude that Ultratec *intended to benefit* its

direct competitors by its statement to the FCC." Pls.' Contract Br. at 23, Dkt. 90.  It is surely true

that Plaintiffs would have preferred to maintain their monopoly *and* to have obtained

reimbursement for IP CTS.  But that was not the option they were given.  The FCC refused to

issue a ruling providing for reimbursement without Ultratec's promise to license competitors on

reasonable terms.  DSFOF at ¶¶ 469-474; DFOF ¶¶ 48-50, Dkt. 81.  The FCC and Ultratec

therefore agreed ███████████████████████████ of approval of IP CTS in

return for Ultratec's promise to license its patents on reasonable terms to any provider who

required a license to provide IP CTS.  DFOF ¶ 50, Dkt. 81; *see also* DFOF ¶¶ 83-90, Dkt. 81.

　　　　As in the SSO context where the primary purpose of RAND commitments is to protect

companies that may need to obtain licenses to practice the relevant standard, here the primary

purpose of the FCC's conditional approval requiring Ultratec to license its CTS patents at

reasonable rates was to (1) protect other vendors or providers that may need a license to provide

---

[30]   *See Apple*, 886 F. Supp. 2d at 1085 ("The primary purpose of the ETSI and IEEE intellectual property rights
policies and Motorola's licensing commitments is to protect companies that need to obtain licences in order to
practice the standards adopted by the organizations . . . . The entities that care the most about the availability of a
license are those entities such as Apple, who will incorporate the standards into their own products. As a potential
user of the standards at issue and a prospective licensee of essential patents, Apple is a third party beneficiary of the
agreements between Motorola and IEEE and Motorola and ETSI.").

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

IP CTS and (2) by thus encouraging competition, achieve the FCC's ongoing goal of greater functional equivalence for the deaf and hard-of-hearing. For three years, Defendants have been FCC-certified providers of IP CTS and thus are clearly part of the class of intended third-party beneficiaries to Ultratec's agreement with the FCC. DFOF at ¶ 185, Dkt. 81. Consistent with the reasoning in *Apple*, *Innovatio*, and *Microsoft*, this Court should grant partial summary judgment that Defendants are third-party beneficiaries to the agreement between Ultratec and the FCC. *See* Dkt. 79-80. In any event, the Court should deny Plaintiffs Motion for Partial Summary Judgment that Defendants are not third-party beneficiaries to that contract.

> ### 7. Ultratec's Contract with the FCC Requires Ultratec First to Offer a Reasonable Patent License to Defendants Before Suing for Exclusionary Relief.

Where the patent holder who has made a RAND commitment sues for injunctive relief before even offering a patent license to the alleged infringer, that conduct breaches the patent holder's contract with the SSO and bars exclusionary relief. *See Realtek Semiconductor*, 946 F. Supp. 2d at 1006-07; *cf. Motorola Mobility*, 2012 WL 5416941, at *11-12 (RAND contracts "place[] the burden of fair and nodiscriminatory licensing on [the patent-holder], not on potential licensees."); *Microsoft*, 696 F.3d at 884-85; *Microsoft*, 2012 WL 5993202, at *7-8.[31]   Put

---

[31]   Plaintiffs cite this Court's opinion in *Motorola Mobility* for the proposition that RAND contracts do not necessarily preclude injunctive relief. Pls.' Contract Br. at 24 (citing *Apple*, 2012 WL 5416841 at *15 [the correct citation is 2012 WL 5416**9**41]). That citation is, however, taken out of context and does not apply to these facts. In *Motorola Mobility*, this Court was addressing the issue of whether seeking exclusionary relief where there exists a RAND contract *per se* breaches the contract. *Id.* at *13 ("both [parties] seek the court's interpretation whether, as a matter of contract law, the ETSI and IEEE policies at issue in this case preclude Motorola from seeking injunctive relief to enforce its patent rights in its standards-essential patents"). Because the RAND contracts at issue were unclear on this point, this Court denied summary judgment that Motorola Mobility *per se* breached the contract by suing for exclusionary relief. *Id.* at *15. This is consistent with the Federal Circuit's recent opinion in *Apple Inc. v. Motorola, Inc.*, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014), which held that "[t]o the extent that the district court applied a *per se* rule that injunctions are not available for SEPs, it erred," because injunctive relief may be appropriate, for instance, in situations "where an infringer unilaterally refuses a FRAND royalty or unreasonably delays negotiations to the same effect." *Id.* at *35.

