**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **ULTRATEC, INC. and CAPTEL, INC.,** | § § § § § | |
| Plaintiffs, | § | |
| v. | § § | Civil Action No.: 3:13-cv-00346-bbc |
| **SORENSON COMMUNICATIONS, INC. and CAPTIONCALL, LLC,** | § § § | |
| Defendants. | § § § | |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT 8,379,801**

**[FILED UNDER SEAL]**

# Redacted - Public Version

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## TABLE OF CONTENTS

Page

I.      Introduction ............................................................................................................... 1

        A.      Overview of the '801 Patent .............................................................................. 1

II.     Claims 1-29 are not anticipated or obvious over the relied-upon references ................... 4

III.    Legal Standard ............................................................................................................ 5

IV.     Claim Construction ...................................................................................................... 6

        A.      "block of text" ................................................................................................. 6

        B.      "tagging" "tag" (verb), "tag" (noun) ............................................................... 7

        C.      "communication device" .................................................................................. 8

        D.      "revoicing" ..................................................................................................... 10

        E.      Claims 1, 9, and 14 require "in-line correction" at a hearing-impaired
                user's device ................................................................................................... 11

        F.      Claim 2 requires that the step of "generating another block of text" be
                a different step than the step of "replacing a first block of text of the
                text caption with another block of text," and further requires that these
                two steps are performed at two different devices .................................................. 18

        G.      Claims 25 and 29 require "in-line correction" at a hearing-impaired
                user's device ................................................................................................... 22

        H.      Claims 25 and 29 require that a hearing-impaired user's device display
                an indication to the hearing-impaired user "that the corrected block of
                text replaced" the block of text ......................................................................... 23

        I.      Claims 10-12 require that the "tag[ging]" or "highlight[ing]" be
                displayed to a hearing-impaired user (as opposed to a call assistant) ................... 24

        J.      "text caption" ................................................................................................ 24

V.      The Person of Ordinary Skill in the Art ......................................................................... 25

        A.      The conflicting definitions of a Person of Ordinary Skill in the Art is a
                genuine issue of material fact ........................................................................... 25

        B.      Defendants' Expert Qualifies as a Person of Ordinary Skill in the Art ................. 28

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

VI.    Genuine Issues of Material Fact Exist Regarding Whether the Bridge Video
Publication Anticipates Claims 1-18 and 29 of the '801 Patent ......................................29

    A.    The Bridge Video Publication ..............................................................................29

    B.    The Bridge Video Publication does not qualify as prior art ................................29

    C.    The Bridge Video Publication does not disclose "a text transcription of
a voice signal"......................................................................................................31

    D.    The Bridge Video Publication does not disclose a "text caption"........................32

    E.    The Bridge Video Publication does not disclose the "tag" limitations
of Claims 5, 6, 10, and 15-16..............................................................................32

    F.    The Bridge Video Publication does not disclose the "highlighting"
limitation of Claims 6, 11-12, and 16 .................................................................35

    G.    The Bridge Video Publication does not disclose a "communication
device" of Claims 1, 9, 14, and 29......................................................................37

    H.    The Bridge Video Publication does not disclose "a voice signal
received by the communication device" of Claim 9 .............................................37

    I.    The Bridge Video Publication does not disclose "indicating that the
corrected block of text replaced the block of text" of Claim 29 ..........................38

VII.   Genuine Issues of Material Fact Exists Regarding Whether Engelke 1 Anticipates
Claims 1, 2, 7, 9, and 13 .................................................................................................39

    A.    Engelke 1 ..............................................................................................................39

    B.    Engelke 1 does not disclose "in-line correction" at a hearing-impaired
user's device.........................................................................................................41

    C.    Engelke 1 does not disclose "generating the another block of text" as a
different step than "replacing a first block of text of the text caption
with another block of text" and also does not disclose that these two
steps are performed at two different devices ........................................................42

VIII.  Ryan Does Not Anticipate Claims 1, 2, 7, 9-13, 25, 26, 28 and 29..................................44

    A.    Ryan ......................................................................................................................44

    B.    Ryan does not disclose "in-line correction" at a hearing-impaired
user's device.........................................................................................................45

    C.    Ryan does not disclose "generating the another block of text" as a
different step than "replacing a first block of text of the text caption

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

with another block of text" and also does not disclose that these two steps are performed at two different devices ...................................................45

D.    Ryan does not disclose a "communication device" of Independent Claims 9, 25, and 29 ...................................................................47

E.    Ryan does not disclose the "tagging" and "highlighting" limitations of Claims 10-12 ...........................................................................47

F.    Ryan does not disclose an indication "that the corrected block of text replaced" the block of text of Claims 25, 26, 28, and 29 ......................48

IX.   Genuine Issues of Material Fact Exist Regarding Whether Claims 1-29 are Obvious in View of the References Relied-Upon By Plaintiffs ........................48

A.    Additional Relied-Upon References ....................................................48

B.    Claims 1-29 are patentable over the proposed combination of Engelke 2 and Cervantes ....................................................................50

C.    Claims 3-6 and 8 are patentable over the proposed combination of Ryan and Cervantes ....................................................................54

D.    Claims 5, 6, 10-12, 15, 16, 25, 26, 28, and 29 are patentable over the proposed combination of the Bridge Video Publication and Cervantes ...............60

E.    Claims 19-23 are patentable over the proposed combinations of the Bridge Video Publication and Engelke 1 ............................................62

X.    Genuine issues of material fact exist regarding the secondary considerations of non-obviousness.............................................................................64

A.    Plaintiffs' arguments for the alleged obviousness of the '801 Patent are disputed by their own documents .......................................................64

B.    Long Felt Need for Post-Transmission Error Corrections of the '801 Patent...........................................................................................65

C.    The '801 Patent was met with wide commercial success ....................................66

D.    Plaintiffs' Copied and Valued the '801 Patent Invention .....................................67

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akamai Techs. Inc. v. Cable & Wireless Internet Servs., Inc.,*
    344 F.2d 1186 (Fed. Cir. 2003)..................................................................................5

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................................5

*Continental Can Company USA, Inc. v. Monsanto Company,*
    948 F.2d 1264 (Fed. Cir. 1991)............................................................................5, 32

*Crown Operations International, Ltd. v. Solutia, Inc.,*
    289 F.3d 1367 (Fed. Cir. 2002)................................................................................5

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
    567 F.3d 1314 (Fed. Cir. 2009)............................................................................6, 55

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)....................................................................................................25

*In re Gordon,*
    733 F.2d 900 (Fed. Cir. 1984)................................................................6, 51, 55, 58

*In re Oelrich,*
    666 F.2d 578 (C.C.P.A. 1981)............................................................................5, 32

*In re Ratti,*
    270 F.2d 810 (C.C.P.A. 1959)................................................................6, 51, 55, 59

*In re Spada,*
    911 F.2d 705 (Fed. Cir. 1990)................................................................................25

*Innovention Toys, LLC v. MGA Entm't, Inc.,*
    637 F.3d 1314(Fed. Cir. 2011)................................................................................25

*Krippelz v. Ford Motor Co.,*
    667 F.3d 1261 (Fed. Cir. 2012)................................................................................5

*KSR Int'l v. Teleflex Inc.,*
    550 U.S. 398 (2007)..................................................................................................6

*Leo Pharm. Prods., Ltd. v. Rea,*
    726 F.3d 1346 (Fed. Cir. 2013)..........................................................................54, 60

*McGinley v. Franklin Sports, Inc.,*
    262 F.3d 1339 (Fed. Cir. 2001)..........................................................................52, 57

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

*Microsoft Corp. v. i4i Ltd. Partnership*,
   131 S. Ct. 2238 (2011)..................................................................................................5

*Salazar v. Procter & Gamble Co.*,
   414 F.3d 1342 (Fed. Cir. 2005)....................................................................................15

*Scripps Clinic & Research Foundation v. Genentech, Inc.*,
   927 F.2d 1565 (Fed. Cir. 1991)......................................................................................5

*Vivid Tech., Inc. v. American Science Eng'g, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999)........................................................................................5

**STATUTES**

35 U.S.C. § 103(a) ......................................................................................................6, 25

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## I.      <u>Introduction</u>

U.S. Patent No. 8,379,801 (the '801 Patent) contains various claims covering a novel and superior way of providing error correction within transmitted text captions.   DSFOF ¶ 518.

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Plaintiffs now move for summary judgment of invalidity regarding the '801 Patent. Summary judgment is inappropriate where, as here, several factual disputes exist regarding the '801 Patent, including the level of one of ordinary skill in the art, whether alleged prior art is eligible to be prior art and what the alleged prior art may disclose, as well as the existence of secondary considerations of non-obviousness including the Plaintiffs' own copying of the '801 Patent.

### A.      Overview of the '801 Patent

In general terms, the '801 Patent allows corrections to be made to blocks of text that have already been transmitted to a hearing-impaired user's captioned telephone.  In the '801 patent, a first "block of text 314" is generated and displayed to a hearing-impaired user.  DSFOF ¶ 515. This first block of text 314 may have errors in it.  When a call assistant discovers an error in the first block of text 314, the call assistant may generate a "corrected block of text 414" and send it to the hearing-impaired user's device.  The hearing-impaired user's device may then replace the block of text 314 with the corrected block of text 414.  As such, the hearing-impaired user may now view the corrected block of text 414.  Furthermore, "in order to make a correction more obvious to a hearing-impaired user" the correction may be "tagged."  This tag may "identify each

1

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

corrected word." *Id.* As such, "in comparison to conventional text caption correction methods" (such as the methods described in Engelke 1 and Ryan relied upon by Plaintiffs in this case) "a user viewing the text caption may be provided with a context of the error correction." DSFOF ¶ 516. As a result of all this, the '801 Patent "may reduce distractions to a hearing-impaired user, and, therefore, interruptions in the flow of conversation between a hearing-capable user and a hearing-impaired user may be reduced." *Id*.

This benefit becomes particularly apparent when the state-of-the-art error correction scheme utilized by Ultratec at the time of the filing of the '801 Patent is compared to the novel correction approach of the '801 Patent. The Ultratec error correction scheme would send a corrected word in brackets as the next word in a stream of words without any way to tell where the correction should apply. In the example used by Ultratec, to explain this to their customers, a text caption with corrections would read: "I will meet you at the vest want at 1:30 <restaurant>." DSFOF ¶ 517. In a superior and much more readable approach of the '801 Patent, the same corrected caption read: "I will meet you at the **restaurant** at 1:30." This lets the reader know the context of the correction and avoids interruptions in the flow of conversation. While technically difficult to implement, the '801 Patent provides an elegant solution to supplant the previously-"annoying" error correction approach that was used in captioned telephones. In fact, it was shortly after observing the difference between the two error correction schemes in-person that the Examiner allowed the '801 Patent. DSFOF ¶ 519. To best illustrate the added advantages of the '801 patent over other error correction schemes, Defendants are providing as an exhibit to this brief a copy of the video shown to the PTO examiner when determining the patentability of the '801 patent claims. DSFOF ¶ 520.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

Figures 3-5 provide a further example of an error correction made possible by the '801 patent.  In Figure 3, the first block of text is generated and displayed to the hearing-impaired user.  This block of text has errors in it (i.e., it says "top" instead of "stop," and "door" instead of "store").  PFOF ¶ 633, Dkt. 104-1.  Figure 4 illustrates the corrected block of text.  *Id.*  This corrected block of text is transmitted to the hearing-impaired user's device, where it replaces the first block of text, as is seen in Figure 5.  *Id.*  Furthermore, the corrected words are "tagged" to indicate to the hearing-impaired user what corrections were made.  *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

Fast forward to the present, Plaintiffs now attempt to characterize the '801 Patent as: (i) a simple method; (ii) "a simple matter of minor coding adjustments;" and (iii) "a technical and commercial inevitability."  Pls.' '801 Br. at pp. 1 and 36-37, Dkt. 94.  ██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████, the '801 Patent is (i) not "a simple method;" (ii) not "a simple matter of minor coding adjustments;" and (iii) not "a technical and commercial inevitability" as argued in their brief.  Pls.' '801 Br. at pp. 1, 36-37, Dkt. 94.

███████████████████████████████████████████████████████

██████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## II.     Claims 1-29 are not anticipated or obvious over the relied-upon references

Plaintiffs argue that the Bridge Video Publication, Engelke 1, and Ryan allegedly anticipate numerous claims of the '801 Patent.  However, the '801 Patent is distinguishable from these references.  The Bridge Video Publication does not relate to hearing-impaired users or captioned telephones.  It is for court settings, such as courtroom trials and depositions.  DSFOF ¶ 529.  As for Engelke 1 and Ryan, the design of these references is entirely different from that of the '801 Patent.  Specifically, the '801 Patent first transmits a block of text 314 to the hearing-impaired user, and subsequently transmits a corrected block of text 414 to the hearing-impaired user allowing for **post-transmission** error correction.  DSFOF ¶ 515.  Engelke 1 relates to pre-transmission error correction, allowing for text generated at a call assistant's workstation to be corrected **prior** to transmission.  Engelke 1 and Ryan teach purposely delaying transmission of text to the hearing-impaired user until the text has already been corrected.  Plaintiffs try to side-step this major difference by alleging that the claims of the '801 patent are anticipated by traditional word processing operations, such as spell check and manual replacement of a word.  Pls.' '801 Br. at p. 27, Dkt. 94.

The '801 Patent is not obvious and Plaintiffs' arguments regarding obviousness are both flawed factually and legally.  ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████  As described below, the references relied-upon by Plaintiffs teach away from the modifications proposed by Plaintiffs, the proposed modifications would change the principle of operation of the references, or the proposed modifications would render the references unsatisfactory for their intended purpose.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

III.    **Legal Standard**

Summary judgment is appropriate only where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Plaintiffs bear the burden of proving invalidity by anticipation and obviousness, and thus, Defendants are entitled to have all justifiable inferences drawn in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Vivid Tech., Inc. v. American Science Eng'g, Inc.*, 200 F.3d 795, 806-807 (Fed. Cir. 1999).

