lIN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ULTRATEC, INC. and CAPTEL, INC.,

                Plaintiffs,

      v.

SORENSON COMMUNICATIONS, INC.
and CAPTIONCALL, LLC,

                Defendants.

OPINION and ORDER

13-cv-346-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       The parties in this case make and sell telecommunication devices for the hearing impaired.  Both sides own patents related to these devices and both sides are suing each other for infringement of one or more of those patents.  This opinion will address the motion for summary judgment filed by plaintiffs Ultratec, Inc. and CapTel, Inc., dkt. #87, in which they challenge the validity of defendant Sorenson's U.S. Patent No. 8,379,801, which discloses "systems and methods related to providing error correction in a text caption."

       Several weeks after the parties finished briefing this motion, defendants Sorenson Communications Inc. and CaptionCall LLC filed a letter they titled "Notice . . . re: Disclaimer in Patent under 37 C.F.R. § 1.321(a)."  Dkt. #270.  Although the title gives little hint of the letter's contents, counsel wrote in the document that defendants have "dedicated Claims 1, 2, 7 and 9 to the public and effectively removed them from the '801 patent."  As a result, counsel wrote that "the issue of validity with respect to those claims is now moot."

It is not clear why defendants failed to accompany their "notice" with a motion to dismiss claims 1, 2, 7 and 9.  Regardless, because the effect of the notice is to remove those claims from the lawsuit, I am dismissing with prejudice defendants' counterclaim as to claims 1, 2, 7 and 9 of the '801 patent.

With respect to the remaining claims in the '801 patent, I am granting plaintiffs' motion for summary judgment because I agree with their argument that the claims of the '801 patent are obvious as a matter of law in light of two other patents  (U.S. Patent No. 7,881,441 and U.S. Patent No. 7,428,702) that, together, include all the elements of the '801 patent.  This conclusion makes it unnecessary to consider plaintiffs' arguments that subsets of claims in the '801 patent are anticipated or rendered obvious in light of other prior art references.

OPINION

Under 35 U.S.C. § 103, a patent is invalid "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."  As with all invalidity defenses, the alleged infringer has the burden to prove by clear and convincing evidence that a patent is obvious.  Plantronics, Inc. v. Aliph, Inc., 724 F.3d 1343, 1353 (Fed. Cir. 2013).

The Court of Appeals for the Federal Circuit has described obviousness as "a question of law based on underlying findings of fact."  Source Search Technologies, LLC v.

LendingTree, LLC, 588 F.3d 1063, 1069 (Fed. Cir. 2009).  Courts may consider a number of factors, including the scope and content of the prior art, the characteristics and understanding of an individual of ordinary skill in the relevant field of art at the time of invention, the differences between the claimed invention and the prior art and the evidence of secondary factors, such as commercial success or a "long felt demand" met by the claimed invention.  Id.

Plaintiffs argue that all of the claims in the '801 patent are obvious in light of the '441 patent and '702 patent.  The '801 patent includes both apparatus and method claims related to correcting transcription errors in telecommunication devices for the hearing impaired.  For example, claim 17 discloses:

> A method, comprising:
>
> generating a text caption as a text transcription of a voice signal;
>
> transmitting the text caption to a communication device;
>
> identifying an error in a block of text within the text caption;
>
> and transmitting a corrected block of text to the communication device as an inline correction for the text caption to replace the block of text within the text caption with the corrected block of text at a proper location as produced in the voice signal during communication between at least two parties.

