IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ULTRATEC, INC. and CAPTEL, INC.,

                Plaintiffs,

    v.

SORENSON COMMUNICATIONS, INC.
and CAPTIONCALL, LLC,

                Defendants.

OPINION AND ORDER

13-cv-346-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This civil action involving claims of patent infringement and counterclaims of invalidity is scheduled for trial beginning on October 14, 2014.  This order addresses the parties' motions in limine with respect to their experts on damages.  Dkt. ##445, 466.

OPINION

A. Defendants' Motion in Limine (*Daubert* Motion) to Exclude Testimony of Bruce McFarlane, dkt. #445

      Under 35 U.S.C. § 284, "the court shall award the claimant damages adequate to compensate for the infringement."  The patentee bears the burden of proving reasonable damages and the "patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'"  Uniloc USA, Inc., 632 F.3d at 1315 (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993)) (alteration in original).  "There must be

1

a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." Id. at 1317. Defendants Sorenson Communications, Inc. and CaptionCall, LLC contend that plaintiffs have not sufficiently tied their expert's testimony to the facts of the case. They seek to exclude as unreliable all of the testimony of plaintiffs' damages expert Bruce McFarlane on the ground that the reasonable royalty rate he proposes for plaintiffs' patents is based on a flawed and unreliable premise: that plaintiffs' 2011 exclusive supply agreements with Sprint and Hamilton are sufficiently similar to a true patent license to be evidence of a hypothetical license between plaintiffs and defendants in this case.

Defendants argue that because the 2011 agreements include much more than patent licenses they are an impermissible basis from which to determine a reasonable royalty rate for the patents in suit. Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010) (damages award not reasonable because it was based in part on license agreements for which jury not told about factual differences between agreements and patents in case and based in part on license agreements that involved per unit royalties rather than lump sum royalties, as awarded by jury); ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 873 (Fed. Cir. 2010) ("[T]he district court erred by considering ResQNet's re-bundling licenses to significantly adjust upward the reasonable royalty without any factual findings that accounted for the technological and economic differences between those licenses and the '075 patent."); Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1329 (Fed. Cir. 2009) (royalty rate based on agreements between plaintiff and other

2

companies was not reliable without testimony that explained relevant differences between agreements and hypothetical licenses for patents at issue).  Citing Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1316-17 (Fed. Cir. 2011), defendants also argue that because the 2011 agreements represent a fundamentally flawed premise, any calculation stemming from them is also fundamentally unreliable, even if it is properly adjusted.

McFarlane used the 2011 Sprint and Hamilton agreements as comparators for the purpose of determining his proposed reasonable royalty rate of the patents at issue in this case. As defendants point out, these agreements included provisions for much more than the licenses of the patents at issue in this suit.  The agreements apportioned fees from the Federal Communications Commission using a "three box method," so that Sprint and Hamilton received a percentage of the FCC reimbursement rate, based on their contribution to each "box."  According to this method, 21-22% of the FCC rate was paid to Sprint or Hamilton (or whatever entity conducted the work) for work in customer service or marketing, 33% was set aside for plaintiffs for technology and 44-46% was devoted to platform and production, which involved work done by both plaintiffs and Hamilton.  The technology box included licenses to the patents at issue in this case, as well as other items such as software and hardware licenses and proprietary information.  The other boxes did not pertain to patent licenses.

In arriving at a proposed reasonable royalty rate for the patents in suit, McFarlane subtracted the fee portions from the 2011 agreements devoted to the marketing and production boxes.  He also excluded certain technology box components that went beyond

patent licensing, such as the phone subsidy, customized software licenses and speech recognition software licenses. McFarlane acknowledged that he did not quantify the royalty rate for individual patents but considered the non-asserted patents and non-patent technology licenses qualitatively, as a downward adjustment of the overall royalty rate.

Plaintiffs concede that the 2011 agreements are not simply patent licenses. However, they argue that the 2011 agreements explicitly include patent licenses, so the agreements are tied to the patents in suit. Further, plaintiffs point to case law in which the Court of Appeals for the Federal Circuit approved the use of agreements that went beyond patent licenses as comparators. E.g., Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1212 (Fed. Cir. 2010) ("Finjan noted multiple differences between the Finjan–Microsoft licensing scenario and a hypothetical negotiation with Defendants. Parr explained that Finjan did not compete with Microsoft but does compete against Secure; that Finjan received significant intangible value from Microsoft's endorsements of Finjan; and that the license involved a lump sum instead of a running royalty. These differences permitted the jury to properly discount the Microsoft license.") (citing ResQNet.com, Inc., 594 F.3d at 870–73 and Wordtech Systems, Inc., 609 F.3d at 1319–20).

Plaintiffs contend that the 2011 agreements are relevant under four of the Georgia-Pacific factors that courts consider when determining the reasonableness of royalty rate calculations. Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) modified sub nom. Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295 (2d Cir. 1971). First, the 2011 agreements are relevant to factor

4

1 ("The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty"), with adjustment for the "extra" aspects of the agreements because the 2011 agreements included these patent licenses. Next, they are relevant to factor 4 (("The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly") because the 2011 agreements show the terms that plaintiffs would agree to with respect to their patents. Factor 5 relates to agreements between plaintiffs and their competitors, like defendants ("The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business . . . "). Finally, factor 8 applies because the 2011 agreements represent income plaintiffs expected when licensing their CapTel services ("The established profitability of the product made under the patent . . . ").

No bare patent licenses for the asserted patents existed. Although the 2011 agreements differ from a basic, bare patent license, I am persuaded that McFarlane chose relevant and reliable comparator agreements under Georgia-Pacific factors 1, 4 and 5. The 2011 agreements involved the patents at issue (factor 1), represented an actual agreement into which plaintiffs were willing to enter considering their attempts to maintain a monopoly (factor 4) and involved plaintiffs' competitors, which are similar to defendants (factor 5). Moreover, the situation is not like ResQNet.com, Inc., 594 F.3d at 873. McFarlane *did* present facts "that accounted for the technological and economic differences between those [2011 agreements] and the [patents in this case]," id. Further, unlike the situation in

5

Lucent Technologies, Inc., 580 F.3d at 1329, and Wordtech Systems, Inc., 609 F.3d at 1320, McFarlane considered the differences between the plaintiffs' agreements and the more basic hypothetical patent licenses. Finjan, Inc., 626 F.3d at 1212 ("Finjan noted multiple differences between the Finjan-Microsoft licensing scenario and a hypothetical negotiation with Defendants. . . . These differences permitted the jury to properly discount the Microsoft license."). Indeed, McFarlane explained that the 2011 agreements contained licenses to the relevant patents and he made adjustments to the royalty rates that were based on the differences between the agreements and a more basic patent license. Fig. 49, McFarlane Rep., dkt. #388 (two-page chart outlining in detail comparison of a 2011 agreement with hypothetical patent license).

Defendants' arguments go to the weight the jury should afford McFarlane's testimony. Defendants have not shown that his analysis is so flawed as to render it unreliable for consideration by the jury. ActiveVideo Networks, Inc. v. Verizon Communications, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the . . .license agreements as well as any failure on the part of [plaintiff's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion."). Defendants will be free to cross examine McFarlane on the accuracy of his calculations and the adjustments he made or failed to make in finding his proposed royalty rate. Accordingly, defendants' motion will be denied.

6

B.  Plaintiffs' Motion in Limine #17 to Preclude Certain Evidence and Opinion Testimony regarding Damages, dkt. #466

Plaintiffs seek to exclude defendants' damages expert Dr. Keith Ugone because his proposed reasonable royalty rate was not calculated using a reliable method. Instead, Ugone considered only defendants' willingness to pay and not what plaintiffs believe the patents are worth.

Ugone appears to base his calculation on a hypothetical negotiation between the parties wherein the defendants are willing to spend only their "excess profit." Under Georgia-Pacific factor 15, consideration of what reasonable royalty rate would leave the infringer with some profit is acceptable, though it is not necessary that a royalty rate allow profit for the infringer. Douglas Dynamics, LLC v. Buyers Products Co., 717 F.3d 1336, 1346 (Fed. Cir. 2013) ("[A]n infringer's net profit margin is not the ceiling by which a reasonable royalty is capped."); Monsanto Co. v. Ralph, 382 F.3d 1374, 1384 (Fed. Cir. 2004) ("[A]lthough an infringer's anticipated profit from use of the patented invention 'is among the factors to be considered in determining' a reasonable royalty the law does not require that an infringer be permitted to make a profit.") (quoting Georgia-Pacific, 318 F. Supp. at 1120); State Industries, Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989) ("There is no rule that a royalty be no higher than the infringer's net profit margin.").

Ugone's method of considering defendants' profit margins is often called the analytical or income approach. However, Ugone's profit calculations differ substantially

7

from those of the experts discussed in the case law. In those cases, the experts compared the infringer's profits *without* infringement to the infringer's profits *with* infringement. TWM Manufacturing Co., Inc. v. Dura Corp., 789 F.2d 895, 899 (Fed. Cir. 1986) ("The special master . . . used the so-called "analytical approach[,]" in which she subtracted the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices."); Apple, Inc. v. Samsung Electronics Co., No.: 12-CV-00630-LHK, 2014 WL 794328 at *25 (N.D. Cal. Feb. 25, 2014) ("Using the Income Approach, Dr. Chevalier separately looks at the subset of profits for the products that incorporate the patented technology at issue due to that technology, less the return Samsung would have enjoyed had it used the next-best alternative to that technology."); Novozymes A/S v. Genencor International, Inc., 474 F. Supp. 2d 592, 606 (D. Del. 2007) ("According to [the analytical] method, the parties would compare the expected profit margin of the infringing product to the typical profit margin for the relevant business."); Inline Connection Corp. v. AOL Time Warner, Inc., 470 F. Supp. 2d 424, 432 n.38 (D. Del. 2007) ("The Income Approach estimates an asset's price based on the value of the benefits derived from the use of that asset.").

In this case, Ugone does not compare defendants' infringing profits to their noninfringing profits. Instead, he calculates a royalty rate range (per minute of captioning) in which he takes the weighted average of defendants' best case profit projections, including profits from infringement, subtracted by defendants' "base case" profit projections, also including profits from infringement. Ugone considers only a subset of infringement profits

8

because he considers only defendants' "excess profits" over and above their "base" profits from infringement, while other experts conducting this analysis have considered the total profits resulting from infringement.

This method is problematic, but that is not even where Ugone lands. Rather, his proposed royalty rate is much lower than the rates he found comparing best and base case profits. From a single footnote in defendants' brief, it appears that Ugone arrived at this number by subtracting the weighted average of a longer term projected profit by the weighted average of a shorter term projected profit. Neither Ugone nor defendants explain this reasoning or why the subtraction of averages for two different time periods yields a royalty rate that has any relation to what the parties might negotiate for patent licenses.

Finally, the parties dispute Ugone's reliance on the Dragon software licenses as comparator "value indicators." Ugone says the technology claimed in the patents in suit is "captured in the Dragon software." Ugone Rebuttal Rep., dkt. #386, at 118, ¶ 168. He lays out the pricing of the licenses in a chart but comes to no conclusion about how these prices affect his proposed royalty rate. Because Ugone does not alter his proposed royalty rate in any discernible way as a result of his reliance on the software licenses, I do not see the relevance of plaintiffs' arguments to the reliability of Ugone's proposed royalty rate.

Nevertheless, without further information and explanation from defendants as to why Ugone's profitability method is reliable, I will not permit him to testify because he will have nothing helpful to offer the jury. Defendants will be permitted to file a response to this order addressing the problems with Ugone's analysis identified in this opinion. Plaintiffs will

9

be permitted a response as well and should be prepared to explain the relevance of their objection to Ugone's reliance on the Dragon licenses. Plaintiffs' motion on Ugone's reliance on the existence of noninfringing alternatives will be addressed only if defendants' response explaining Ugone's benchmark calculations is sufficient.

ORDER

IT IS ORDERED that

1. Defendants Sorenson Communications, Inc.'s and CaptionCall, LLC's motion in limine, dkt. #445, is DENIED.

2. With respect to plaintiffs' motion in limine relating to Ugone's testimony, dkt. #466, defendants may have until 12:00 p.m. on Saturday, October 11, 2014 to file a response as outlined in this opinion. If defendants fail to provide an adequate explanation of Ugone's reasoning, he will not be permitted to testify. Plaintiffs may have until 8:00 a.m. on Monday, October 13, 2014 to respond.

Entered this 9th day of October, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge