IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ULTRATEC, INC. and CAPTEL, INC.,

                     Plaintiffs,

    v.

SORENSON COMMUNICATIONS, INC.
and CAPTIONCALL, LLC,

                     Defendants.

OPINION AND ORDER

13-cv-346-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Before the court are three motions in limine to exclude certain evidence related to damages: (1) plaintiffs Ultratec, Inc. and CapTel, Inc.'s motions to exclude the testimony of defendants' damages expert, Keith Ugone, dkt. ##460, 466; (2) defendants Sorenson Communications, Inc. and CaptionCall, LLC's motion to exclude evidence of their overall revenues during the damages phase of trial, dkt. #395; and (3) plaintiffs' motion to preclude Kelby Brick from giving certain testimony, dkt. #458.  I am granting plaintiffs' motion to exclude Ugone's testimony, denying defendants' motion to exclude evidence of their overall revenues and granting plaintiffs' motion to bar defendants from presenting the testimony of Kelby Brick to the jury.

OPINION

A. Plaintiffs' Motion in Limine #17 to Preclude Certain Evidence and Opinion Testimony Regarding Damages, dkt. #466 and Plaintiffs' Motion in Limine #15 to Preclude Any Evidence or Opinion Testimony regarding the Existence of Alleged Non-Infringing Alternatives, dkt. #460

In an order dated October 9, 2014, dkt. #583, I advised the parties that the proposed royalty rate of defendants' damages expert, Keith Ugone, appeared unreliable because Ugone had not sufficiently explained the basis for his calculations. I gave both sides an opportunity to be heard on the issue.

1. Ugone's proposed royalty rate and calculations

Defendants' damages expert Ugone argued that defendants' profitability should be the driving force in determining a reasonable royalty rate. This is a valid starting point. Wordtech Systems v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1319 (Fed. Cir. 2010) ("A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer based on the factors in Georgia-Pacific. . . ."). Nevertheless, the experts' proposed royalty rate derived from the infringer's profits must have a basis in science or economics. Fed. R. Evid. 702.

Ugone provided a number of calculations throughout his expert report, but only a few were calculations that he actually used to produce his proposed royalty rate. To begin,

2

Ugone took estimates of defendants' profits (in actuality, their "earnings before tax, interest, depreciation, and amortization" (EBIDTA)) from a February 2012 presentation that projected defendants' "base case" profits for 2012 and 2013; a May 2013 presentation that projected defendants' "base case" profits from 2014 through 2022; a November 2012 model that estimated defendants' "base case" profits for 2012 through 2017 and a March 2012 presentation that estimated defendants' "stretch case" profits for 2011 through 2017. The "base case" profits are for "normal" expected profits; the "stretch case" profits are for defendants' target, or hoped for, profit margins. Defendants produced all of these models or presentations. (It is unclear why Ugone did not rely on actual profits for previous years, but the parties do not discuss this issue.) Next, Ugone calculated the per minute profits (or profit rates) by dividing each of these estimates by the minutes of captioning actually completed or forecasted to be captioned each year. He then averaged each projection to provide a per year mean and weighted the means. The weighted means account for the difference in the number of entries (years) in each data set, so that the per year profit means are adjusted to account for the fact that the data sets include more or fewer years than the others to which they are being compared.

From these different models, Ugone calculated a weighted stretch case per minute profit rate for 2011 through 2013 of $0.379 and a weighted stretch case per minute profit rate for 2012 through 2017 of $0.411. He also calculated an alternative weighted base case profit rate for 2012 through 2017 of $0.337 and a weighted base case profit rate for 2012 through 2022 of $0.394. He then subtracted the shorter term stretch case profits ($0.379)

from the longer term stretch case profits ($0.411) for $0.0325, and the shorter term base case profits ($0.337) from the longer term base case profits ($0.394) for $0.0575 and then proposed this range ($0.0325 to $0.0575) as a reasonable royalty rate for the patent licenses at issue in this case.

2. Ugone's method of subtracting long and short-term profits

Plaintiffs challenge the final step (the subtraction of the shorter term from longer term profits) as an unreliable method for calculating a royalty rate. I agree. It makes little sense that the proposed royalty rate under the more conservative budget would be a higher amount ($0.0575) than the proposed royalty rate under the more profitable "target" budget ($0.0325). It is true, as defendants argue, that a companies' long-term profit averages tend to be larger because the profit margin increases over time, in part because upfront costs tend to decline. Defendants say that Ugone was making up for that difference by subtracting the shorter term profits from the longer term profits.

However, Ugone's analysis had already accounted for this discrepancy in part because the rates he calculated were weighted averages, meaning that they had been adjusted to make up for the fact that some data sets included more years than others. Thus, it is not clear why subtracting short-term profits from long-term profits would adjust for the differences between those profit ranges. Further, it is not clear why Ugone compared two different time periods without adjusting for this difference (2012-2017 profits minus 2012-2013 profits and the 2012-2022 profits minus the 2012-2017 profits), or why Ugone subtracted

4

overlapping profit years (2012 and 2012-17) for which the projected profits should have been comparable.

Instead of subtracting total short-term profits from total long-term profits, Ugone could have proposed the median or average rate between the short and long-term profits, such as $0.395 (stretch case profits) or $0.366 (base case profit). For example, if Company X expects an average profit of $10 million/year for the next ten years and $8 million/year for the next five years; the mean profit would be $9 million, not $2 million, as Ugone would have calculated in his method. It is reasonable that Company X's *royalty rate* based on those profits would be less than its profits. The expert analyzing Company X might propose a royalty rate of 25% of the profit, based on industry standards or other factors, resulting in a royalty rate of $2.25 million. In this case, Ugone might have proposed an appropriate portion of the $0.366 or $0.395 rate as a royalty rate, but he did not. Instead, he simply took an entire profit rate gleaned from one data set and subtracted it from the entire profit rate gleaned from a different data set.

Defendants argue that Ugone's proposed rates ($0.0325 to $0.0575) are reasonable when compared to other indicators, such as software license agreements and noninfringing alternative costs. That may be true, but it cannot be verified from the present record. Ugone would have been free to explain why proper comparator rates might lead to an appropriate value, but that is not what he did. He first made his calculation and then pointed to "value indicators," without adjusting his proposed royalty rate in any discernible way or explaining the lack of adjustment in a quantifiable way. For example, Ugone points

5

to the cost of implementing a speaker independent voice recognition system as between approximately $1.2 million and $1.7 million, but he does not explain how this cost might affect the proposed per minute proposed royalty rate. Ugone Rep., dkt. #386, at 124 n.496.

Finally, defendants argue that Ugone's proposed rate range ($0.0325 to $0.0575) is "in between" the range of "excess profits" rates also discussed by Ugone, showing that the proposed royalty rate range is credible. They cite Ugone's calculation of these "excess profits" by subtracting the "base case" profits from the "stretch case" profits discussed above, over the various time ranges. For example, he subtracted from the stretch case profit rate of $0.411 the base case profit rate of $0.337 for an "excess profit" rate of $0.0705, that is, profit over and above the base case profit margin.

Ugone's excess profit analysis has its own problems. As discussed in the October 9 order, it is not clear whether Ugone should have considered only profits over and above a "base case" profit rather than proposing a portion of the entire infringement profit margin. The latter approach has been permitted in some cases. E.g., Ergotron, Inc. v. Rubbermaid Commercial Products, LLC, CIV. 10-2010 ADM/JJG, 2012 WL 3733578, at *4 (D. Minn. Aug. 28, 2012). The point may be moot because, after making these excess profit calculations, Ugone set the excess profit numbers aside and did not use them to derive his final proposed royalty rate. That rate comes entirely from subtracting the long and short-term profit rates, as discussed above. The mere happenstance that the rate falls within the range does not show the reliability of Ugone's method. At issue is the soundness of the underlying method that led to Ugone's calculation of the proposed royalty rate. Defendants

6

have not explained why subtracting short-term profit projections from long-term profit projections is a reasonable measure of a royalty rate for the patented products. Just because Ugone made a good guess does not mean his approach is a reliable one.

I conclude that defendants have not shown why Ugone should be permitted to testify or submit an expert report on his proposed royalty rate and the methods he used to calculate it.

3. Comparator agreements and noninfringing alternatives

Plaintiffs argue that Ugone's reliance on the Dragon agreements is improper because the agreements are not sufficiently similar to a hypothetical royalty rate to be a proper basis from which to derive a proposed royalty rate. Plaintiffs acknowledge that Ugone did not use the pricing of these agreements to calculate or adjust his royalty rate, so the question is whether the agreements can be used to rebut plaintiffs' proposed royalty rate. Because these agreements concern the main technological innovation that made the captioning technology possible, it is reasonable to think that they that they would influence the royalty rates. Therefore, I will allow Ugone to testify on this subject.

In addition, Ugone will be permitted to testify on the effect of noninfringing alternatives because the existence of such alternatives may affect the negotiated royalty rate. However, defendants have not shown that Ugone has the qualifications to determine *what* noninfringing alternatives might have existed at the time of the hypothetical negotiation; only experts qualified on such questions may testify about the hypothetical existence of such

7

alternatives. Fed. R. Evid. 701-702.

Benedict Ochiogrosso is defendants' only witness who has the qualifications to testify about the existence of noninfringing alternatives and the only one to have provided an opinion about the existence of such alternatives. Defendants' lay employee witnesses cannot testify as to hypothetical products not part of their employers' product line because that testimony would be equivalent to expert opinion testimony. Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; . . . and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."). Paul Ludwick's testimony was limited to saying only that a claim should be construed in a particular way. His construction left open the possibility of noninfringing alternatives but he did not provide an opinion about such noninfringing alternatives. Because Ugone is not qualified to reach conclusions from such limited opinion testimony, he cannot rely on Ludwick's testimony.

However, Ugone may rely on noninfringing alternatives identified by Ochiogrosso to discuss the economic impact of the existence of those alternatives on the royalty rate. On this point, I agree with the holding in Formax, Inc. v. Alkar-Rapidpak-MP Equipment, Inc., 11-C-298, 2014 WL 3057116 (E.D. Wis. July 7, 2014): "Presumably there are very few people who would be qualified to give compound opinions that involve both engineering technology and finance; one does not need to be an expert in everything. It is perfectly reasonable for a finance and damages expert to adopt the conclusions of other experts. Whether those conclusions are sound can be explored at trial through cross-examination and

8

other expert testimony." Ochiogrosso's reservations about the technological feasibility or commercial availability of noninfringing alternatives do not render Ugone's analysis unreliable; rather, those reservations are a basis for cross examination on the accuracy of Ugone's arguments on the economic impact of the alternatives. Id. Technical feasibility and commercial availability are disputed material facts, but that does not mean that the experts are foreclosed from arguing about them. Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1394 (Fed. Cir. 2003) (expert opinion "not legally erroneous; it was merely based on [plaintiff's] version of the disputed facts"). See also Carnegie Mellon University v. Marvell Technology Group, Ltd., CIV. 09-290, 2012 WL 3686736 (W.D. Pa. Aug. 24, 2012) (dispute of fact on availability of noninfringing alternative is not appropriate subject of Daubert motion). Ugone may attempt to rebut the testimony of plaintiffs' expert with discussion of noninfringing alternatives, limited to those that Ochiogrosso covered.

Although Ugone may not testify about his proposed royalty rate or on any alternative rate that he bases on the Dragon agreements or noninfringing alternatives, he may testify about any positive or negative effect that the Dragon agreements and the noninfringing alternatives might have on plaintiffs' proposed royalty rate, with the limitations discussed above.

B. Defendants' Motion in Limine No. 2 to Exclude Reference to Defendants' Overall Revenues, dkt. #395

In an order dated September 29, 2014, I concluded that plaintiffs would not be

9

permitted to produce evidence on defendants' overall revenues during the liability phase of the trial. Dkt. #546. I reserved the question whether such evidence could be admitted during the damages phase. Because defendants admit that their entire revenues arose from accused products, their overall revenues are relevant to a damages calculation. Dfts.' Br., dkt. #588, at 6 (". . . CaptionCall offered only one product and service—the accused product and service.").

Defendants' wealth and market share are all a direct result of their revenues and alleged infringement, so each of these measures could be used to calculate plaintiffs' damages. Cf. Deere & Co. v. International Harvester Co., 710 F.2d 1551, 1559 (Fed. Cir. 1983) ("The district court did nothing more or less than take into account the impact of anticipated collateral sales of an admittedly noninfringing product line on the respective bargaining positions of the parties engaged in the theorized licensing negotiations. We consider this an eminently reasonable approach to the willing seller-willing buyer analysis . . . particularly in this case, where the worth of the contested patent cannot be realistically divorced from the value both [parties] placed on their respective shares in the combine market.") (Citations omitted). Defendants' overall revenues, market share and wealth are factors that might influence the negotiating positions in a hypothetical negotiation over the reasonable royalty rate. Georgia-Pacific Corp., 318 F. Supp. at 1120 ("The commercial relationship between the licensor and licensee" is a relevant consideration for determining a reasonable royalty rate.). Accordingly, defendants' motion will be denied.

C. <u>Plaintiffs' Motion in Limine No. 14 to Preclude Certain Testimony from Kelby Brick, dkt. #458</u>

In an order dated October 8, 2014, I reserved ruling on the question whether defendants may use Kelby Brick as a fact witness to present evidence concerning their affirmative defenses before the jury until defendants were given an opportunity to explain why the jury should hear evidence of the affirmative defenses during the damages phase of trial. Dkt. #579 at 2-3. Defendants filed a short response to that order, dkt. #587, in which they failed to identify any specific issues they believe the jury must resolve during the damages phase of trial with respect to affirmative defenses. Without conceding the issue, they ask the court to conduct a post-verdict bench trial together with an injunction hearing in which the court can hear evidence relating to affirmative defenses. In their reply, dkt. #605, plaintiffs note correctly that defendants have not identified any reason for the jury to issue an advisory verdict on the affirmative defenses, all of which relate to the equitable relief sought by plaintiffs. Accordingly, plaintiffs' motion will be granted to the extent that Brick will not be allowed to testify before the jury. The court will consider defendants' affirmative defenses in conjunction with plaintiffs' request for an injunction if and when that becomes necessary. I am inclined to grant plaintiffs' request that the court adopt the summary judgment record and limit the evidence to non-cumulative evidence at a hearing before the court, but I will discuss this issue with the parties if and when such a hearing is required.

ORDER

IT IS ORDERED that

1. The motion of plaintiffs Ultratec, Inc. and CapTel, Inc. to exclude the report and testimony of damages expert Keith Ugone, dkt. #466, is GRANTED in part. Ugone will not be permitted to testify about a proposed royalty rate and defendants Sorenson Communications, Inc. and CaptionCall, LLC will not be permitted to submit evidence on that subject. The motion is DENIED in all other respects.

2. Plaintiffs' motion to exclude the evidence of noninfringing alternatives, dkt. #460, is GRANTED in part. Ugone may testify only with respect to those noninfringing alternatives that defendants' expert Benedict Ochiogrosso discussed with Ugone and stated were in existence at the time of the hypothetical negotiation. The motion is DENIED in all other respects.

3. Defendants' motion to exclude evidence of their overall revenues, wealth and market share in the damages phase of the trial, dkt. #395, is DENIED.

4. Plaintiffs' motion in limine no. 14, dkt. #458, is GRANTED to the extent that defendants will not be allowed to present the testimony of Kelby Brick to the jury. The court will consider defendants' affirmative defenses in conjunction with plaintiffs' request

for an injunction if and when that becomes necessary.

    Entered this 21st day of October, 2014.

                                      BY THE COURT:
                                      /s/
                                      BARBARA B. CRABB
                                      District Judge