But that does not speak to the issue here, where the patent-holder, Ultratec, failed to offer any license at all—reasonable or otherwise—or even notify Defendants of claimed infringement before suing for exclusionary relief. Both the Federal Circuit and this Court left open the issue of whether RAND "contracts require [the patent-

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

differently, the patent owner that publicly commits itself to licensing its patents on reasonable

terms in return for some bargained-for benefit—such as the patents being deemed essential or

eligibility to receive payment for the provision of a service predicated on the patents—has an

**affirmative obligation** to offer a reasonable patent license to potential infringers **before** seeking

injunctive relief.  *Id.*   It is the patent owner's responsibility to police the use of its patents and

affirmatively comply with that contractual obligation to offer a reasonable patent license when it

believes a third party infringes its patents.  *Id.*

  Defendants do not, as Plaintiffs suggest, "contend that they should be allowed to infringe

Ultratec's patents with impunity" (Pls.' Contract Br. at 1, Dkt. 90); but Defendants do contend

that **if** Ultratec believed Defendants infringed its patents and desired to enforce them, **Ultratec**

should have notified Defendants of that purported infringement and offered a license consistent

with its promise to the FCC before simultaneously filing this patent infringement lawsuit and a

petition to institute an *inter parte review* to attempt to invalidate CaptionCall's patent without

warning to Defendants of any kind.[32]  Ultratec's failure first to offer a license to the patents in suit

with respect to which it claimed infringement was breach of its contract with the FCC.  It was

---

holder] to **first offer a license** to [infringer] on [FRAND] terms **before filing suit**."  *Motorola Mobility*, 2012 WL 5416941 at \*16 (emphasis added).   On that question, this Court suggested that the patent-holder's failure to offer a reasonable patent license before seeking exclusionary relief would be *per se* breach of contract because RAND contracts "place[] the burden of fair and nondiscriminatory licensing on [the patent-holder], not on potential licensees."  *Id.* at \*11-12; *Microsoft Corp. v. Motorola, Inc.*, 2012 WL 2030098, at \*8-9 (W.D. Wash. June 6, 2012) (Robart, J.) ("[I]t was not the intent of the contracting parties (Motorola and the IEEE/ITU) to require that [the] implementer of a standard first apply for a license and then negotiate a license in good faith before Motorola's RAND obligations are triggered.").   This is consistent with Judge Whyte's more recent holding in *Realtek Semiconductor* that, where a RAND contract exists, "the act of seeking injunctive relief (here, at the ITC *before* proposing a RAND license to Realtek) is inherently inconsistent and a breach of defendants' promise to license the patents on RAND terms."  946 F. Supp. 2d at 1006-07 (distinguishing from situations where "an accused infringer of a standard-essential patent *refuses* to accept a RAND license").

[32] Plaintiffs complain that Defendants are trying to "limit Ultratec's rightful statutory remedies."  Pls.' Contract Br. at 1, Dkt. 90.  Defendants are doing nothing of the kind.  **Plaintiffs** limited their own otherwise "rightful statutory remedies" when they promised to license Ultratec's patents in return for the FCC's approval of IP CTS, and they collected millions upon millions of IP CTS reimbursement dollars in the bargain.  *See* DFOF ¶ 188, Dkt. 81.  They must live with that bargain, which expressly requires them to relinquish any monopoly their patents might otherwise confer upon them.

49

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

not *Defendants'* responsibility to ask for a license before Plaintiffs filed suit and notified them of claimed infringement; and it is not their responsibility now—especially considering that Plaintiffs have now skewed the parties' respective bargaining positions by suing to exclude Defendants from the IP CTS market altogether. *Realtek*, 2014 WL 46997, at *7 (N.D. Cal. Jan. 6, 2014) ("LSI possessed especially strong leverage over Realtek [after suing for exclusion in the ITC], and thus the court cannot call unreasonable Realtek's refusal to negotiate a supposedly 'fair, reasonable, and nondiscriminatory' royalty rate with LSI in this weakened position.").

In *Realtek Semiconductor*, the patent holder, LSI Corporation, sued for injunctive relief before the ITC before offering a license of any kind to the alleged infringer, Realtek. *See* 946 F. Supp. 2d at 1005. The court found that a contract existed between LSI and the IEEE, to which Realtek was a third-party beneficiary. *Id.* The only question that remained was whether seeking injunctive relief before offering a license was breach of contract. *Id.* The court said yes. *Id.* at 1006 ("[T]he act of seeking injunctive relief (here, at the ITC before proposing a RAND license to Realtek) is inherently inconsistent and a breach of defendants' promise to license the patents on reasonable terms."). The practical consequence of this holding was that plaintiff's breach of its contract with the IEEE precluded exclusionary relief against the alleged infringer. *Id.* (enjoining LSI from enforcing exclusionary relief from the ITC).[33]

 but they have chosen instead

to sue for exclusionary relief without offering a patent license of any kind to Defendants.

---

[33]   *See also Microsoft*, 2012 WL 5993202, at *5-8 (granting partial summary that patent holder contractually obligated to license on RAND terms was not entitled to permanent injunction); *cf.* Mark A. Lemley, *Intellectual Property Rights and Standard–Setting Organizations*, 90 Cal. L. Rev. 1889, 1925 (2002) ("[I]f a court determines that an IP owner granted a license by virtue of agreeing to be bound by an SSO IP rule, the only remaining questions concern the scope of the license and the royalty rate. The IP owner in that case has only a contractual claim for a royalty, not a cause of action for patent infringement that might result in an injunction, treble damages, and attorneys' fees.").

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Therefore, the reasoning of *Realtek Semiconductor* applies with equal force here, and the Court should grant partial summary judgment that Plaintiffs are not entitled to injunctive relief.

### D.  Summary Judgment Is Not Appropriate for Defendants' Defense of Patent Misuse.

"The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage. Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant." *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).  "This concept of patent 'misuse' has evolved as an equitable principle which requires a court of equity to deny relief to the patentee who uses his patent monopoly to restrain competition." *Triumph Hosiery Mills v. Alamance Industries, Inc.*, 191 F. Supp. 652, 660, aff'd. 299 F.2d 793 (4th Cir. 1962), *cert. denied*, 370 U.S. 924 (1962).  The doctrine of patent misuse has been applied to cases where the patentee used its patent monopoly to suppress the manufacture of possible competing goods not covered by its patent. *See, e.g.*, *Standard Sanitary Mfg. Co. v. United States*, 226 U.S. 20, 49 (1912); *Nat'l Lockwasher Co. v. George K. Garrett Co.*, 137 F.2d 255, 256 (3d Cir. 1943); *Columbus Auto. Corp. v. Oldberg Mfg. Co.*, 264 F. Supp. 779, 783-84 (D. Colo. 1967) aff'd, 387 F.2d 643 (10th Cir. 1968).  Certain conduct is *per se* not patent misuse including if the patentee "conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned." 35 U.S.C. § 271(d)(5).  If a practice is not specifically excluded by § 271(d), the following test applies:

51

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

> [A] court must determine if that practice is reasonably within the patent grant, i.e., that it relates to subject matter within the scope of the patent claims. If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse. If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the rule of reason. Under the rule of reason, the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.  Id. (internal citations and quotation marks omitted).

*Virginia Panel Corp. v. MAC Panel Co*., 133 F.3d 860, 869 (Fed. Cir. 1997).

Plaintiffs in this case have improperly extended their statutory rights by prohibiting licensees from providing goods and services that are not covered by their patents. ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

Plaintiffs have enjoyed a decade of absolute market power: before CaptionCall entered the IP CTS market, ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

██████████████████████████████████████████████████

███████████████████████████

     Plaintiffs have admitted that they intended to use their patents to eliminate competition in the marketplace. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

*See, e.g.*, *Interface Group, Inc. v. Mass. Port Auth.*, 816 F.2d 9, 11 (1st Cir. 1987) ("Higher entry barriers make it easier for existing firms to exploit whatever power they have to raise prices above the competitive level because they have less to fear from potential new entrants.") (Breyer, J.); *see also* DFOF ¶ 164, Dkt. 81 (likening Plaintiffs to "robber barons"—except worse because "there [was] no 'market' for the provision of the CTS technology" given that "it is a technology provided on a monopoly basis [by Plaintiffs], with neither competition nor regulation").

     The anti-competitive effect of Plaintiffs' licensing policies includes the suppression of innovation in the TRS market. For example, in November 2010, Mobile Captions Company ("MCC") launched a new smart phone application and service for providing TRS, with Hamilton Relay providing the captioning service. *See* DSFOF at ¶ 507. In June 2011, Hamilton abruptly and unilaterally terminated its contract "at the behest of Defendants Ultratec and Cap Tel, Inc."

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

DSFOF at ¶ 508.  According to Dixie Zeigler, Vice President of Hamilton, Ultratec and CapTel exerted pressure on Hamilton to terminate its arrangement with MCC.  DSFOF at ¶ 509.

A few weeks later, Hamilton terminated its contract with MCC.  *See* DSFOF at ¶ 507.  Plaintiffs' actions "ruin[ed]" MCC's business.  *See* DSFOF at ¶ 511.    The anti-competitive effect of his actions are clear.

Moreover, these actions against MCC impermissibly extended Plaintiffs' statutory rights beyond their statutory scope

The FCC went through great effort to ensure that the TRS market would not fall under the control of a single vendor.  It defined TRS service broadly so that competitors such as MCC could innovate in the market (DFOF ¶ 32, Dkt. 81); it asked Dr. Vanderheiden whether there were alternative methods for IP CTS that would avoid Ultratec's patents (DSFOF at ¶¶ 477-486); it asked Ultratec to confirm its licensing policy (DFOF ¶ 77-80, Dkt. 81); and it conditioned its approval of IP CTS on Ultratec's representation that it would license its CTS patents .  DFOF ¶¶ 83-90, Dkt. 81.  But all of those efforts would be futile if Plaintiffs are allowed to leverage their

patents to exclude competitors irrespective of whether those competitors infringe Plaintiffs' patents.

The doctrine of patent misuse exists to prevent this sort of anti-competitive abuse. Plaintiffs' motion for partial summary judgment on Defendants' defense of patent misuse should be denied.

## IV.  CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Partial Summary Judgment on Defendants' Breach of Contract Counterclaim and Eighth, Ninth, and Tenth Affirmative Defenses should be denied.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

Dated:  May 12, 2014                                Respectfully submitted,

  /s/  *Bryant C. Boren Jr.*     
Bryant C. Boren, Jr.
Lead Attorney
*Admitted Pro Hac Vice*
bryant.c.boren@bakerbotts.com
BAKER BOTTS L.L.P.
1001 Page Mill Road
Palo Alto, CA 94304
Telephone:  (650) 739-7501
Facsimile:  (650) 739-7601

Brian Oaks
*Admitted Pro Hac Vice*
brian.oaks@bakerbotts.com
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
Telephone: (512) 322-5470
Facsimile: (512) 322-3621

Jonathan B. Rubenstein
*Admitted Pro Hac Vice*
jonathan.rubenstein@bakerbotts.com
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6594
Facsimile: (214) 661-4594

Allen A. Arntsen
aarntsen@foley.com
FOLEY & LARDNER LLP
150 E. Gilman Street
P.O. Box 1497
Madison, Wisconsin 53701-1497
Tel.: 608.258.4293
Fax: 608.258.4258

**Attorneys for Defendants and Counter-Plaintiffs
Sorenson Communications, Inc. and
CaptionCall, LLC**

56

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 12, 2014, a copy of the foregoing pleading was served via electronic mail on all counsel of record.

_____/s/  Harper S. Batts_____

## AUTHORIZATION TO FILE UNDER SEAL

Pursuant to General Order #311 for Filing Documents Under Seal, this document is being filed under seal by the authority set forth in the Protective Order filed in this case (Dkt. 66-1)

_____/s/  Harper S. Batts_____