For anticipation, Plaintiffs have the burden of showing by clear and convincing evidence that a single prior art reference contains each and every element of the claims either explicitly or inherently. *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2242 (2011); *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1265 (Fed. Cir. 2012). Generally, the facts relevant to this finding are the reference claimed to be prior art and evidence of what the reference meant to persons of ordinary skill in the field of the invention. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991); *Akamai Techs. Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.2d 1186 (Fed. Cir. 2003). Furthermore, a patent does not disclose an element inherently unless the element is "necessarily present and a person of ordinary skill in the art would recognize its presence." *Crown Operations International, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002); *see also Continental Can Company USA, Inc. v. Monsanto Company*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991) ("Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.") (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981)).

For obviousness, Plaintiffs have the burden of showing by clear and convincing evidence that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. §

103(a).

According to the Supreme Court, summary judgment for obviousness is not appropriate

when any of the following are in dispute: (1) the content of the prior art; (2) the scope of the

patent claim; (3) the level of ordinary skill in the art; and (4) the obviousness of the claim. *KSR

Int'l v. Teleflex Inc.*, 550 U.S. 398, 406, 427 (2007). Furthermore, a proposed combination or

modification is not obvious if (1) a reference teaches away from the proposed combination or

modification (*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed.

Cir. 2009)); (2) the proposed combination or modification would render the primary reference

unsatisfactory for its intended purpose (*In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984)); or (3)

the proposed combination or modification would change the principle of operation of the

primary reference (*In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959)).

## IV.   **Claim Construction**

Plaintiffs' allegations that Defendants' claim constructions are simply "buyer's remorse"

are inappropriate and incorrect. While Defendants provide some constructions that are narrower

than Plaintiffs' proposed construction, these constructions appropriately result in the '801 Patent

claims not covering decades-old word processing techniques. When properly construed, the '801

Patent is a novel and elegant solution to a difficult problem.

### A.   **"block of text"**

One or more of the claims of the '801 patent include the limitation "block of text."

Plaintiffs propose that this limitation should be construed as "at least one word, sentence,

or line of text." Pls.' '801 Br. at p.8, Dkt. 94. Defendants do not oppose this construction.

### HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**B.**     **"tagging" "tag" (verb), "tag" (noun)**

One or more of the claims of the '801 Patent includes the limitation "tagging," "tag"

(verb), or "tag" (noun).  As an example, Claim 5 provides an example of the use of one of these

limitations:

> The method of claim 4, wherein displaying the another block of text further
> comprises <u>tagging</u> the corrected text within the text caption.

DSFOF ¶ 531. (emphasis added).

Plaintiffs and Defendants disagree about the proper construction of these limitations, as is

seen below:

| Term | Defendants' Proposed Construction | Plaintiffs' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| tagging | identifying with an identifier | attaching a label to something for the purpose of identification |
| tag (verb) | identify with an identifier | attach a label to something for the purpose of identification |
| tag (noun) | an identifier | a label attached to something for the purpose of identification |

PFOF ¶¶ 637, 638, Dkt. 104-1.

Defendants' construction is supported in the intrinsic record of the '801 Patent at Col. 6,

Lines 7-13:

> Furthermore, in order to make a correction more obvious to a hearing-impaired
> user reading the text caption, application program 108 may further be configured
> to <u>identify each corrected word within the text caption with an identifier (e.g., a</u>
> <u>mark or a tag)</u>. By way of example and not by way of limitation, application
> program 108 may be configured to identify each corrected word by highlighting
> each corrected word displayed in a text caption on display device 134.

DSFOF ¶ 534.  Here, the '801 Patent explains that "a mark or a tag" is "an identifier" that

"identif[ies] each corrected word," which is consistent with Defendants' proposed constructions.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Plaintiffs failed to cite to any support for their proposed constructions of "tagging," "tag" (verb), and "tag" (noun).  Instead, Plaintiffs merely point to an opinion from their expert, Mr. Steel, that their proposed constructions are those of plain and ordinary meaning.  Pls.' '801 Br. at p. 9, Dkt. 94.  In addition to the intrinsic evidence relied upon by Defendants, Defendants' expert Mr. Occhiogrosso explained how Defendants' claim construction is proper.  DSFOF ¶ 535.

C.     "communication device"

The parties also propose that the term "communication device" be construed.  As an example, Claim 9 provides one example of the use of this limitation:

> A communication system, comprising:
> a communication device including a processor;
> a computer-readable medium coupled to the processor;
> a display coupled to the processor; and at least one application program stored in the computer-readable medium, wherein the at least one application program, when executed by the processor, is configured to:
> display a text caption including one or more blocks of text on the display, the text caption indicating a text transcription of a voice signal received by the communication device; and
> display another block of text within the text caption on the display at a location that corresponds to an actual location as produced by the voice signal.

DSFOF ¶ 536 (emphasis added).

Plaintiffs and Defendants disagree about the proper construction of "communication device."  Plaintiffs argue that this term should be construed as "a device that enables communication between users."  Pls.' '801 Br. at p. 9, Dkt. 94.  Defendants propose that this term should be construed as a "captioned telephone or telephone enabled for text telephony." PFOF ¶¶ 637, 638, Dkt. 104-1.

Defendants' construction is supported by the intrinsic record of the '801 Patent. Specifically, this construction is explained by Col. 4, Lines 9-12 of the '801 Patent:

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

> By way of example, communication device 120 may include a captioned telephone, a telephone enabled for text enhanced telephony, or any other suitable communication device configured to receive and display text.

DSFOF ¶ 537. In addition to this intrinsic evidence, Defendants' expert (Mr. Occhiogrosso) explained that a "communication device" should be construed as a "captioned telephone or telephone enabled for text enhanced telephony." DSFOF ¶ 538.

Plaintiffs allege that Defendants' proposed construction is improper because the '801 Patent also explains that a "communication device" may include "a conventional voice phone." Pls.' '801 Br. at p. 10, Dkt. 94. This is incorrect. Although the '801 Patent notes that a "communication device 190 may comprise a conventional voice phone" (DSFOF ¶ 539), it is clear from the '801 Patent, that "communication device 190" is not the "communication device" referred to in the claims of the '801 Patent. For example, as is seen above, Claim 9 explains that the claimed "communication device" "display[s] a text caption including one or more blocks of text on the display." DSFOF ¶ 536. A conventional voice phone does not (and is never explained in the '801 Patent as being able to) "display a text caption including one or more blocks of text," as is required by Claim 9. As such, "communication device 190" is irrelevant to the construction at hand.

Instead, the '801 Patent states that "communication device 120" (as opposed to communication device 190) does have a display that can display a text caption including one or more blocks of text. DSFOF ¶ 537. It is this communication device 120 that the claims of the '801 Patent refer to. The '801 Patent also explains that the "communication device" of the claims is a "captioned telephone or telephone enabled for text enhanced telephony," as proposed by Defendants. *Id.*

9

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**D.    "revoicing"**

One or more of the claims of the '801 Patent include the term "revoicing."   As an example, Claim 22 provides one example of this limitation:

> The method of claim 21, wherein generating the text caption includes the call assistant <u>revoicing</u> words heard from the voice signal for the voice recognition program to generate the text caption.

DSFOF ¶ 540 (emphasis added).

Plaintiffs and Defendants disagree about the proper construction of "revoicing." Plaintiffs allege that this limitation should be construed as "an operation in which the call assistant repeats the words she or he hears upon receipt of the voice signal."  Pls.' '801 Br. at p. 10, Dkt. 94.  Defendants propose that this limitation should be construed as "repeating."  PFOF ¶¶ 637, 638, Dkt. 104-1.

Defendants' proposed construction is consistent with and supported by the specification. In particular, the '801 Patent explains in Col. 5, Lines 5-8 that revoicing is "repeating":

> As will be understood by one having ordinary skill in the art, revoicing is an operation in which the call assistant <u>repeats</u> the words she or he hears upon receipt of the voice signal.

DSFOF ¶ 541 (emphasis added).

Plaintiffs' proposed construction does not make any sense if applied to the claims.  If the limitation "revoicing" is replaced with Plaintiffs' proposed construction, Claim 22 would recite:

> The method of claim 21, wherein generating the text caption includes the call assistant "performing <u>an operation in which the call assistant repeats the words she or he hears upon receipt of the voice signal</u>" words heard from the voice signal for the voice recognition program to generate the text caption.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

In contrast, inserting Defendants' proposed construction results in a logical and consistent claim:

> The method of claim 21, wherein generating the text caption includes the call assistant "repeating" words heard from the voice signal for the voice recognition program to generate the text caption.

Plaintiffs are inconsistent in arguing that the statement "As will be understood by one having ordinary skill in the art, revoicing is an operation in which the calling system repeats the words she or he hears upon receipt of the voice signal" of the '801 Patent is a definition for "revoicing." This statement does not include the terms "only" or "defined," which is what Plaintiffs appear to believe is required for a definition. Pls.' '801 Br. at pp. 8-9, Dkt. 94.

### E. Claims 1, 9, and 14 require "in-line correction" at a hearing-impaired user's device

Claims 1, 9, and 14 each include limitations directed to (1) "displaying" a text caption and then (2) "displaying" another block of text within the text caption. '801 Patent, Claims 1, 9, and 14. As an example, Claim 1 recites the following:

> A method of providing error correction in a text caption, the method comprising:
> displaying a text caption on at least one electronic device, the text caption including one or more blocks of text representing a text transcription of a voice signal;
> replacing a first block of text of the text caption with another block of text during a real-time conversation from which the voice signal is generated; and
> displaying another block of text within the text caption on the at least one electronic device at a location of the first block of text within the text caption.

DSFOF ¶ 530 (emphasis added).

While Plaintiffs argue that in-line corrections are not required by Claims 1, 9, and 14, a proper reading of the claims requires that Claims 1, 9, and 14 should be construed as requiring "in-line correction" at a hearing-impaired user's device. DSFOF ¶ 542.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

    1.    <u>Defendants proposed construction of Claims 1, 9, and 14 is supported by the claim language itself and the specification</u>

The limitations of Claims 1, 9, and 14 repeated above, as a whole, require "in-line correction" at a hearing-impaired user's device.   This construction is supported by the specification as every time that the '801 Patent references that a single device can (1) "display" a text caption and then (2) "display" another block of text within the text caption, the patent makes clear that the correction is taking place at the hearing-impaired user's device:

> In accordance with various embodiments of the present invention, application program 108 may be configured to provide <u>in-line correction</u> of any errors that may be detected within a text caption <u>displayed on display device 134 [of the hearing-impaired user's device]</u>. Stated another way, application program 108 may be configured to replace any detected errors within a displayed text caption with corrected text. More specifically, in the event the call assistant notices <u>one or more errors within a block of text of the text caption as displayed on each of display device 134 [of the hearing-impaired user's device]</u> and display device 132, the call assistant may edit the block of text including the one or more errors through input into device 102 to correct the one or more errors. For example only, the call assistant may edit a block of text through input into a keyboard (e.g., selecting and replacing text, inserting text, and/or deleting text). As a result, a corrected block of text including one or more corrected words may be generated. Thereafter, the corrected block of text including the one or more corrected words may be sent to communication device 120. Upon receipt of the corrected block of text at communication device 120, application program 118 may be configured to replace the block of text including the one or more errors with the associated corrected block of text. Furthermore, substantially simultaneously upon replacing the block of text including the one or more errors with the associated corrected block of text, <u>application program 118 may be configured to display the corrected text caption on display device 134 [of the hearing-impaired user's device]</u>.

DSFOF ¶ 543 (including annotations); DSFOF ¶ 544.  As is seen in the above passage, display device 134 (i.e., the display of the hearing-impaired user's device) (1) displays a text caption output from the speech recognition program and then (2) displays "the corrected text caption" as an "in-line correction."  Not only does the passage expressly explain that the two separate steps of displaying (which are recited in Claims 1, 9, and 14) is a description of "in-line correction,"

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

but it also expressly explains that this "in-line correction" is provided by the hearing-impaired user's device (not the call assistant's device).

This construction is further supported by Col. 6, Lines 15-40 of the '801 Patent, which states that the hearing-impaired user's device (as opposed to the call assistant's device) (1) displays a block of text 314 with errors, and then (2) displays a "corrected block of text 414" as an in-line correction of the text caption.   DSFOF ¶ 545.   Thus, each time the '801 Patent references that a single device can (1) "display" a text caption and then (2) "display" another block of text within the text caption, the '801 Patent is describing in-line correction taking place at the hearing-impaired user's device.   As such, in light of the specification, it is clear that Claims 1, 9, and 14, as a whole, require "in-line correction" at the hearing-impaired user's device.

2.    Defendants' Proposed Construction of "in-line correction" is also supported by the '801 Patent's description of the invention

The requirement of "in-line correction" at the hearing-impaired user's device of Claims 1, 9, and 14 is further bolstered by the '801 Patent's stated inventive aspects.   The '801 Patent states that its purpose is to "provid[e] text caption correction while providing a user with context of a correction and without distracting the user or interrupting the continuity of a conversation between a hearing-impaired user and a hearing user."   DSFOF ¶546.   This purpose is also seen at Col. 7, Lines 3-18 of the '801 Patent.   DSFOF ¶ 516 (explaining that "'in-line' correction" provides a user "with a context of the error correction" and reduces "interruptions in the flow of conversation between a hearing-capable user and a hearing-impaired user").   Plaintiffs concede this, stating that the '801 Patent is directed to a "method for showing the user of a text captioning system the errors that have been corrected."   Pls.' '801 Br. at p. 1, Dkt. 94.

13

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

The fundamental purpose of the '801 Patent cannot be achieved by replacing text solely at a call assistant's device. DSFOF ¶ 547. The call assistant already knows the context of the correction -- the call assistant is the one making the correction. Furthermore, it is not the call assistant that is in danger of being "distract[ed]" or of having "the continuity of a conversation" "interrupt[ed]." DSFOF ¶¶ 546, 547. Instead, it is the <u>hearing-impaired user</u>. To prevent this, the '801 Patent provides "in-line correction" at the hearing-impaired user's device, as is discussed above. Therefore, Claims 1, 9, and 14 require "in-line correction" at the hearing-impaired user's device. Plaintiffs' proposed construction would prevent the '801 Patent from achieving its purpose, and would result in the claims being equivalent to track-changes in a Word document. DSFOF ¶ 547.

3.     <u>Defendants' Proposed Construction is Supported by the File History</u>

The requirement of "in-line correction" at the hearing-impaired user's device is further supported by statements made by the United States Patent and Trademark Office. During the prosecution of the '801 Patent, the Examiner interpreted each of Claims 1, 9, and 14 as requiring "in-line correction." In determining that each of Claims 1, 9, and 14 were patentable, the Examiner noted that Claims 1, 9, and 14 are each directed towards "displaying the corrected block of text within the text caption as an <u>inline correction</u> during the conversation." DSFOF ¶ 519 (emphasis added) (providing the "examiner's statement of reasons for allowance" of the claims of the '801 Patent). Thus, the Examiner of the '801 Patent determined that each of Claims 1, 9, and 14 require "in-line correction."

Plaintiffs claim that the Examiner's reasons for allowance are irrelevant because the Examiner merely lumped all the independent claims together, and furthermore, "the subjective intent of the Examiner when allowing a case is irrelevant." Pls.' '801 Br. at p.12, Dkt. 94. This also is incorrect. While the Examiner did specifically call out and address each of the

14

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

independent claims together, the Examiner did so to identify a common feature across all independent claims, namely "inline correction."   DSFOF ¶ 519.   Rather than "lumping," as alleged by Plaintiffs, this indicates that the Examiner understood all of the claims included the patentably distinct feature of "in-line correction".

Plaintiffs' statement that "the subjective intent of the Examiner when allowing a case is irrelevant" is flat out wrong.   The case pointed to by Plaintiffs as support for this statement, (i.e., *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005)) never says this.   What *Salazar* actually says is that "an Examiner's Statement of Reasons for Allowance  'will not necessarily limit a claim.'"  *Id.*  "Not necessarily limit" is a far cry from "irrelevant." The case concludes that: "an applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope."  *Id.*

Consistent with *Salazar*, Applicants did not remain silent regarding the Examiner's statements in this case.   The Examiner noted that "the invention is [m]ore towards in-line corrections of text and in real time."  DSFOF ¶ 548.   In response to this Interview Summary, the Applicants filed an amendment stating "[t]his Amendment includes amendments to the claims that address the outstanding rejections and the request by the examiner in an effort to remove outstanding issues and otherwise expedite prosecution.  DSFOF ¶ 549 (emphasis added).   That is, the Applicants did not remain silent.   Instead, they specifically filed amendments designed to follow the Examiner's suggestion that the claims be "[m]ore towards in-line corrections of text and in real time."   This is consistent with a "clear and unmistakable disavowal" of claim scope, and Plaintiffs do not provide any argument (or evidence) to the contrary.   It is clear that both the

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

Examiner and the Applicants intended these claims to require "in-line correction" at the hearing-impaired user's device.

The prosecution history of the '801 Patent further supports Defendants' construction. In this prosecution, an examiner interview was held on November 27, 2012. DSFOF ¶ 548. During the interview, the inventors explained to the Examiner that the '801 Patent is directed to in-line corrections at a hearing-impaired user's device. DSFOF ¶ 550. The discussion was focused on in-line corrections at the assisted user's device with no discussion of performing in-line corrections at a call assistant's terminal. *Id.* The inventors showed the Examiner videos of the subject matter of the '801 Patent in operation, which show "inline corrections" being performed at the hearing-impaired user's device. *See* DSFOF ¶¶ 520, 551. Based on this examiner interview, and based on amendments requested by the Examiner to further define the "inline corrections" at a hearing-impaired user's device, the Examiner allowed Claims 1-29. DSFOF ¶ 552. The Examiner agreed that each of the claims of the '801 Patent are directed towards "displaying the corrected block of text within the text caption as an <u>inline correction</u> during the conversation." DSFOF ¶ 519 (emphasis added). Therefore, each of Claims 1, 9, and 14 require "in-line correction" at the hearing-impaired user's device.

            4.     <u>Defendants' Proposed Construction Requiring "in-line corrections" is also consistent with the PTAB's view of Claims 1, 9, and 14</u>

In the *inter partes* review of the '801 Patent, the Patent Trial and Appeal Board (the "PTAB") provided an explanation of the disclosure of the '801 Patent that supports this requirement of Claims 1, 9, and 14. In describing the '801 Patent, the PTAB emphasized the fact that "a second device, e.g., communication device 120" (which is the hearing-impaired user's device) is the device that both displays "a text caption" and also displays "the new block of text in the text caption." DSFOF ¶ 553. Thus, the PTAB understood that when two steps of

16

displaying are performed on the same device in the context of the '801 Patent (as is seen in Claims 1, 9, and 14), those steps are performed by the hearing-impaired user's device (as opposed to the call assistant's device).

> 5.   Plaintiffs' Inconsistent Arguments Support Defendants' Proposed Construction of Claims 1, 9 and 14

Plaintiffs' arguments that "in-line correction" at the hearing-impaired user's device is not required fail upon inspection.   Plaintiffs note that Claims 1 and 9 should not be construed as requiring "in-line correction" at the hearing-impaired user's device because "these additional limitations are found in a dependent claim that provides additional limitations to Claim 1 or Claim 9 (*see* Claims 4, 5, 10, and 12)," and that such a construction would, therefore, "render the dependent claims meaningless."  Pls.' '801 Br. at pp. 11-12, Dkt. 94; DSFOF ¶ 554.  None of the claims that depend from Claims 1 or 9 (or even 14) recite in-line correction at the hearing-impaired user's device.  DSFOF ¶ 555.  Plaintiffs did not provide any evidence or explanation that would suggest otherwise.  DSFOF ¶ 554.

The cited dependent claims actually provide further support for construing Claims 1, 9, and 14 as requiring "in-line correction" at the hearing-impaired user's device.   Each of dependent Claims 5, 6, 10, 11, 12, 15, and 16 (which depend from Claims 1, 9, and 14, respectively) recite the concept of "tagging" and/or "highlighting" a corrected word.  DSFOF ¶ 556.  This is important because even Mr. Steel conceded that this "tagging" or "highlighting" is performed at the hearing-impaired user's device.  DSFOF ¶557. (noting that "[i]n Figure 5 [of the '801 Patent], the corrected words 'stop' and 'store' are displayed to the user with highlighting to indicate they are corrections," as opposed to being displayed to the "call assistant").  As these claims recite operations performed at the hearing-impaired user's device,

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

they provide further evidence that Claims 1, 9, and 14 require "in-line correction" at the hearing-impaired user's device.

Plaintiffs further allege that Claim 3 depends from Claim 1, and the proposed claim construction would merge the limitations of Claim 3 into Claim 1. Pls.' '801 Br. at p. 31, Dkt. 94. This is also incorrect. Claim 3 adds two new limitations, generating and transmitting, which are not requisite to "in-line correction" at the hearing-impaired user's device. DSFOF ¶ 558. Therefore, Claims 1 and 3 would still have different scopes, contrary to Plaintiffs' incorrect assertions.

**F.    Claim 2 requires that the step of "generating another block of text" be a different step than the step of "replacing a first block of text of the text caption with another block of text," and further requires that these two steps are performed at two different devices**

Dependent Claim 2 requires both: (1) "generating the another block of text" and (2) "replacing a first block of text of the text caption with another block of text during a real-time conversation from which the voice signal is generated." This is seen below:

> 1.    A method of providing error correction in a text caption, the method comprising:
>
> displaying a text caption on at least one electronic device, the text caption including one or more blocks of text representing a text transcription of a voice signal;
>
> replacing a first block of text of the text caption with another block of text during a real-time conversation from which the voice signal is generated; and
>
> displaying another block of text within the text caption on the at least one electronic device at a location of the first block of text within the text caption.
>
> 2.    The method of claim 1, further comprising identifying one or more errors within the first block of text of the text caption with respect to what was said in the voice signal prior to generating the another block of text.

DSFOF ¶ 530, 559.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

The parties disagree about whether Claim 2 should be construed as requiring that these two steps be performed at two different devices. Although Plaintiffs provide lip-service that these two steps of Claim 2 should be construed as two different steps, Plaintiffs conflate the two in any description they provide. Pls.' '801 Br. at p. 27, Dkt. 94 (alleging that two different steps can be simultaneous). Additionally, Plaintiffs allege that Claim 2 should not be construed as requiring these two steps to be performed on two different devices. Pls.' '801 Br. at pp. 26-27, Dkt. 94. The proper construction of Claim 2 requires that the step of "generating another block of text" be a different step than the step of "replacing a first block of text of the text caption with another block of text," and further requires that these two steps be performed at two different devices.

<blockquote>1.   <u>Defendants proposed construction of Claim 2 is supported by the claim language itself, and the intrinsic record</u></blockquote>

Throughout the '801 Patent, the step of "generating the another block of text" is disclosed as being different than the step of "replacing a first block of text of the text caption with another block of text." Further, the step of "generating the another block of text" is consistently described as being performed on a different device than the step of "replacing a first block of text of the text caption with another block of text." The '801 Patent explains that the process of generating corrected blocks of text and using the generated block of texts to replace un-corrected blocks of text is <u>performed as different steps on different devices</u>:

> [T]he call assistant may edit a block of text through input into a keyboard (e.g., selecting and replacing text, inserting text, and/or deleting text). As a result, a corrected block of text including one or more corrected words may be generated. Thereafter, the corrected block of text including the one or more corrected words may be sent to communication device 120. Upon receipt of the corrected block of text at communication device 120, application program 118 may be configured to replace the block of text including the one or more errors with the associated corrected block of text.

19

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

DSFOF ¶ 543.

That this process is performed as different steps and performed on different devices is further confirmed by Col. 6, Lines 29-40 and Figures 4-5 of the '801 Patent. The '801 Patent explains that the corrected block of text 414 (shown in FIGURE 4) is (1) generated by relay service 110 and (2) transmitted to communication device 120. Once the corrected block of text 414 is received by communication device 120, the corrected block of text 414 is (3) used to replace block of text 314, resulting in text caption 510 (shown in FIGURE 5):

> For example, with reference to FIGS. 3 and 4, a call assistant may recognize one or more errors within block 314 and, thereafter, generate a corrected block of text 414 including one or more corrected words 414 and 416. Thereafter, corrected block of text 414 may be transmitted from relay service 110 and received by communication device 120. Block of text 314 may then be replaced by corrected block of text 414, as illustrated in text caption 510 (see FIG. 5).

DSFOF ¶ 560 (emphasis added).



PFOF ¶ 633, Dkt. 104-1.

Additionally, a similar explanation is provided by the '801 Patent at Col. 6, Lines 59-67 and Figure 6:

> Moreover, method 600 may include identifying one or more errors within a block of text within text caption 602 and generating a new block of text having corrected word for each identified error 604. Method 600 may further include replacing the block of text having the one or more errors with the new block of text in the text caption 606. In addition, method 600 may include displaying the

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

text caption on the second device wherein the block of text having the one or more errors is replaced by the new block of text 608.

DSFOF ¶ 561.



*FIG. 6*

DSFOF ¶ 562.  A new block of text is generated at step 604, and then (in a completely different step, step 606), the generated block of text is used to replace the block of text having one or more errors in it.

The abstract of the '801 Patent also supports Defendants' construction.  The abstract explains that the generation of text and the replacement of text using the generated text are two completely different steps.  DSFOF ¶ 521.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

2.    Plaintiffs Proposed Construction of Claim 2 Relies on Flawed Analysis

Plaintiffs assert that Claim 2 should not be construed as requiring the steps of "generating the another block of text" and "replacing a first block of text of the text caption with another block of text" be performed on two different devices.  Pls.' '801 Br. at pp. 26-27, Dkt. 94. Plaintiffs allege that this concept is already included in Claim 3 and that such a construction would "merge" the limitations of Claim 2 into Claim 3.  This argument, however, is flawed. Claim 3 does not depend from Claim 2.  DSFOF ¶ 558.  Instead, both claims depend from Claim 1.  As such, whether this concept is included in Claim 3 is irrelevant.  Here, Claims 2 and 3 have a different scope, even when Claim 2 is construed to require that the steps of "generating the another block of text" and "replacing a first block of text of the text caption with another block of text" be performed on two different devices.  Unlike Claim 3, Claim 2 recites "identifying one or more errors within the first block of text of the text caption with respect to what was said in the voice signal."  DSFOF ¶ 559.  Further, Claim 3 explicitly includes the additional step of "transmitting" not included in Claim 2, and thus the claims have different claim scope.  DSFOF ¶ 558, 559.

**G.    Claims 25 and 29 require "in-line correction" at a hearing-impaired user's device**

Similar to Claims 1, 9, and 14 (discussed above at Section IV.E.2), Plaintiffs and Defendants disagree about whether Claims 25 and 29 require "in-line correction" at a hearing-impaired user's device.  Plaintiffs allege that Claims 25 and 29 should not be construed to require that this "in-line correction" be performed at a hearing-impaired user's device. Pls.' '801 Br. at pp. 11-13, Dkt. 94.  Claims 25 and 29 properly construed require that "in-line correction" be performed at a hearing-impaired user's device.  DSFOF ¶ 563.  This is further explained at Section IV.E.2.

22

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**H.    Claims 25 and 29 require that a hearing-impaired user's device display an indication to the hearing-impaired user "that the corrected block of text replaced" the block of text**

Claims 25 and 29 include the following limitations: "indicating that the corrected block of text replaced" the block of text.   DSFOF ¶ 564.   Plaintiffs and Defendants disagree about whether Claims 25 and 29 require it to be a hearing-impaired user's device that displays an indication to the hearing-impaired user "that the corrected block of text replaced" the block of text.

Properly construed, Claims 25 and 29 require that a hearing-impaired user's device display an indication to the hearing-impaired user "that the corrected block of text replaced" the block of text.   This construction is supported by the specification of the '801 Patent.   In particular, every time that the '801 Patent expressly mentions indications of a corrected word, the '801 Patent is describing visual indications that are displayed to the hearing-impaired user.   For example, the specification states: "[I]n order to make a correction more obvious to a hearing-impaired user reading the text caption, application program 108 may further be configured to identify each corrected word within the text caption with an identifier (e.g., a mark or a tag)."   DSFOF ¶ 565 (emphasis added).   As another example, the specification states: "as illustrated in FIG. 5, application program 118 (see FIG. 2) may be configured to display corrected words (i.e., words 414 and 416) within text caption 510 with a marking (i.e., a tag), such as a highlight 520."   DSFOF ¶ 566; PFOF ¶ 633, Dkt. 104-1.   These passages expressly disclose that the indications are visually displayed to the hearing-impaired user (as opposed to visually displayed to the call assistant).

Contrary to Defendants' proposed construction, Plaintiffs argue for an interpretation broad enough to cover correction indications made to a computer, itself.   Pls.' '801 Br. at p. 22, Dkt. 94.   Plaintiffs have not and cannot point to any portion of the '801 Patent for support.

I. **Claims 10-12 require that the "tag[ging]" or "highlight[ing]" be displayed to a hearing-impaired user (as opposed to a call assistant)**

Each of Claims 10-12 include limitations directed to "tag[ging]" or "highlight[ing]." As an example, Claim 11 recites the following:

> The communication system of claim 9, wherein the at least one application program is further configured to display at least one word within the text caption having the one or more blocks of text of the text caption replaced by the another block of text as <u>highlighted</u>.

DSFOF ¶ 567 (emphasis added).

Plaintiffs and Defendants disagree about whether Claims 10-12 require that the "tag[ging]" or "highlight[ing]" be displayed to a hearing-impaired user (as opposed to a call assistant). Defendants propose that Claims 10-12 should be construed to require that this "tag[ging]" or "highlight[ing]" be displayed to a hearing-impaired user (as opposed to a call assistant). DSFOF ¶ 568. The proper construction of Claims 10-12, as a whole, is that these claims require this "tag[ging]" or "highlight[ing]" be displayed to a hearing-impaired user (as opposed to a call assistant), as is explained above at Section IV.H.

J. **"text caption"**

One or more of the claims of the '801 Patent include the limitation "text caption." As an example, Claim 1 recites: "displaying a <u>text caption</u> on at least one electronic device, the text caption including one or more blocks of text representing a text transcription of a voice signal." DSFOF ¶ 530 (emphasis added).

The parties disagree about the proper construction of "text caption." Defendants propose that the term "text caption" be given the plain and ordinary meaning of "a display of text that communicates spoken words to a hearing impaired user." DSFOF ¶ 569. Plaintiffs disagree with Defendants' construction but fail to point to any evidence or expert opinion in support of

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

their theory.  *See* Pls.' '801 Br. at pp. 19-20, Dkt. 94.  This contrasts to the opinion specifically provided by Mr. Occhiogrosso, who noted that the '801 Patent explains that text captions are used "to assist those who are deaf or hearing impaired," and further noted that this definition of "text caption" is also supported by Plaintiffs' own reference, Engelke 2."  DSFOF ¶¶ 570, 571, 572.

Plaintiffs only argument appears to be that Defendants' construction "would render the limitations of Claim 19 superfluous."  Pls.' '801 Br. at pp. 19-20, Dkt. 94.  However, Claim 19 actually recites specific limitations of a relay service, for example, "a relay service including a call assistant."  DSFOF ¶ 573.  Despite Plaintiffs' mischaracterization, Claim 19 is not the same as "a display of text that communicates spoken words to a hearing impaired user."  Instead, it provides limitations of a relay service (e.g., one that includes a call assistant, instead of an automated relay service).  Therefore, Plaintiffs' sole argument that Defendants' construction would render Claim 19 is "superfluous" is just another instance of Plaintiffs trying to mislead the Court, and Defendants' construction should be adopted.

## V.     The Person of Ordinary Skill in the Art

### A.     The conflicting definitions of a Person of Ordinary Skill in the Art is a genuine issue of material fact

Both anticipation and obviousness must be determined from the perspective of the person of ordinary skill in the art.  *See Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323(Fed. Cir. 2011) (citing 35 U.S.C. § 103(a); *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)); *In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990).  As such, summary judgment is not appropriate when there is a genuine issue of material fact with regard to the person of ordinary skill in the art.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Here, a genuine issue of material fact exists regarding the person of ordinary skill in the art for the '801 Patent. In this case, multiple definitions for a person of ordinary skill in the art have been presented. Plaintiffs allege that the parties provided "roughly congruent definitions for the person having ordinary skill in the art of the '801 Patent," and that "[t]he parties' positions on the level of skill in the art is unlikely to result in a material dispute of fact." Pls.' '801 Br. at p. 35, Dkt. 94. However, this is yet a further instance of Plaintiffs' double-speak. For example, despite these alleged "facts" posited by Plaintiffs' in one portion of their brief, they earlier had gone on at some length as to why Defendants' expert, Mr. Occhiogrosso, is not a person of ordinary skill in the art. *Compare* Pls.' '801 Br. at pp. 13-14 *with* p. 35, Dkt. 94. To suggest that both "parties' positions on the level of skill in the art is unlikely to result in a material dispute of fact" when the immaterial dispute allegedly removes Defendants expert as one of ordinary skill in the art is simply flabbergasting. Obviously, if the difference would remove Defendants' expert as one of ordinary skill in the art, the parties' positions differ significantly.

The first definition provided by Plaintiffs for a person of ordinary skill in the art in the '801 Patent is "a person that is, among other attributes, familiar with the electronic generation, correction, and display of transcribed or captioned text that is transmitted to and displayed on an electronic device." DSFOF ¶ 574. Plaintiffs provided this definition in their petition for *Inter Partes* review of the '801 Patent, and then later adopted it in the present litigation. DSFOF ¶ 575.

In an effort to manufacture a reason to exclude Mr. Occhiogrosso's testimony, Plaintiffs later further restricted their definition of a person of ordinary skill in the art to one that possessed:

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

- an undergraduate degree in one or more of the following areas: electrical engineering, computer science, or computer information systems;
- a general knowledge of programming software applications for real-time transcription; and
- a general knowledge and understanding of the telecommunications needs of the deaf and hard-of-hearing and the design goals and limitations of existing telecommunications technology for the deaf and hard-of hearing.

This definition was provided by Plaintiffs' expert, James A. Steel, and adopted by Plaintiffs in their motion for summary judgment.  DSFOF ¶ 576; Pls.' '801 Br. at pp. 13-14, Dkt. 94.

Plaintiffs again change their definition later in the same motion:

- a person with "a relevant undergraduate degree and some years of specific technical experience."

Pls.' '801 Br. at p. 35, Dkt. 94.

Defendants' own definition of the person of ordinary skill in the art is the following:

- the characteristics of a person of ordinary skill in the art of the '801 Patent in the 2008–2009 time frame would have been a person with a bachelor's degree in electrical engineering (or electrical and computer engineering) and a few years of experience with telephone communication system architecture, design and implementation, digitization of voice, speech recognition technology, voice-over-IP technology, and/or text captioning
- However, someone with less technical education but more experience, or more technical education but less experience would meet this standard

DSFOF ¶ 577.

The differences between Plaintiffs' proposed definitions and Defendants' proposed definition create a genuine issue of material fact in this case.  Perhaps the most disputed portion is that Plaintiffs' (second) definition requires that a person of ordinary skill in the art has "a general knowledge and understanding of the telecommunications needs of the deaf and hard-of-hearing and the design goals and limitations of existing telecommunications technology for the deaf and hard-of hearing."  This is an issue that is clearly disputed.  Plaintiffs' attempts to mislead the Court that there is no material dispute as to a person of ordinary skill in the art is

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

incorrect and inappropriate.  There most certainly is a material dispute as to the qualifications of a person of ordinary skill in the art, and therefore summary judgment on obviousness and anticipation are inappropriate, as this is a fundamental issue to both analyses.

### B.    Defendants' Expert Qualifies as a Person of Ordinary Skill in the Art

Plaintiffs' allege that Defendants' expert, Benedict Occhiogrosso, is "not a person of ordinary skill in the art, even under his own definition."  PFOF ¶ 662, Dkt. 104-1.  Mr. Occhiogrosso, however, is a person of ordinary skill in the art under his own definition, and also under the various definitions proposed by Plaintiffs.  Mr. Occhiogrosso has (1) a Bachelor of Science in electrical engineering and (2) a Master of Science in electrical engineering.  DSFOF ¶ 578.   Mr. Occhiogrosso also has at least "a few years of experience with telephone communication system architecture, design and implementation, digitization of voice, speech recognition technology, voice-over-IP technology, and/or text captioning."  DSFOF ¶ 579.  These factors (alone) qualify him as a person of ordinary skill.

Mr. Occhiogrosso also qualifies as a person of ordinary skill in the art under the Plaintiffs' numerous definitions.  He has previous work experience in voice processing for "captioning of meetings and captioning or transcription of recorded information .... [which] is explicitly for deaf and hard of hearing."  DSFOF ¶ 580.  Additionally, he has "designed telecommunication relay services" and "a telecom relay service for multilingual translation" for the United Nations, and also done "some audio conferencing with transcription for various member firms in the financial services community."  DSFOF ¶ 581.

The only "evidence" Plaintiffs point to as allegedly disputing Mr. Occhiogrosso's qualifications is an irrelevant excerpt from his *inter partes* review deposition.  Specifically, during this deposition, Plaintiffs' attorney questioned Mr. Occhiogrosso about whether or not he is a person of ordinary skill in "a telecommunications system that is designed to deliver both text

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

and voice information to a hearing-impaired person, the text being corrected by a call assistant at a call center and transmitted to the hearing-impaired person's device where it is used to effectively replace previously transmitted captions." *See* PFOF ¶ 662, Dkt. 104-1 (which points to deposition testimony at 91:2-93:11 of the rough draft of Mr. Occhiogrosso's testimony). This is not Defendants' definition of a person of ordinary skill in the art, nor is it one of the definitions asserted by Plaintiffs.

## VI.   Genuine Issues of Material Fact Exist Regarding Whether the Bridge Video Publication Anticipates Claims 1-18 and 29 of the '801 Patent

### A.   The Bridge Video Publication

The Bridge Video Publication discusses an error correction system for "real-time transcription[s]" in a legal proceeding. DSFOF ¶ 582. In the Bridge Video Publication, a court reporter can make a change to a document in a legal proceeding (e.g., a document including testimony from a witness) on the court reporter's device, and the correction may be displayed on a client's device (e.g., a device being viewed by a judge during the legal proceeding). DSFOF ¶ 583. The correction is made to the client's device using an "auto-refresh" of the screen on the client's device. DSFOF ¶ 584; PFOF ¶ 679, Dkt. 104-1.

### B.   The Bridge Video Publication does not qualify as prior art

Plaintiffs' motion for summary judgment fails to provide proper evidence that the Bridge Video Publication actually qualifies as "prior art." As an initial matter the term "Publication" is deceiving as the "Bridge Video Publication" consists of screenshots of a "video" Plaintiffs claim to have found using the Wayback Machine (*See* PFOF ¶ 664, Dkt. 104-1). Plaintiffs do not provide any evidence that this "video" is an accurate representation of what was publicly available prior to the filing date of the '801 Patent. Nor can they.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

The only alleged "evidence" used by Plaintiffs to authenticate the Bridge Video Publication is a declaration by Xavier Santistevan. *See* Pls.' '801 Br. at p. 15, Dkt. 94; PFOF ¶¶ 663-669, Dkt. 104-1. At most, this declaration may establish that a "video" could be accessed using a URL with a header date of January 2, 2008; it does not establish that the video found on this URL is the <u>same</u> video that would have been available to the public on January 2, 2008. Budzisz Decl. Ex. 65, Dkt. 92-65, Santistevan Decl. at ¶ 4. In fact, a declaration submitted by Plaintiffs in the *inter partes* review of the '801 Patent indicates otherwise. This declaration by Christopher Butler (the office manager at the Internet Archive, which created the Wayback Machine) states that the January 2, 2008 date relied-upon by Plaintiffs <u>only</u> applies to the "HTML file" "<u>not</u> to image files linked therein." DSFOF ¶ 585. Furthermore, Mr. Butler's declaration also explains that "images that appear on a page <u>may not</u> have been archived on the same date as the HTML file." *Id*. The "video" relied-upon by Plaintiffs as the Bridge Video Publication is a compilation of images, not an HTML file.

Based upon the materials provided by Plaintiffs, there is no way to know when the "video" relied-upon by Plaintiffs was actually archived. It could have been archived on January 2, 2008, or it could have been archived on a later date. Even if a video was accessible as of January 2, 2008 using the link archived by the Wayback Machine, the content of that video could be entirely different from what was eventually archived by the Wayback Machine.

Plaintiffs' citation to the "e-Tips" electronic newsletter (allegedly dated November 2007) cannot cure the above-discussed deficiencies of the Bridge Video Publication. Pls.' '801 Br. at p. 15, Dkt. 94. This newsletter does not include a copy of the "video" relied-upon by Plaintiffs or a copy of any of the screen shots from the "video" that Plaintiffs rely upon. PFOF ¶ 668, Dkt. 104-1.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Therefore, Plaintiffs have failed to establish that the Bridge Video Publication qualifies as prior art. Such a failure by Plaintiffs clearly creates a material issue of fact, and thus, summary judgment is not appropriate.

**C.     The Bridge Video Publication does not disclose "a text transcription of a voice signal"**

The Bridge Video Publication fails to disclose "a text transcription of a voice signal," as is recited in Independent Claims 1, 14, and 29. DSFOF ¶ 586. Specifically, Mr. Occhiogrosso explained that a voice <u>signal</u> is "an electric signal corresponding to a voice," and that the Bridge Video Publication does not discloses such a "voice signal." DSFOF ¶ 587. Plaintiffs attempt to counter Mr. Occhiogrosso's statements by suggesting that the claimed "voice signal" does not have to be an "electric" signal, and also suggesting that (even if it does) the Bridge Video Publication "inherently" discloses such an "electric" signal. Pls.' '801 Br. at p. 19, Dkt. 94. Such a disagreement regarding the content of Independent Claims 1, 14, and 29 and the content of the Bridge Video Publication creates a genuine issue of material fact, rendering summary judgment inappropriate.

Furthermore, Plaintiffs are wrong on both points. The only evidence Plaintiffs provide for their interpretation of "voice signal" is a statement in the '801 Patent that:

> Upon receipt of a voice signal, a human call assistant (not shown) positioned within relay service 110, may listen to the voice signal transmitted from communication device 120 and "revoice" the words to a speech recognition computer program (not shown) within relay service 110.

Pls.' '801 Br. at p. 19, Dkt. 94; DSFOF ¶588. Plaintiffs never explain how a "voice signal" can possibly be "transmitted from communication device 120" to "relay service 110" (as is recited in the quote above) without it being an electric signal. Clearly, the "voice signal" is an electric signal (of a person's voice), not just a person's voice. Plaintiffs' argument is at odds with their

own expert, Mr. Steel, who declared that in the Bridge Video Publication, a court reporter only transcribes the "voice of a testifying witness," not a voice signal.  DSFOF ¶ 589.

Plaintiffs further attempt to salvage their anticipation argument by alleging that this "voice signal" is inherently disclosed by the Bridge Video Publication because "court reporters are known to transcribe speech that has been translated to an electric signal by microphones and then translated back into an audible signal by headphones or court room speakers."  Pls.' '801 Br. at p. 19, Dkt. 94.  Even if Plaintiffs are able to come up with some example of when something *could* happen, it does not mean that such a situation is "necessarily present" in the Bridge Video Publication," as is required by the inherency doctrine.  This is conceded by Plaintiffs own expert, who states that the transcription in the Bridge Video Publication merely "can" or "could" represent a voice signal.  DSFOF ¶ 590.  "Can" and "could" are not "necessarily present," as is required for inherency.  *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991) (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981).

### D.    The Bridge Video Publication does not disclose a "text caption"

As is discussed above in the claim construction section at Section IV.J, "text caption" should be properly construed as "a display of text that communicates spoken words to a hearing impaired user."  Mr. Occhiogrosso explained that when properly construed, the Bridge Video Publication fails to disclose, expressly or inherently, the "text caption" of Claims 1-18 and 29. DSFOF ¶ 591.  Plaintiffs do not disagree with this opinion. Pls.' '801 Br. at p. 20, Dkt. 94.

### E.    The Bridge Video Publication does not disclose the "tag" limitations of Claims 5, 6, 10, and 15-16

The Bridge Video Publication does not disclose "tagging" as required by Claims 5, 6, 10, and 15-16.  DSFOF ¶ 593.  Plaintiffs' expert alleges that "tagging" is disclosed by "changing the text color or replacing the corrected text in all capital letters" in the Bridge Video Publication.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

DSFOF ¶ 594.  Plaintiffs also now allege for the first time that "tagging" of corrected text is disclosed in the Bridge Video Publication by (1) "at least, the red rectangle drawn around the corrected and replaced text" of the Bridge Video Publication; (2) "the blue rectangle around text on the reporter's screen;" and (3) the "text that has been drawn in a different color - blue."  Pls.' '801 Br. at pp. 20-21, Dkt. 94.

The Bridge Video Publication does not disclose "tagging."  As was explained above, Plaintiffs' expert alleges that "tagging" is disclosed by "changing the text color or replacing the corrected text in all capital letters" in the Bridge Video Publication.  DSFOF ¶ 594.  However, the Bridge Video Publication clearly illustrates that the alleged initial transcription ("Welcome to the Bridge program") and the relied-upon corrected transcription ("WELCOME TO THE BRIDGE PROGRAM") have the same text color (black) on both the reporter's screen and the client's screen.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY



PFOF ¶¶ 678-79, Dkt. 104-1; DSFOF ¶ 595.   Furthermore, the relied-upon "replacing the corrected text in all capital letters" of the Bridge Video Publication also does not meet the "tagging" element.   The change to all capital letter is the correction, itself ("Welcome to the Bridge program" is changed to "WELCOME TO THE BRIDGE PROGRAM"), not any type of tag.  PFOF ¶¶ 678-79, Dkt. 104-1; DSFOF ¶ 596.

Plaintiffs also argue that "tagging" of corrected text is somehow disclosed by "at least, the red rectangle drawn around the corrected and replaced text" of the Bridge Video Publication.   Pls.' '801 Br. at 21, Dkt. 94.  That is, Plaintiffs appear to no longer be relying on operations performed by the software in the Bridge Video Publication, but are now pointing to what appears to be a graphic that is drawn on the video after-the-fact (e.g., for marketing purposes).   If Plaintiffs are somehow contending that the rectangles and arrows were included in any original

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

software, they have failed to provide any evidence that this is the case, and at a minimum a factual dispute exists regarding the video's content.

Plaintiffs further contend that "tagging" of corrected text is disclosed in the Bridge Video Publication by "the blue rectangle around text on the reporter's screen." Pls.' '801 Br. at 21, Dkt. 94.[1]  Plaintiffs have failed to provide any actual explanation for how "the blue rectangle around text on the reporter's screen" is any type of "tag," let alone something that discloses "attaching a label to something for the purposes of identification" or "identifying with an identifier," as are the parties respective proposed constructions of "tag."  Plaintiffs' also fail to establish that the "blue rectangle" is nothing more than a graphic added to video, rather than part of the underlying software program.  Plaintiffs evidentiary failures at a minimum create a factual dispute.

Finally, Plaintiffs also allege that "tagging" of corrected text is disclosed by "a different color - blue."  Pls.' '801 Br. at 21, Dkt. 94.  However, as is expressly illustrated by the Bridge Video Publication, neither the initial transcription ("Welcome to the Bridge program") nor the corrected transcription ("WELCOME TO THE BRIDGE PROGRAM") are colored blue.  PFOF ¶¶ 678-79, Dkt. 104-1; DSFOF ¶ 595.  Instead, they are both black, proving Plaintiffs' allegation wrong.  *Id.*  Further, there is no explanation as to why any other text in the video may or may not be blue.  Plaintiffs' guesswork is simply not persuasive.  Lastly, even if blue text were corrections, there is no blue text on the client device's screen.  *Id.*

### F.    The Bridge Video Publication does not disclose the "highlighting" limitation of Claims 6, 11-12, and 16

Plaintiffs allege that "highlighting" a corrected block of text is disclosed by "the representation of the corrected text in a different color or the representation of the corrected text in all capital letters."  Pls.' '801 Br. at 21, Dkt. 94.  The Bridge Video Publication however does

---

[1] Notably, neither expert in this case appear to agree with Plaintiffs' allegation.  DSFOF ¶¶ 593,  594.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

not disclose "highlighting" of corrected text. The relied-upon "changing the text color" does not disclose "highlighting" of corrected text. This is confirmed by the Bridge Video Publication, which has the relied-upon initial transcription ("Welcome to the Bridge program") and the relied-upon corrected transcription ("WELCOME TO THE BRIDGE PROGRAM") in same text color (black).



PFOF ¶¶ 678-79, Dkt. No. 104-1; DSFOF ¶ 597. Furthermore, the relied-upon "replacing the corrected text in all capital letters" of the Bridge Video Publication also does not include "highlighting" of corrected text. The change to all capital letter is the correction, itself ("Welcome to the Bridge program" is changed to "WELCOME TO THE BRIDGE PROGRAM"), not any type of "highlighting." PFOF ¶ 678-79, Dkt. No. 104-1; DSFOF ¶ 598.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

### G. The Bridge Video Publication does not disclose a "communication device" of Claims 1, 9, 14, and 29

As is explained in the claim construction section at Section IV.C, the proper construction for a "communication device" is a "captioned telephone or telephone enabled for texting enhanced telephony." When properly construed as proposed by Defendants, the Bridge Video Publication fails to disclose "a communication device," as is explained by Mr. Occhiogrosso. DSFOF ¶599. Plaintiffs do not dispute that the Bridge Video Publication fails to disclose "a communication device" if Defendants' proposed construction is adopted. Pls.' '801 Br. at pp. 21-22, Dkt. 94.

### H. The Bridge Video Publication does not disclose "a voice signal received by the communication device" of Claim 9

The Bridge Video Publication does not disclose "a voice signal received by the communication device" of Claim 9. DSFOF ¶ 600. Plaintiffs' expert appears to concede this fact when noting that the transcription of the Bridge Video Publication "can represent a text transcription of a voice signal heard by the transcriptionist," not a communication device. DSFOF ¶ 601 (emphasis added). Contrary to their own expert, Plaintiffs assert that this limitation is disclosed because "the court reporter's computer receives a text transcription of a voice signal transcribed by a court reporter." Pls.' '801 Br. at p. 22, Dkt. 94.

Plaintiffs appear to be contending that the court reporter's device receives "a voice signal" when it receives "a text transcription" of that voice signal. Pls.' '801 Br. at p. 22, Dkt. 94. This is nonsensical. It is the equivalent of claiming that you own a baseball autographed by Babe Ruth, when you own a picture of a baseball autographed by Babe Ruth.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

## I.   The Bridge Video Publication does not disclose "indicating that the corrected block of text replaced the block of text" of Claim 29

As is explained in the claim construction section at Section IV.H, the proper construction for Claim 29 is that this claim requires that a hearing-impaired user's device display an indication to the hearing-impaired user "that the corrected block of text replaced" the block of text.   Regardless of the construction, Mr. Occhiogrosso explained that the Bridge Video Publication does not disclose "indicating that the corrected block of text replaced the block of text" of Independent Claim 29.   DSFOF ¶ 602.   Plaintiffs allege that not only is this limitation "inherently" disclosed, but it is also expressly disclosed by the "red box around the replaced text." Pls.' '801 Br. at p. 22, Dkt. 94.

The Bridge Video Publication does not disclose, expressly or inherently, these limitations.   First, the relied-upon "red box around the replaced text" appears to be a graphical addition to the video for marketing purposes rather than a disclosure of the underlying software. Plaintiffs have provided no evidence that the underlying software program included such a red box.   Notably, Plaintiffs' own expert did not back Plaintiffs' allegation.   DSFOF ¶ 603 (only alleging that this limitation is inherently disclosed by some type of "indication" to the client's computer).

Second, Plaintiffs are incorrect in contending that the "auto-refresh" of the client's screen inherently requires some type of data packet that would indicate "that the corrected block of text replaced the block of text."   Specifically, even if the client's computer receives a data packet, this data packet would not necessarily be an indication displayed to the hearing-impaired user by the hearing-impaired user's device, as is required by Independent Claim 29.   DSFOF ¶¶ 604, 605.   Instead, it would likely be a data packet that causes the computer screen to refresh.   *Id.*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

As explained by Mr. Occhiogrosso, it is much more likely that the auto refresh of the Bridge Video Publication is designed to automatically occur every few seconds. DSFOF ¶ 606. When the few seconds elapse, the client's device would refresh even if there were no corrections or changes. *Id.* As such, any data packet would not necessarily indicate "that the corrected block of text replaced the block of text," as is required by the inherency doctrine. Instead, it would merely place text in a storage location that would be displayed every few seconds. Therefore, even if Defendants' claim construction is not adopted, the Bridge Video Publication still fails to disclose these limitations of Claim 29.

## VII. Genuine Issues of Material Fact Exists Regarding Whether Engelke 1 Anticipates Claims 1, 2, 7, 9, and 13

### A. Engelke 1

Engelke 1 teaches an editing system for real-time transcription of a telephone conversation between a hearing-impaired user and a hearing user. DSFOF ¶ 607. In Engelke 1, a call assistant in a relay center listens to the conversation and revoices it to a speech-recognition program. DSFOF ¶ 608. The call assistant then reviews the transcription output from the speech-recognition program. DSFOF ¶ 609. If the call assistant notices an error in the transcription, the call assistant can replace the error with a correction. DSFOF ¶ 610. The transcription, as corrected, is then sent to the hearing-impaired user. DSFOF ¶ 609. The transcription is **never** corrected after being sent to the hearing-impaired user. DSFOF ¶¶ 611, 612, 613.

Throughout the specification, Engelke 1 emphasizes that all corrections of the transcription occur "prior" to the transcription ever being sent to the hearing-impaired user. DSFOF ¶ 613. In addition to the abstract, Engelke 1 illustrates the fact that edits to the transcription (i.e., "EDIT 130") occur "prior" to the transcription ever being sent to the hearing-

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

impaired user (i.e., "TEXT OUT").  DSFOF ¶ 612 (illustrating "EDIT 130" as occurring before

"TRANSMIT 124" and "TEXT OUT").



FIG. 6

Furthermore, Engelke 1 touts its "important[]" ability to allow a hearing-impaired user to

select the type and speed of transcription desired by the hearing-impaired user.  DSFOF ¶ 614.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**



FIG. 9

DSFOF ¶ 615.

If the hearing-impaired user desires a quicker transcription (with the possibility of more errors) the slider control 152 of Engelke 1 provides the hearing-impaired user with the ability to make such a selection.   On the other hand, if the hearing-impaired user desires a slower transcription (with the possibility of fewer errors) the slider control 152 of Engelke 1 also provides the hearing-impaired user with the ability to make such a selection.  This "important[]" ability of Engelke 1 can only be provided because the corrections of the transcription of Engelke 1 occur "prior" to the transcription ever being sent to the hearing-impaired user.  DSFOF ¶¶ 609, 614, 615.

**B.     Engelke 1 does not disclose "in-line correction" at a hearing-impaired user's device**

As is explained above in the claim construction section at Section IV.E, Independent Claims 1 and 9 (and claims 2, 7, and 13 that depend therefrom) should be interpreted as requiring "in-line correction" at a hearing-impaired user's device.  When properly construed as proposed

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

by Defendants, Engelke 1 fails to disclose the limitations of Claims 1, 2, 7, 9, and 13.  DSFOF ¶ 616.  Plaintiffs do not dispute this.  Pls.' '801 Br. at p. 26, Dkt. 94.

      **C.**    **Engelke 1 does not disclose "generating the another block of text" as a different step than "replacing a first block of text of the text caption with another block of text" and also does not disclose that these two steps are performed at two different devices**

As is explained in the Claim Construction section at Section IV.F, Claim 2 requires that the step of "generating the another block of text" be a different step than the step of "replacing a first block of text of the text caption with another block of text," and further requires that these two steps be performed at two different devices.  When properly construed, Engelke 1 fails to disclose the limitations of Claim 2, as is explained by Mr. Occhiogrosso.  DSFOF ¶ 617.  Despite disagreeing with Defendants' proposed construction, Plaintiffs appear to agree that Engelke 1 does not disclose these steps performed on two different devices.  Pls.' '801 Br. at pp. 27-28, Dkt. 94.  However, Plaintiffs contend that Engelke 1 does perform these steps as different steps. Pls.' '801 Br. at pp. 26-27, Dkt. 94.

Plaintiffs are incorrect in alleging that Engelke 1 discloses the step of "generating the another block of text" as a different step than "replacing a first block of text of the text caption with another block of text."  First, Plaintiffs allege that Engelke 1's ability to revoice or type a new word in order to replace an incorrect word (i.e., editing) is somehow two separate conceptual steps that are performed "close together in time, or simultaneously."  Pls.' '801 Br. at pp. 26-27, Dkt. 94.  This argument contradicts the specification of the '801 Patent.  The '801 Patent explains that this relied-upon editing is only one step of "generating the another block of text," not both steps required by Claim 2.  DSFOF ¶ 618 (noting "replacing text, inserting text, and/or deleting text" by a call assistant is only the single step of "generating the another block of text," not both steps required by Claim 2).  Furthermore, any other construction of "generating

42

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

the another block of text" and "replacing a first block of text of the text caption with another block of text" would cause the two different steps to essentially mean the same thing, improperly reading words out of the claim.

Plaintiffs incorrectly cite *Altiris, Inc. v. Symantec Corp.* in support of their contention that "there is no reason to construe the claims to prevent simultaneously performance [sic] of the 'generating' and 'replacing' steps."  318 F.3d 1363, 1371 (Fed. Cir. 2003); Pls.' '801 Br. at p. 27, Dkt. 94.  *Altiris* holds that a preamble does not limit the order of the steps recited in a method claim.  *Id.* "Finding it improper to read a specific order of steps," as Plaintiff contends *Altiris* holds, still does not support the argument that "no specific order" equates to "simultaneous." Pls.' '801 Br. at p. 27, Dkt. 94.

Second, Plaintiffs allege that the relied-upon editing of Engelke 1 discloses the two different steps of Claim 2 because "[o]ne of skill in the art would also understand that using word processing operations, one <u>can</u> either type directly over existing text, or type new text adjacent to existing text, then delete the text to be replaced."  Pls.' '801 Br. at p. 27, Dkt. 94 (emphasis added).  Regardless of whether this is correct or not, it is mere possibility -- not "necessarily present," as is required under the inherency doctrine.

Third, Plaintiffs argue that Engelke 1 discloses the two different steps of Claim 2 based on the use of "macros".  Pls.' '801 Br. at p. 27, Dkt. 94.  Plaintiffs' theory appears to be that a word associated with a macro must be pre-generated in some way prior to it ever being used to replace another word.  Pls.' '801 Br. at p. 27, Dkt. 94.  This is nonsensical.  It is the equivalent of arguing that the letter "k" is pre-generated by your computer just because there is a letter "k" on your computer's keyboard.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Even if the relied-upon "macros" of Engelke 1 are somehow pre-generated, there is no indication in Engelke 1 that this pre-generation would meet the limitations of Claim 2.  Claim 2 recites: "identifying one or more errors within the first block of text of the text caption with respect to what was said in the voice signal <u>prior to generating the another block of text</u>." DSFOF ¶ 559 (emphasis added).  That is, the "generating" step of Claim 2 must occur <u>after</u> the errors are identified.  Plaintiffs do not assert or provide evidence that the relied-upon pre-generation of "macros" occurs after errors are identified in the transcription.

**VIII.**   <u>**Ryan Does Not Anticipate Claims 1, 2, 7, 9-13, 25, 26, 28 and 29**</u>

   **A.**   **Ryan**

Ryan teaches a system for editing and relaying messages between a hearing-impaired user and a hearing user.  DSFOF ¶ 619.   In Ryan, a call assistant in a relay interface listens to the words spoken by a hearing user over "a voice channel" and converts the words into a transcription that is transmitted to the hearing-impaired user over a "data channel."   DSFOF ¶ 620.  Furthermore, errors in the transcription are corrected "before" the transcription is ever displayed to the hearing-impaired user.  DSFOF ¶ 621.

According to Ryan, errors in the transcription can be corrected in two different ways. First, the transcription can be manually corrected by the call assistant.  DSFOF ¶ 622.  Second, the transcription can be automatically spell-checked.  DSFOF ¶623.  However, all corrections to the transcription of Ryan occur "before" the transcription is ever displayed to the hearing-impaired user.  DSFOF ¶ 624.  Not only are all of the corrections performed "before" the transcription is displayed to the hearing-impaired user, but Ryan notes that correcting a transcription after the transcription has already been displayed to the hearing-impaired user is problematic because "[t]he presence of misspelled words or other typographical errors in a

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

message tend to distract the reader and may even confuse or alter the intended meaning of the message."  DSFOF ¶ 625.

**B.      Ryan does not disclose "in-line correction" at a hearing-impaired user's device**

As is explained in the claim construction sections at Section IV.E and IV.G, Independent Claims 1, 9, 25, 26, 28 and 29  (and claims 2, 7, 10-13, 26, and 28 that depend therefrom) require "in-line correction" at a hearing-impaired user's device.  When properly construed as proposed by Defendants, Ryan fails to disclose the limitations of Claims 1, 2, 7, 9-13, 25, 26, 28 and 29 because Ryan does not disclose "in-line correction" at a hearing-impaired user's device, as is explained by Mr. Occhiogrosso.  DSFOF ¶ 626.  Despite disagreeing with Defendants' proposed construction, Plaintiffs appear to agree that Ryan does not disclose in-line correction <u>at a hearing impaired user's device</u>.  Pls.' '801 Br. at p. 31, Dkt. 94.

Plaintiffs are incorrect in alleging that Ryan discloses "in-line" correction (let alone "in-line correction" at a hearing-impaired user's device, as is actually required by these claims).  Plaintiffs point to traditional word processing operations (i.e., manual edits and spell-checking features) performed at the call assistant's device of Ryan as disclosing the "in-line correction" of the '801 patent.  Pls.' '801 Br. at pp. 30-31, Dkt. 94.  As was explained by Mr. Occhiogrosso, one of ordinary skill in the art would understand that mere word processing operations at a call assistant's device do not disclose the "in-line corrections" as required by the claims.  DSFOF ¶ 627.

**C.      Ryan does not disclose "generating the another block of text" as a different step than "replacing a first block of text of the text caption with another block of text" and also does not disclose that these two steps are performed at two different devices**

As is explained in the claim construction section at Section IV.F, Claim 2 requires that the step of "generating the another block of text" be a different step than the step of "replacing a

45

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

first block of text of the text caption with another block of text," and further requires that these two steps be performed at two different devices.  When properly construed, Ryan fails to disclose the limitations of Claim 2.  DSFOF ¶ 628.  Despite disagreeing with Defendants' proposed construction, Plaintiffs appear to concede that Ryan does not disclose these steps performed on two different devices.  Pls.' '801 Br. at p. 32, Dkt. 94 (merely arguing an incorrect construction).

Plaintiffs are incorrect in alleging that Ryan discloses the step of "generating the another block of text" as a different step than "replacing a first block of text of the text caption with another block of text."  Plaintiffs allege that this is disclosed by the spell-checking feature of Ryan.  Pls.' '801 Br. at pp. 31-32, Dkt. 94.  Specifically, Plaintiffs appear to be arguing that the correct spelling of a word is pre-generated (i.e., when it is stored in database 28 of Ryan), and that this correct spelling then later replaces the incorrect spelling.  Even if the correct spelling of Ryan is pre-generated, there is no indication in Ryan that this pre-generation would meet the limitations of Claim 2.  In fact, Claim 2 recites:  "identifying one or more errors within the first block of text of the text caption with respect to what was said in the voice signal <u>prior to generating the another block of text</u>."  DSFOF ¶ 559  (emphasis added).  That is, the "generating" step of Claim 2 must occur <u>after</u> the errors are identified.  Plaintiffs do not assert (let alone provide evidence) that the relied-upon pre-generation of a correct spelling of Ryan occurs after the spelling error is identified in the transcription.  Furthermore, such an assertion would be nonsensical.  In order for a spell check to function, the corrected words must already be stored (and thus pre-generated) long before the error is identified.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**D. Ryan does not disclose a "communication device" of Independent Claims 9, 25, and 29**

As is explained in the claim construction section at Section IV.C, the proper construction for a "communication device" is a "captioned telephone or telephone enabled for texting enhanced telephony." When properly construed as proposed by Defendants, Ryan fails to disclose a "communication device." DSFOF ¶ 629. Plaintiffs do not dispute this. Pls.' '801 Br. at p. 33, Dkt. 94.

Plaintiffs allege that Defendants' proposed construction of a "communication device" is wrong because the '801 Patent allegedly refers to a "communication device" as further including a "conventional telephone." Pls.' '801 Br. at p. 33, Dkt. 94. Unfortunately, even if "communication device" was further construed to also include a "conventional telephone," Ryan would still fail to disclose a "communication device." For example, Plaintiffs have not provided any explanation (let alone support) for how the dial-up relay interface 10 of Ryan is a "conventional telephone." It is not, as is confirmed by Mr. Occhiogrosso. DSFOF ¶ 630. In fact, Ryan expressly indicates that the relied-upon relay interface 10 of Ryan "includes an operator/relay terminal 12 and couples a standard telephone set 14 with a TDD 16 having an associated display 17." DSFOF ¶ 631. Thus, the relied upon relay interface 10 appears to be a computer, not a telephone of any type, let alone a "conventional telephone."

**E. Ryan does not disclose the "tagging" and "highlighting" limitations of Claims 10-12**

In his expert report, Mr. Occhiogrosso explained that Ryan does not disclose the "tagging" and "highlighting" limitations of Claims 10-12. DSFOF ¶ 632. Plaintiffs argue that the "tagging" and "highlighting" limitations of Claims 10-12 are disclosed by the statement that "corrected text can be displayed in a different color" that is only displayed to the call assistant at the call assistant's device. DSFOF ¶ 633. As is explained in the claim construction section at

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Section IV.I, the proper construction for the "tagging" and "highlighting" limitations of Claims 10-12 is "tagging" or "highlighting" displayed to a hearing-impaired user (as opposed to a call assistant).  When properly construed as proposed by Defendants, Ryan fails to disclose the "tagging" and "highlighting" limitations of Claims 10-12.  DSFOF ¶ 632.  In fact, Plaintiffs do not disagree.  Pls.' '801 Br. at pp. 33-34, Dkt. 94.

**F.   Ryan does not disclose an indication "that the corrected block of text replaced" the block of text of Claims 25, 26, 28, and 29**

Ryan does not disclose an indication "that the corrected block of text replaced" the block of text of Claims 25, 26, 28, and 29.  DSFOF ¶ 634.  Plaintiffs' expert argues that these limitations of Claims 25, 26, 28, and 29 are disclosed by the statement that "corrected text can be displayed in a different color" that is only displayed to the call assistant at the call assistant's device.  DSFOF ¶ 635.

As is explained in the claim construction section at Section IV.H, the proper construction for an indication "that the corrected block of text replaced" the block of text of Claims 25, 26, 28, and 29 requires that a hearing-impaired user's device display an indication to the hearing-impaired user "that the corrected block of text replaced" the block of text.  When properly construed as proposed by Defendants, Ryan fails to disclose these limitations of Claims 25, 26, 28, and 29.  DSFOF ¶ 634.  Plaintiffs do not disagree.  Pls.' '801 Br. at p. 34, Dkt. 94.

**IX.   Genuine Issues of Material Fact Exist Regarding Whether Claims 1-29 are Obvious in View of the References Relied-Upon By Plaintiffs**

**A.   Additional Relied-Upon References**

**1.   Engelke 2**

Engelke 2 teaches an internet-based captioned telephone system that enables a hearing-impaired user to use a normal telephone, instead of a caption-enabled telephone, to communicate with a hearing user.  DSFOF ¶ 636.  In Engelke 2, audio from the hearing user's telephone (28)

48

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

is first sent over the telephone network to the hearing-impaired user's telephone (46).  DSFOF ¶
637.  The audio is then sent from the hearing-impaired user's telephone to a co-located computer
(14) that is connected to the Internet (34).  The audio is sent from this computer over the Internet
to a relay center (56).  The relay center transcribes the audio, and the resulting transcription is
sent back to and displayed on the computer.  The text may be displayed on the computer using a
browser plug-in or an instant messaging program.  *Id.*



FIG. 2

DSFOF ¶ 638.

Importantly, Engelke 2 only  discloses "error correction" by incorporating Engelke 1 by
reference and explaining that "[t]he operation of [relay service 56] is described in more detail in
[Engelke 1]."  DSFOF ¶ 639.

2.  Cervantes

Cervantes teaches an instant-messaging system that enables a user to edit an instant
message that was previously sent by the user.  DSFOF ¶ 640.  After the instant message is edited,
the message can show the edits to the recipient in highlighting, coloring, underlining, or other
formatting.  DSFOF ¶ 641.

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**



DSFOF ¶ 642.

**B.    Claims 1-29 are patentable over the proposed combination of Engelke 2 and Cervantes**

In order to allegedly disclose various aspects of Claims 1-29, Plaintiffs argue that it would have been obvious to modify "the system of Engelke 1 and Engelke 2" to disclose transmitting a corrected transcription after an uncorrected transcription has already been sent to a hearing impaired user.  DSFOF ¶ 643; Pls.' '801 Br. at p. 40, Dkt. 94 (adopting the analysis of Mr. Steel).  Such a modification to the system of Engelke 1 and Engelke 2 as suggested by Plaintiffs would not be obvious because (1) any proposed modification of Engelke 2 requires a modification of Engelke 1;[2] (2) the proposed modification is improper because it would change

---

[2] Plaintiffs do not provide any argument as to this point.  Pls.' '801 Br. at p. 41, Dkt. 94.  As such, Plaintiffs appear to be conceding that a proposed modification of Engelke 2 requires a modification of Engelke 1. Pls.' '801 Br. at p. 41, Dkt. 94.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

the principle of operation of Engelke 1; and (3) the proposed modification is improper because it would render Engelke 1 unsatisfactory for its intended purpose.  DSFOF ¶ 644; PFOF at ¶ 1081, Dkt. 104-1.

### 1.    Plaintiffs assertions of obviousness are irrelevant

Plaintiffs provide various assertions of obviousness with regard to Claims 1-29.  Pls.' '801 Br. at pp. 42-44, Dkt. 94.  These assertions are irrelevant in this case.  It is well established that a proposed combination or modification is not obvious if (1) the proposed combination or modification would change the principle of operation of the primary reference (*In re Ratti*, 270 F.2d at 813); or (2) the proposed combination or modification would render the primary reference unsatisfactory for its intended purpose (*In re Gordon*, 733 F.2d at 902).   In fact, Plaintiffs have conceded that this is correct in the Reply Brief in the *inter partes* review of '801 Patent.  DSFOF ¶ 645.  As such, all of Plaintiffs' arguments for obviousness (*see* Pls.' '801 Br. at pp. 42-44, Dkt. 94) are irrelevant if either of these two tests is met.  As is seen below, both of these tests are met.  Furthermore, at the very least, there is a genuine issue of material fact regarding these tests, rendering summary judgment inappropriate.

### 2.    The proposed modification would change the principle of operation of Engelke 1

In his report, Mr. Occhiogrosso explained why the modification proposed by Plaintiffs would change the principle of operation of Engelke 1.  DSFOF ¶ 646.  In response, Plaintiffs contend that: (1) Mr. Occhiogrosso misunderstands the concept of the principle of operation; and (2) the principle of operation of Engelke 1 would not be changed by the proposed modification.  Pls.' '801 Br. at pp. 41-42, Dkt. 94.  Plaintiffs are incorrect.

First, Plaintiffs' opinion on the principle of operation appears to be based on a mis-reading of their own cited case law.  Specifically, Plaintiffs point to the Federal Circuit decision

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

in *McGinley* as holding that a change in principle of operation requires the patentee to show "that the combination will produce a 'seemingly inoperative device.'" Pls.' '801 Br. at pp. 41-42, Dkt. 94. Contrary to this, the Court in *McGinley* was actually only referring to "teach away" arguments, not an argument about the principle of operation of a reference (as is asserted by Defendants):

> If references taken in combination would produce a "seemingly inoperative device," we have held that such references <u>teach away</u> from the combination and thus cannot serve as predicates for a prima facie case of obviousness.

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001).

Second, Plaintiffs are also incorrect in arguing that Engelke 1's principle of operation "is to provide a call assistant to correct errors in transcription." Pls.' '801 Br. at p. 42, Dkt. 94. The only support Plaintiffs provide for such a principle of operation is the following sentence in Engelke 1: "most generally, the invention allows the call assistant to select those words for editing based on their screen location, most simply by touching the word on the screen." Pls.' '801 Br. at p. 42, Dkt. 94. Plaintiffs, however, do not ever explain how this sentence conveys the principle of operation of Engelke 1 and also never reconcile their proposed principle of operation with any of the following portions of Engelke 1: Abstract; 2:49-52; 3:60-67; 4:36-41; 5:61 - 6: 15; 7:31-40; and Figure. 9. Each of these portions of Engelke 1 support Defendants' position that the principle of operation of Engelke 1 requires a transcription of Engelke 1 to be corrected "prior" to the transcription ever being transmitted to a hearing-impaired user. DSFOF ¶ 647.

Third, contrary to Plaintiffs, Mr. Occhiogrosso explained in full detail: (1) the principle of operation of Engelke 1; (2) how the proposed modification would change the principle of operation of Engelke 1; and (3) how the proposed modification would require a substantial reconstruction and redesign of Engelke 1. DSFOF ¶ 648. In response to all of these

52

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

explanations, Plaintiffs merely proposed (without any expert opinion) their own principle of operation, and provided a conclusory allegation for why that principle of operation would not be changed by the proposed modification.  Pls.' '801 Br. at p. 42, Dkt. 94.

### 3.   The proposed modification would render Engelke 1 unsatisfactory for its intended purpose

In his expert report, Mr. Occhiogrosso explained in detail: (1) the intended purpose of Engelke 1; and (2) how the proposed modification would render Engelke 1 unsatisfactory for its intended purpose.  DSFOF ¶¶ 649, 650.  In response (and similar to the principle of operation), Plaintiffs merely proposed an intended purpose (i.e., "to provide fast and accurate captions"), and a conclusory allegation for why the proposed modification would not render that intended purpose unsatisfactory.  Pls.' '801 Br. at p. 42, Dkt. 94.  Once again, Plaintiffs did not point to any declaration from their expert as supporting their position, nor did they ever reconcile their position with any of the followings portions of Engelke 1: Abstract; 3:60-67; 4:36-41; 5:61 - 6:15; 7:31-40; Figures 3, 6, and 9.  Each of these portions of Engelke 1 support the intended purpose proposed by Defendants.  DSFOF ¶ 650.

### 4.   Engelke 1 distinguishes itself from the proposed modification

A person of ordinary skill in the art would not modify Engelke 1 as proposed by Plaintiffs at least because Engelke 1 distinguishes itself from such a modification.  In Engelke 1, the transcription is always corrected "prior" to the transcription ever being transmitted to the hearing-impaired user.  DSFOF ¶ 613.  This is confirmed by the abstract, which explains that the call assistant corrects the transcription "prior" to the transcription ever being sent to the hearing-impaired user.  DSFOF ¶ 607.  Also, Figure 6 of Engelke 1 illustrates that a transcription is never sent to the hearing-impaired user until after the call assistant has had an opportunity to correct the transcription.  DSFOF ¶ 612 (illustrating "TEXT OUT" as occurring after "EDIT 130").

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

That is, Engelke 1 thoroughly distinguishes itself from transmitting a corrected transcription **after** an uncorrected transcription has already been sent to a hearing-impaired user (as is proposed by Plaintiff).  Such a distinction is important because the Federal Circuit has recently held that a reference "teaches *away*" from a "combination or, at a minimum, provides no evidence of motivation to combine" when the reference "distinguishes" itself from the combination.  *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1355 (Fed. Cir. 2013).  Specifically, in *Leo Pharmaceutical*, the Federal Circuit reversed the Patent Trial and Appeal Board's finding of obviousness when one of the relied-upon prior art references "distinguish[ed] its compositions from aqueous compositions" discussed in the other prior art references.  *Id.*

Such a finding is no different from the present case.  Engelke 1 distinguishes its error correction (i.e., correcting a transcription prior to the transcription ever being sent to a hearing-impaired user) from the solution proposed by Cervantes (i.e., correcting a message after the uncorrected message has already been sent to the recipient).  This distinction can be seen throughout Engelke 1, such as in the abstract of Engelke 1, the summary of Engelke 1 (emphasizing the "delay before transmission of transcribed text"), the figures of Engelke 1 (e.g., figures 6 and 9), and even in independent Claim 1 of Engelke 1 (emphasizing the use of a "predetermined first delay" before "transmitting the replacement text word").  DSFOF ¶¶ 607, 612, 613,615.  In light of *Leo Pharmaceutical*, it would not be obvious to modify Engelke 1 using Cervantes.

### C.    Claims 3-6 and 8 are patentable over the proposed combination of Ryan and Cervantes

Plaintiffs assert that it would have been obvious to modify Ryan using Cervantes in order to disclose transmitting and displaying a corrected transcription after an uncorrected transcription has already been sent and displayed to a hearing-impaired user.  DSFOF ¶ 651; Pls.' '801 Br. at

p. 45, Dkt. 94. The proposed modification is improper because (1) Ryan teaches away from such a proposed modification; (2) it would render Ryan unsatisfactory for its intended purpose; and (3) it would change the principle of operation of Ryan.  DSFOF ¶ 652.

### 1.   Plaintiffs assertions of obviousness are irrelevant

Plaintiffs provide various assertions of obviousness with regard to Claims 3-6 and 8. Pls.' '801 Br. at pp. 44-45, Dkt. 94.  These assertions are irrelevant in this case.  It is well established that a proposed combination or modification is not obvious if (1) a reference teaches away from the proposed combination or modification (*DePuy*, 567 F.3d at 1326); (2) the proposed combination or modification would render the primary reference unsatisfactory for its intended purpose (*In re Gordon*, 733 F.2d at 902); or (3) the proposed combination or modification would change the principle of operation of the primary reference (*In re Ratti*, 270 F.2d at 813).  Plaintiffs have conceded that this is correct.  Pls.' '801 Br. at p. 46, Dkt. 94, DSFOF ¶ 645.  As such, all of Plaintiffs' arguments for obviousness (*see* Pls.' '801 Br. at pp. 44-45, Dkt. 94) are irrelevant if any of these three tests is met and all three of these tests are met here.

### 2.   Ryan teaches away from the proposed modification

Ryan teaches away from the proposed modification as it explains that displaying an uncorrected transcription to a hearing-impaired user is undesirable, and Plaintiffs' proposed modification would require an uncorrected transcription to be displayed to a hearing-impaired user.  DSFOF ¶¶ 653, 654.  Plaintiffs incorrectly allege that Ryan actually suggests the desirability of the proposed modification.  Pls.' '801 Br. at pp. 46-47, Dkt. 94.  In support of their position, Plaintiffs point to Col. 2, Lines 1-19 of Ryan and conclude that this passage only discloses that "it is undesirable to put corrections adjacent to the message because this is confusing and may cause the message to scroll up and off of the relatively small screens

available on TDD displays of the time." Pls.' '801 Br. at pp. 46-47, Dkt. 94. This, however, is an incomplete reading of this passage. The relied-upon passage specifically states that displaying an uncorrected transcription to a hearing-impaired user is "[a] common problem with the existing telecommunications relay services" because "the relay agent's typographical errors appear at the TDD display." PFOF ¶ 1088, Dkt. 104-1. Furthermore, the passage also indicates that these typographical errors "tend to distract the reader and may even confuse or alter the intended meaning of the message." *Id.* This can be seen below:

> A common problem with the existing telecommunications relay services is that the relay agent's typographical errors appear at the TDD display. The presence of misspelled words or other typographical errors in a message tend to distract the reader and may even confuse or alter the intended meaning of the message. Ironically, the reader may become even more confused if the relay agent attempts to correct the typing error because an error message followed by the corrected text usually appear next to the typing error at the TDD display. Thus, the continuity of the message to the end user is significantly disrupted since the TDD display, which presents a limited number of characters at one time (e.g., twenty characters), may quickly become occupied with misspellings, error messages, and corrected spellings. Therefore, it can become extremely difficult for the end user to readily understand the intended message when the message received at the TDD is replete with mistakes and error messages, especially if part of the message is unnecessarily forced off of the TDD display.

PFOF ¶ 1088, Dkt. 104-1 (emphasis added). Plaintiffs disregard the underlined portion of this passage. and never explain why this passage does not teach away from (or "discourage"[3]) their proposed modification. It clearly does, as is explained by Mr. Occhiogrosso. DSFOF ¶ 653. The proposed modification would result in an uncorrected transcription being transmitted and displayed to the hearing user. DSFOF ¶ 654. If this were to occur, the "typographical errors" in the uncorrected transcription would "distract the [hearing-impaired user] and may even confuse

---

[3] Plaintiffs concede that a reference teaches away from a proposed modification when the reference "discourage[s]" a person of ordinary skill in the art from making the proposed modification. Pls.' '801 Br. at p. 46, Dkt. 94.

or alter the intended meaning of the message," as is warned against in Ryan. *Id.* Plaintiffs never dispute this, nor do they provide any expert opinion with regard to their faulty position. Pls.' '801 Br. at pp. 46-47, Dkt. 94.

> ### 3.   The proposed modification would render Ryan unsatisfactory for its intended purpose

In his expert report, Mr. Occhiogrosso explained in full detail (1) the intended purpose of Ryan; and (2) how the proposed modification would render Ryan unsatisfactory for its intended purpose. DSFOF ¶ 655. In response, Plaintiffs do not dispute the findings of Mr. Occhiogrosso. Pls.' '801 Br. at p. 47, Dkt. 94. Instead, Plaintiffs first point to the *McGinley* decision and allege that Mr. Occhiogrosso failed to meet the requirements of the *McGinley* decision. Pls.' '801 Br. at p. 47, Dkt. 94. As was explained above, the Court in *McGinley* was only referring to "teach away" arguments, not the intended purpose of a reference. *McGinley*, 262 F.3d at 1354.

Plaintiffs do not even propose an intended purpose of Ryan, let alone explain how it would still exist if the proposed combination were to occur. Pls.' '801 Br. at p. 47, Dkt. 94. Plaintiffs only allege, using an improper reading of the above case law, that "Occhiogrosso does not show that Ryan could not function as a telecommunication's relay service with the added functionality of Cervantes." Pls.' '801 Br. at p. 47, Dkt. 94. Defendants do not have to show that the combination would create a seemingly inoperative device, which can be evidence of "teaching away." Instead, Defendants only need show the intended purpose of Ryan, and how Ryan would be rendered unsatisfactory for that purpose. *In re Gordon*, 733 F.2d at 902. Mr. Occhiogrosso has done just that, and Plaintiffs do not dispute any of his opinions. DSFOF ¶ 655. At the very least, this failure to dispute Mr. Occhiogrosso on this point creates a genuine issue of material fact, rendering summary judgment inappropriate.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

    4.    <u>The proposed modification would change the principle of operation of</u>
<u>Ryan</u>

Defendants have set forth: (1) the principle of operation of Ryan; (2) how the proposed modification would change that principle of operation; and (3) how the proposed modification would require a substantial reconstruction and redesign of Ryan.  DSFOF ¶ 656.  In response, Plaintiffs allege that the principle of operation of Ryan "is that it works as a telecommunications relay service with error correction."  Pls.' '801 Br. at p. 48, Dkt. 94.  As support for this alleged principle of operation, Plaintiffs note that the principle of operation of Ryan "is set forth generally" by the following:

> To accomplish these and other related objects of the invention, a system is provided for relaying messages from a first telecommunications device to a second telecommunications device wherein the system comprises a relay terminal capable of storing received messages and sending these messages over a communications link to the second device and further comprises analysis means for correcting at least one word in a message prior to displaying the message at the second telecommunications device.

PFOF ¶ 1088, Dkt. 104-1., Pls.' '801 Br. at pp. 46-47, Dkt. 94.  This, however, proves that Defendants are correct.  Specifically, Plaintiffs' own admitted principle of operation (i.e., the quoted paragraph above) clearly states "<u>and further comprises analysis means for correcting at</u> <u>least one word in a message prior to displaying the message at the second telecommunications</u> <u>device</u>."  Pls.' '801 Br. at pp. 47-48, Dkt. 94; PFOF ¶ 1088, Dkt. 104-1.  Ryan cannot possibly "correct[] at least one word in a message prior to displaying the message at the second telecommunications device" (i.e., Plaintiffs' admitted principle of operation from above) if Ryan was modified to transmit and display a corrected transcription after an uncorrected transcription has already been sent and displayed to a hearing impaired user (i.e., Plaintiffs proposed modification of Ryan).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

The proposed modification would change the principle of operation of Ryan as it would require a substantial reconstruction and redesign of Ryan.  DSFOF ¶ 657.  Plaintiffs assert that this is a "red herring" because (1) "[t]he issue [is] whether a person of ordinary skill in the art would be capable of making those changes;" and (2) their expert (Mr. Steel) declared that this combination is "a simple matter of minor coding adjustments."  Pls.' '801 Br. at p. 48, Dkt. 94. On both of these points Plaintiffs are incorrect.  First, Plaintiffs do not cite to any support for their contention that "[t]he issue [is] whether a person of ordinary skill in the art would be capable of making those changes."  In fact, Defendants merely have to show that the proposed combination would change the principle of operation of Ryan.  *In re Ratti*, 270 F.2d at 813.  This has been done.  DSFOF ¶656. ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████.

### 5.     Ryan distinguishes itself from the proposed modification

A person of ordinary skill in the art would not modify Ryan as proposed by Plaintiffs at least because Ryan distinguishes itself from such a modification.  In Ryan, the transcription is always corrected "prior" to the transcription ever being transmitted to the hearing-impaired user. This is confirmed by the Abstract of Ryan, which explains that "the formatted words are individually analyzed so that corrections may be made <u>prior</u> to display at the second terminal. Ryan, Abstract.  Ryan emphasizes that "it is an important object of the present invention to provide a system and method for making corrections to words in a message <u>before</u> the words are displayed at the TDD."  DSFOF ¶ 621.  This is further seen at Col. 2, Lines 35-38: "The present invention overcomes the problems associated with existing telecommunications relay services by

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

providing a system and method for correcting mistakes <u>before</u> the message is displayed at the end user's TDD."  DSFOF ¶ 522 (emphasis added).

That is, Ryan distinguishes itself from transmitting a corrected transcription <u>after</u> an uncorrected transcription has already been sent to a hearing-impaired user (as is proposed by Plaintiffs).  Such a distinction is important in light of *Leo Pharm. Prods.*.  Here, Ryan distinguishes its error correction (i.e., correcting a transcription prior to the transcription ever being sent to a hearing-impaired user) from the solution proposed by Cervantes (i.e., correcting a message after the uncorrected message has already been sent to the recipient).  Therefore, at least in light of *Leo Pharm. Prods.*, it would not be obvious to modify Ryan using Cervantes.

## D. Claims 5, 6, 10-12, 15, 16, 25, 26, 28, and 29 are patentable over the proposed combination of the Bridge Video Publication and Cervantes

### 1. The Bridge Video Publication does not qualify as prior art

As is discussed above at Section VI.B, Plaintiffs have failed to provide any evidence that the Bridge Video Publication qualifies as "prior art."

### 2. Claims 5, 6, 10-12, 15, and 16 are patentable over the proposed combination of the Bridge Video Publication and Cervantes

As is explained above at Sections VI.C, VI.D, VI.G, and VI.H, the Bridge Video Publication does not disclose each of the limitations of Independent Claims 1, 9, and 14.  This is important because: (1) each of Claims 5, 6, 10-12, 15, and 16 depend from these Independent Claims 1, 9, and 14, and (2) Plaintiffs do not allege that the proposed combination of the Bridge Video Publication and Cervantes would cure any of these deficiencies.  Pls.' '801 Br. at p. 50, Dkt. 94.  In his expert report, Mr. Occhiogrosso noted Plaintiffs' failure to allege that the proposed combination of the Bridge Video Publication and Cervantes would cure any of these deficiencies of the Bridge Video Publication with regard to Independent Claims 1, 9, and 14.  DSFOF ¶ 658.  Instead of disputing this opinion, Plaintiffs only note the issue and then generally

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

allege that "[t]hese claims, however, are invalid as anticipated or obvious on the basis of, at least, the other pieces of prior art discussed in this motion and in Mr. Steel's report." Pls.' '801 Br. at p. 50, Dkt. 94. Plaintiffs fail to explain how the proposed combination of the Bridge Video Publication and Cervantes discloses each of the limitations of Claims 1, 9, and 14 ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

       3.     <u>Claims 25, 26, 28, and 29 are patentable over the proposed combination of the Bridge Video Publication and Cervantes</u>

The Bridge Video Publication and Cervantes do not disclose each of the following limitations: (1) "a text transcription of at least a portion of a voice signal;" (2) "text caption;" and (3) "a communication device." DSFOF ¶ 660. Plaintiffs disagree with this, stating [t]his argument is based on Mr. Occhiogrosso's incorrect assumption that these limitations require a captioned telephone." Pls.' '801 Br. at p. 50, Dkt. 94.

Plaintiffs allegations are incorrect for at least the reasons discussed above at Sections VI.C, VI.D, VI.G, and VI.I, and further because Plaintiffs fail to allege that the proposed combination of the Bridge Video Publication and Cervantes would cure these deficiencies of the Bridge Video Publication.

       4.     <u>The proposed combination of the Bridge Video Publication and Cervantes is not obvious.</u>

In order to allegedly disclose each of the limitations of claims 5, 6, 10-12, 15, 16, 25, 26, 28, and 29, Plaintiffs allege that "it would have been obvious to one of ordinary skill in the art to combine the highlighting feature of Cervantes with the voice transcription correction process of the Bridge Video Publication." DSFOF ¶ 661; Pls.' '801 Br. at p. 50, Dkt. 94. The proposed combination was not, in fact, obvious because "a judge would not permit typographical errors in

61

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

the witness transcription to be highlighted because such highlighting could distract or even improperly prejudice a jury member who may be able to see the client's screen."  DSFOF ¶ 662. Without disputing any aspect of Mr. Occhiogrosso's opinion, Plaintiffs merely state that "Mr. Occhiogrosso provides no basis for any of this" and that "[t]he Court may take notice of the fact that an indication that an error has been corrected on a live transcript could be advantageous in a courtroom or deposition setting amidst live testimony, questions and objections, and the shuffling of exhibits."  Pls.' '801 Br. at p. 51, Dkt. 94.  Plaintiffs' failure to provide any substantive rebuttal of Mr. Occhiogrosso's opinion, creates a genuine issue of material fact, rendering summary judgment inappropriate.  The Court could also (and more likely) take notice of the fact that an indication that an error has been corrected on a live transcript could be disadvantageous in a courtroom or deposition setting amidst live testimony, questions and objections, and the shuffling of exhibits.  Plaintiffs provide no argument (let alone an expert opinion) for why the Court should take judicial notice of a disputed fact.

> **E.**   **Claims 19-23 are patentable over the proposed combinations of the Bridge Video Publication and Engelke 1.**

>> 1.     The Bridge Video Publication does not qualify as prior art

As is discussed above at Section VI.B, Plaintiffs have failed to provide any evidence that the Bridge Video Publication qualifies as "prior art."   Therefore, for at least the reasons discussed above at Section VI.B, Plaintiffs have not proven that the Bridge Video Publication qualifies as prior art.

>> 2.     The proposed combination of Engelke 1 and the Bridge Video Publication is not obvious

Plaintiffs assert that it would have been obvious to modify Engelke 1 with the real time error correction of the Bridge Video Publication in order to allegedly disclose the limitations of Claims 19-23.  Pls.' '801 Br. at p. 53, Dkt. 94.  This proposed modification would change the

principle of operation of Engelke 1 and/or it would render Engelke 1 unsatisfactory for its intended purpose.  DSFOF ¶ 663.

Plaintiffs are incorrect in alleging that this proposed combination is obvious.  Modifying Engelke 1 to allegedly disclose transmitting a corrected transcription after an uncorrected transcription has already been sent to the hearing-impaired user (as is proposed by Plaintiffs (DSFOF ¶ 664)) would change the principle of operation of Engelke 1 and/or render Engelke 1 unsatisfactory for its intended purpose as is discussed above at Section IX.B.  Plaintiffs merely allege that Mr. Occhiogrosso's opinions are based on a "misunderstanding of Engelke's purpose and principle of operation."  Pls.' '801 Br. at p. 53, Dkt. 94.  As is explained above at Section IX.B, it is Plaintiffs who are mistaken about the principle of operation and intended purpose of Engelke 1.

3.   The proposed combination of the Bridge Video Publication and Engelke 1 is not obvious

Plaintiffs assert that it would have been obvious to modify the Bridge Video Publication for use in a telecommunications relay service such as that provided in Engelke 1.  Pls.' '801 Br. at p. 53, Dkt. 94.  Such a modification is improper because: (1) it would render the Bridge Video Publication unsatisfactory for its intended purpose; and (2) it would change the principle of operation of the Bridge Video Publication.  DSFOF ¶ 665.  Plaintiffs do not dispute this.  Pls.' '801 Br. at p. 53, Dkt. 94.   Instead, Plaintiffs note that "the relevant combination is the modification of the Bridge Video Publication for use in the telecommunications system of Engelke 1," and that Mr. Occhiogrosso's opinions somehow "miss the point"  Pls.' '801 Br. at p. 53, Dkt. 94.  This argument has no merit.  In his report, Mr. Occhiogrosso clearly states (in footnote 3 on page 106) that he was addressing "a combination of the Bridge Video Publication and Engelke 1 where 'the program disclosed in the Bridge Video Publication [is used] in a TRS

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

setting such as disclosed in Engelke 1 ... in section VIII.I." DSFOF ¶ 666. This section VIII.I corresponds to Mr. Occhiogrosso's arguments that the modification would render the Bridge Video Publication unsatisfactory for its intended purpose and change the principle of operation of the Bridge Video Publication. DSFOF ¶ 665.

Plaintiffs' objection appears to be that Mr. Occhiogrosso referred to this modification as a "combin[ation of] the organizational structure of Engelke 1 into the system of the Bridge Video Publication," while Mr. Steel (in his expert report) once referred to this same modification as a modification where "the program disclosed in the Bridge Video Publication [is used] in a TRS setting such as disclosed in Engelke 1." DSFOF ¶¶ 665, 666. That is, the experts named the same modification by two different names. Plaintiffs do not explain why they believe that Mr. Occhiogrosso addressed the wrong modification (which he did not) or why Mr. Occhiogrosso's arguments would not apply to their modification (which they do).

## X.   Genuine issues of material fact exist regarding the secondary considerations of non-obviousness.

Despite Plaintiffs' efforts to minimize secondary considerations, numerous secondary considerations exists here to support the non-obviousness of the '801 Patent. ██████████ ████████████████████████████████████████████████████████ ████████████████████████████   ████████████  At a minimum, the existence of these secondary considerations is a factual dispute making summary judgment inappropriate here.

### A.   Plaintiffs' arguments for the alleged obviousness of the '801 Patent are disputed by their own documents

To support their theory of obviousness, Plaintiffs characterize the '801 Patent as (i) a simple method (ii) "a simple matter of minor coding adjustments;" (iii) and "a technical and commercial inevitability." Pls.' '801 Br. at p. 1, 36-37, Dkt. 94. ████████████████

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**



**B.      Long Felt Need for Post-Transmission Error Corrections of the '801 Patent**

Plaintiffs incorrectly allege that (1) there is no evidence of what is meant by "long-felt" and that (2) there is no evidence that the claimed invention of the '801 Patent actually met this long-felt need.  Pls.' '801 Br. at p. 55, Dkt. 94.  Plaintiffs' own admissions satisfy both these points.  Mr. Steel established what was meant by "long-felt" when he explained in his report that

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

"it has been a goal of CTS providers to try to have low latency - in other word a small amount of time when the hearing user says a word and when the text of that word appears on the display on the hard-of-hearing user's captioned phone."  DSFOF ¶ 669.  That is, Mr. Steel confirmed Mr. Occhiogrosso's opinion that there was a well-known long-felt need for "a much faster way of providing captioned telephone service."  DSFOF ¶ 679.

**C.  The '801 Patent was met with wide commercial success**

Plaintiffs allege that Defendants have not shown that there was a nexus between the merits of the '801 Patent and Defendants' commercial success with their products.  Pls.' '801 Br. at p. 56, Dkt. 94.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**D.      Plaintiffs' Copied and Valued the '801 Patent Invention**

Plaintiffs attempt in their briefing to ignore the value of the '801 Patent and their copying of its invention despite incriminating documents authored from their key employees and engineers regarding the efforts to copy the '801 invention.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY



The strong secondary considerations of non-obviousness in this case support denial of any of Plaintiffs' obviousness arguments and at a minimum create factual disputes that make summary judgment inappropriate regarding the validity of the '801 Patent.

XI.   **Conclusion**

For the reasons discussed above, several factual disputes exist regarding the '801 Patent, including the level of one of ordinary skill in the art, whether alleged prior art is eligible to be prior art, what the alleged prior art may disclose, and the existence of secondary considerations of non-obviousness including the Plaintiffs' own copying of the '801 Patent.   Therefore,

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Plaintiffs' motion for partial summary judgment of invalidity regarding the '801 Patent should be denied.

Dated:  May 12, 2014                    Respectfully submitted,

       */s/  Bryant C. Boren, Jr.*
Bryant C. Boren, Jr.
Lead Attorney
*Admitted Pro Hac Vice*
bryant.c.boren@bakerbotts.com
BAKER BOTTS L.L.P.
1001 Page Mill Road
Palo Alto, CA 94304
Telephone:  (650) 739-7501
Facsimile:  (650) 739-7601

Brian Oaks
*Admitted Pro Hac Vice*
brian.oaks@bakerbotts.com
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
Telephone: (512) 322-5470
Facsimile: (512) 322-3621

Jonathan B. Rubenstein
*Admitted Pro Hac Vice*
jonathan.rubenstein@bakerbotts.com
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6594
Facsimile: (214) 661-4594

Allen A. Arntsen
aarntsen@foley.com
FOLEY & LARDNER LLP
150 E. Gilman Street
P.O. Box 1497
Madison, Wisconsin 53701-1497
Tel.: 608.258.4293
Fax: 608.258.4258

**Attorneys for Defendants and Counter-Plaintiffs
Sorenson Communications, Inc. and
CaptionCall, LLC**

69

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 12, 2014, a copy of the foregoing pleading was served via electronic mail on all counsel of record.

_____/s/  Harper S. Batts_____

## AUTHORIZATION TO FILE UNDER SEAL

Pursuant to General Order #311 for Filing Documents Under Seal, this document is being filed under seal by the authority set forth in the Protective Order filed in this case (Dkt. 66-1).

_____/s/  Harper S. Batts_____

70