The parties agree that the '441 patent and the '702 patent qualify as prior art with respect to the '801 patent, so I need not consider that issue.  The '441 patent is titled "Device independent text captioned telephone service."  It relates to telephone systems that provide real-time text captioning for an individual who is hearing-impaired.  Plts.' PFOF ¶ 800, dkt. #122; Dfts.' Resp. to Plts.' PFOF ¶ 800, dkt. #161.  In particular, audio is sent

from the hearing-user's phone to the hearing-impaired user's phone, which is connected to a computer and the internet.  The audio is then sent to a  relay center, where a call assistant transcribes the audio and sends it back to the hearing-impaired user to be displayed on that user's computer screen.  Dfts.' PFOF ¶ 637, dkt. #160; Plts.' Resp. to Dfts.' PFOF ¶ 637, dkt. #191.  With respect to error correction, the '441 patent incorporates U.S. Patent No. 6,567,503.  Under the '503 patent, the assistant may correct errors that occurred in the transcription after the call assistant transcribes the audio but before the assistant sends the message to the hearing-impaired user.  Plts.' PFOF ¶ 804, dkt. #122; Dfts.' Resp. to Plts.' PFOF ¶ 804, dkt. #161.

The only relevant difference either side identifies between the '801 patent and the '441 patent is the timing of the correction:  "the '801 patent first transmits a block of text . . . to the hearing-impaired user, and subsequently transmits a corrected block of text . . . to the hearing-impaired user and subsequently transmits a corrected block of text . . . to the hearing-impaired user allowing for *post-transmission* error correction. [The '441 patent] relates to pre-transmission error correction, allowing for text generated at a call assistant's work station to be corrected *prior* to transmission."  Dfts.' Br., dkt. #147, at 4 (emphasis in original).

Plaintiffs say that the missing element is provided by the '702 patent, which is titled "Method and System for Dynamic Message Correction."  It discloses an instant messaging system that allows users to edit a message after it has been sent and while it is still being displayed to the other user.  Plts.' PFOF ¶¶ 809, 811, dkt. #122; Dfts.' Resp. to Plts.' PFOF

4

¶¶ 809, 811, dkt. #161.  After the sender corrects the message, a new message may be sent to the recipient or the original message may be altered to reflect the corrections.  In addition, the corrected word or words may be highlighted in some way to notify the recipient of the corrections.  Plts.' PFOF ¶ 812, dkt. #122; Dfts.' Resp. to PFOF ¶ 812, dkt. #161.

Defendants do not deny plaintiffs' argument that, combined, the '441 patent and the '702 patent disclose all of the elements of each claim in the '801 patent, so I will treat that issue as conceded.  Thus, the question is whether it would have been obvious to a person of ordinary skill in the art to combine the elements of the '441 patent and the '702 patent. "[W]hen a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." KSR International Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007) (internal quotations omitted).  Although the '702 patent relates to instant messaging rather than telecommunications devices for the hearing impaired, an invention may be obvious even if it involves combining elements from different devices or fields.  Id. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").  "The proper question [is] whether a [person] of ordinary skill, facing the wide range of needs created by developments in the [relevant] field of endeavor, would have seen a benefit to" combining the elements of the prior art references.  Id. at 424.

The parties dispute how to define a person of ordinary skill in the context of this case,

but the dispute makes no difference to the outcome of plaintiffs' motion, so I will assume that defendants' definition is correct: "a person with a bachelor's degree in electrical engineering (or electrical and computer engineering) and a few years of experience with telephone communication system architecture, design and implementation, digitization of voice, speech recognition technology, voice-over-IP technology, and/or text captioning. However, someone with less technical education but more experience, or more technical education but less experience would meet this standard." Dfts.' PFOF ¶ 577, dkt. #160.

In their briefs, proposed findings of fact and expert report, plaintiffs set forth several reasons in support of their argument that the '801 patent is obvious in light of the '441 patent and the '702 patent:

- There are a small, finite number of ways that error correction (such as a corrected word or phrase) can be introduced and displayed in a text stream in terms of how the correction is positioned with respect to the other text on the screen. All of these options, including "in-line correction", would have occurred to the person of ordinary skill in the art of the '801 patent in late 2008.

- In-line correction would have been a particularly attractive design choice because of the technical limitations of captioning devices at the time. In particular, captioning phones had relatively small screen size, which hampered the ability to display corrected errors outside of the scrolling text stream. Additionally, one known design goal was to minimize "latency", which is the delay between speech and the presentation of text to the [caption telephone service] user. Given this interest, an incentive existed to push raw, uncorrected text out to the user as quickly as possible, and then to correct errors later.

- It would have been obvious for the person of skill in the art of the '801 patent to look outside the field of Telecommunication Relay Services to solutions provided in other, similar fields involving real time transmission of text. These fields would have included TV closed captioning, court reporting and instant messaging. Indeed, [the '441

patent] disclosed that it would have been possible for [caption telephone service] users to use their computers to handle [caption telephone service] calls, and watch the text transcriptions in instant messaging windows on the computer screen.

- Incorporating the editing functionality of [the '702 patent] into the [caption telephone service]  system of [the '441 patent] would be a combination of well-understood systems, with each performing the same functions for which the systems had been known, yielding predictable results. No extensive modifications would be required to [the '441 patent], which would continue to be operable for its intended purpose. (PFF #822).

- Modifying [the '441 patent] to incorporate the error correction functionality of [the '702 patent] was well within the ability of the person of skill in the art.

Defendants do not attempt to address most of these arguments in their brief.  Instead, defendants say that plaintiffs' arguments are "irrelevant" under "well-established" principles of nonobviousness.  Dfts.' Br., dkt. #147, at 51.  In particular, defendants argue that it would not be obvious to combine the '441 patent and the '702 patent for three reasons:  (1) it would "change the principle of operation of" the '503 patent (from which the '441 patent incorporates its method of error correction); (2) it would "render [the '503 patent] unsatisfactory for its intended purpose; and (3) the '503 patent "distinguishes itself" from the method of error correction in the '702 patent.  Dfts.' Br., dkt. #147, at 51-53.

These arguments are undeveloped and seem to be made half-heartedly.  All of them rely on the  difference between pre-transmission and post-transmission error correction, but I agree with plaintiffs that the authority defendants cite does not support defendants' position.

First, defendants argue that modifying the telecommunications device disclosed in the

7

'503 patent and '441 patent to incorporate the error correction method in the '702 patent would "change the principle of operation" of the '503 patent because the '503 patent's "principle of operation" is to "require[] a transcription . . . to be corrected 'prior' to the transcription ever being transmitted to a hearing-impaired user."  Dfts.' Br., dkt. #147, at 52.  Defendants do not explain in their brief what they mean by "principle of operation," much less explain their view of the "principle of operation" of the '502 patent. Instead, defendants simply cite In re Application of Ratti, 270 F.2d 810, 812-13 (CCPA 1959), in which the court held that it would not be obvious to replace a "cylindrical sheet metal reinforcing member" in a seal with "an annular set of outwardly biased spring fingers" because to do so "would require a substantial reconstruction and redesign of the elements shown in" the seal "as well as a change in the basic principles under which the [seal's] construction was designed to operate."  Nothing in Ratti suggests that the court was creating a new doctrine; the court did not cite any authority for doing so.  Instead, the court seemed to be applying the more general principle that substituting an element may not be obvious if the prior art "teaches away" from that substitution.  Id. at 813 ("The teaching of the [prior art reference using a cylindrical sheet metal reinforcing member] points away from the addition of any spring element.").  In addition, the court stated that the fields of the two prior art references  "are at least somewhat remote from each other."  Id.

The Court of Appeals for the Federal Circuit has cited Ratti only a few times and has done little to elaborate on the meaning of "principle of operation."  Most recently, in In re Mouttet, 686 F.3d 1322, 1331-32 (Fed. Cir. 2012), the court held that substitution of

electrical circuitry for optical circuitry in a "programmable arithmetic processor" did "not affect the overall principle of operation" of the processor. The court stated with little explanation that "the principle of operation of [the] computing device [using optical circuitry] is its high level ability to receive inputs into a programmable crossbar array and processing the output to obtain an arithmetic result," which was consistent with a processor using electrical circuitry. Id. at 1332. The court cited In re Umbarger, 407 F.2d 425, 430–31 (CCPA 1969), for the proposition that Ratti is "inapplicable where the modified apparatus will operate on the same principles as before."

Although the cases do not provide a precise definition of the concept of a "principle of operation," defendants do not develop an argument in their brief to show that the '503 and '441 patents would not "operate on the same principles" if the method of error correction in those patents were replaced with the method in the '702 patent. I agree with defendants that the point of the '503 patent is to "improve the speed and accuracy of the transcription" by allowing the call assistant to make corrections. '503 pat., col.1, lns. 55-56. Those principles need not be altered by changing the timing of the correction.

Defendants' evidence to the contrary is a list of passages in the '503 patent that refer to the error being corrected before transmission. '503 pat., abstract, col. 2, lns. 49-52, col. 3, lns. 60-67, col. 5, ln. 61-col. 6, ln.15, col. 7, lns. 31-40 and Fig. 9. However, these passages confirm only that pre-transmission error correction is one of the elements of the '503 patent, which is not an issue in dispute. If I were to accept defendants' attempt to make every element of a patent into a "principle of operation," this would be contrary to Mouttet

9

as well as <u>KSR International</u>, 550 U.S. at 416, in which the Court stated that an invention may be obvious even if it requires the "substitution of one element for another known in the field."

Defendants' other arguments are similar. They argue that substituting a post-transmission method of error correction for a pre-transmission method of error correction would render the '503 patent "unsatisfactory for its intended purpose." Dfts.' Br., dkt. #147, at 53. They cite <u>In re Gordon</u>, 733 F.2d 900, 902 (Fed. Cir. 1984), but the standard in that case is whether the modification would "render[] [the invention] *inoperable* for its intended purpose." Thus, I see little difference between the standards in <u>Gordon</u> and <u>Ratti</u> and I reject defendants' argument under <u>Gordron</u> for the same reasons I rejected their argument under <u>Ratti</u>.

Next, defendants cite <u>Leo Pharmacy Products, Ltd. v. Rea</u>, 726 F.3d 1346, 1353 (Fed. Cir. 2013), for the proposition that a modification is not obvious if the prior art reference "distinguishes" itself from the proposed modification. That argument does not apply to this case because defendants do not cite any passage from the '503 patent that discusses post-transmission error correction, let along "distinguishes" pre-transmission correction from post-transmission correction.

Alternatively, defendants rely on what are called "secondary" factors of nonobviousness. First, defendants say that the '801 patent met a "long felt need" for "a much faster way of providing captioned telephone service." Dfts.' Br., dkt. #147, at 66. "The existence of an enduring, unmet need is strong evidence that the invention is novel, not

obvious, and not anticipated. If people are clamoring for a solution, and the best minds do not find it for years, that is practical evidence . . . of the state of knowledge." <u>Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation</u>, 831 F. Supp. 1354, 1378 (N.D. Ill. 1993) (Easterbrook, J.).

No expert testimony is necessary to reach the conclusion that users of captioning devices would always be searching for a faster device.  However, in the context of this case, the question is not simply whether the invention in the '801 patent may have been faster than other products, but whether the invention in the '801 patent is obvious in light of the '441 patent and the '702 patent.  Thus, in determining whether the failure of others to make the invention in the '801 patent sooner is evidence of nonobviousness, the relevant time frame is not the time in which users of captioning devices wanted a faster product but the time in which others failed to combine the elements of the '441 patent and the '702 patent as defendants did.  The filing date of the '702 patent is January 2008 and the filing date of the '801 patent is November 2009.  It seems unlikely that such a short period of time could qualify as probative evidence of nonobviousness.

Further, defendants do not respond to plaintiffs' argument that defendants' expert did not offer any testimony from which it may be inferred that the '801 patent was "much faster" than the prior art.  Instead, defendants quote two statements from plaintiffs.   The first is a statement from one of defendants' employees that there was a "perception" that plaintiffs' product had "one feature" that "makes corrections . . . much faster."  <u>Id.</u> (citing Dfts.' PFOF ¶ 527, dkt. #160).  However, defendants have adduced no evidence that

11

identifies the "one feature" being discussed, what the product was faster than, the foundation for the "perception" that it was faster or even whether the "perception" had any basis in fact. Accordingly, the quoted statement is simply too vague to serve as probative evidence that the '801 patent met a long-felt need.

The second statement is an email from another executive stating that "[w]e have been working for Engineering behind the scenes for some time now to improve how we approach corrections in an effort to improve the Client experience." Dfts.' Br., dkt. #147, at 66 (citing Dfts.' PFOF ¶ 670). This unremarkable statement shows that plaintiffs wanted to improve their products, but defendants do not explain how it is connected to the '801 patent, so that statement is not helpful either.

Next, defendants say that nonobviousness is shown through the commercial success of the features in the '801 patent. "Commercial value is indeed one of the indicia of nonobviousness . . . because an invention that has commercial value is likely to come on the market very shortly after the idea constituting the invention . . . became obvious; if the invention did not appear so soon despite its value in the market, this is some evidence that it wasn't obvious after all." Ritchie v. Vast Res, Inc., 563 F.3d 1334, 1336 (Fed. Cir. 2009) (Posner, J.). However, because "[t]he commercial success of a product can have many causes unrelated to patentable inventiveness," id., "[e]vidence of commercial success . . . is only significant if there is a nexus between the claimed invention and the commercial success." Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Defendants cite two types of evidence to support their argument about commercial

success:  (1) two emails sent by plaintiffs' employees stating that customers liked one of the accused products; (2) sales data showing a substantial increase in user minutes for defendants' CaptionCall service between April 2012 and April 2013.  Neither of these is probative.  Defendants do not explain how isolated comments from customers could be evidence of commercial success and they cite no authority in support of that dubious proposition.  With respect to the sales data, defendants make no effort to show that any increase in sales is related to the features of the '801 patent.

Finally, defendants say that plaintiffs copied the '801 patent.  "The copying of an invention may constitute evidence that the invention is not an obvious one. . . . This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed."  Vandenberg v. Dairy Equipment Co., 740 F.2d 1560, 1567 (Fed. Cir. 1984).

In support of their argument that plaintiffs copied the '801 patent, defendants quote two statements from plaintiffs' employees:

- "It would be MUCH BETTER if we were to announce these methods BEFORE Sorenson does so it looks like they are the copy cat, not us. What can we do to out maneuver them so that we get the credit for these methods?" Dfts.' Br., dkt. #147, at 73 (citing Dfts.' PFOF ¶ 668).

- "They are trying to patent their replacement of errors with correct captions. We need to get the office to declare this application subject to prior art." Id. (quoting Dfts.' PFOF ¶ 675).

Neither of these statements shows that plaintiffs were copying the '801 patent. Defendants do not provide the context for these statements, but even if I assume that the

statements are about the '801 patent, at most they suggest that defendants may have been pursuing a similar patent application around the same time that defendants were prosecuting the '801 patent.

In sum, I conclude that plaintiffs have proven as a matter of law that it would be obvious to combine the telephone captioning system disclosed in the '441 patent and the '503 patent with the error correction method in the '702 patent. Accordingly, I am granting plaintiffs' motion for summary judgment.


ORDER

IT IS ORDERED that

1. In light of the notice filed by defendants Sorenson Communications Inc. and CaptionCall LLC, dkt. #270, claims 1, 2, 7 and 9 of U.S. Patent No. 8,379,801 are DISMISSED WITH PREJUDICE.

2. The motion for partial summary judgment filed by plaintiffs Ultratec, Inc. and CapTel, Inc., dkt. #87, related to the invalidity of the remainder of the claims in the '801 patent is GRANTED on the ground that the claims are obvious as a matter of law in light of U.S. Patent No. 7,881,441 and U.S. Patent No. 7,428,702.

Entered this 28th day of August, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge